## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| MISLAV BASIC, NATHAN GRUBER, OREN GRUBER, KEVIN BOUDREAU, DANIEL SCHWAIBOLD, ALEX THOMAS, GREGORY THOMAS, and BENJAMIN AYERS, on behalf of themselves and all others similarly situated, | |
| *Plaintiffs*, | **Case No: 1:23-cv-00533** |
| v. | **JURY TRIAL DEMANDED** |
| BPROTOCOL FOUNDATION, GALIA BENARTZI, GUY BENARTZI, EYAL HERTZOG, YEHUDA LEVI, and BANCOR DAO, | |
| *Defendants*. | |

## <u>CLASS ACTION COMPLAINT</u>

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ................................................................ 1

II.    PARTIES ............................................................................................... 4

    A.    Plaintiffs .......................................................................................... 4

    B.    Defendants ...................................................................................... 6

III.   JURISDICTION AND VENUE ............................................................ 8

IV.   BACKGROUND CONCEPTS ............................................................ 10

    A.    Crypto assets and automated market makers ...................................... 10

    B.    Characteristics of AMM liquidity pools ............................................ 12

V.    THE FOUNDATION RAISES $153 MILLION IN AN ICO OF BANCOR'S NATIVE TOKEN AND LAUNCHES THE PROTOCOL ................................ 14

VI.   DEFENDANTS AGGRESSIVELY SOLICIT INVESTMENT FROM U.S. LIQUIDITY PROVIDERS AND MISREPRESENT KEY FACTS ABOUT BANCOR ..................... 16

    A.    Defendants marketed two key features to investors: single-sided staking and impermanent loss protection ................................................................ 16

        1.    Single-sided liquidity deposits and pool "rebalancing" .............................. 16

        2.    Protection against impermanent loss ......................................... 18

    B.    Defendants targeted US retail investors ............................................. 19

    C.    Defendants knowingly misrepresented the risks of the LP Program ................... 25

VII.  DEFENDANTS CONTROL THE BANCOR DAO TO BENEFIT THEMSELVES AND MISLEAD LPS ABOUT THE EXTENT OF THAT CONTROL ................................ 32

VIII. BANCOR ENTERS A "DEATH SPIRAL" AND DEFENDANTS UNILATERALLY "SUSPEND" IL PROTECTION AND COVERTLY CEASE REBALANCING PAYMENTS TO LPS ................................................................................ 36

    A.    Defendants suspend impermanent loss protection ................................. 37

    B.    Defendants stop paying the rebalancing reimbursements ........................... 39

IX.   THE LP PROGRAM IS A SECURITY ................................................ 41

X.    CLASS ALLEGATIONS ..................................................................... 44

        1.    Numerosity ................................................................................ 44

        2.     Typicality ................................................................................................. 44

        3.     Adequacy.................................................................................................. 45

        4.     Prominence and Superiority ..................................................................... 45

XI.    CAUSES OF ACTION ........................................................................................ 45

        FIRST CAUSE OF ACTION ........................................................................... 46

        SECOND CAUSE OF ACTION ....................................................................... 47

        THIRD CAUSE OF ACTION ........................................................................... 49

        FOURTH CAUSE OF ACTION ....................................................................... 50

        FIFTH CAUSE OF ACTION ............................................................................ 52

        SIXTH CAUSE OF ACTION ........................................................................... 52

        SEVENTH CAUSE OF ACTION ..................................................................... 53

        EIGHTH CAUSE OF ACTION ........................................................................ 54

        PRAYER FOR RELIEF ................................................................................... 54

Plaintiffs Mislav ("Michael") Basic, Nathan Gruber, Oren Gruber, Kevin Boudreau, Daniel Schwaibold, Alex Thomas, Gregory Thomas, and Benjamin Ayers, individually and on behalf of all others similarly situated, bring this class action against Defendants Galia Benartzi, Guy Benartzi, Eyal Hertzog, and Yehuda Levi (collectively, the "Individual Defendants"), BProtocol Foundation (the "Foundation") and Bancor DAO.  Each Plaintiff's allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of relevant whitepapers, press releases, media reports, and other publicly disclosed reports and information about Defendants.

## I.      PRELIMINARY STATEMENT

1.      To make up for secret deficits in their online crypto asset exchange, Defendants promised Plaintiffs an investment that was free from certain risks.  This promise was false, as Defendants knew at the time, and Plaintiffs and others similarly situated lost millions as a result.

2.      In 2017, the Individual Defendants co-founded the Foundation to launch the Bancor Protocol ("Bancor" or the "protocol"), an automated protocol for trading crypto assets.  Bancor aggregates investors' crypto assets to create a functioning crypto asset exchange (also described as an "automated market maker," or "AMM").  In return, Bancor offers investors a portion of the fees charged to traders using the exchange.

3.      Though Bancor is purportedly run by a decentralized autonomous organization ("Bancor DAO"), Defendants retain near-total control over Bancor, both directly (control over its capital, employees, and code) and indirectly (domination and manipulation of the Bancor DAO). As a result, Defendants control virtually every element of Bancor's operations.

4.      To facilitate trades in crypto assets—and to be competitive among online crypto exchanges—Bancor must maintain sufficient liquidity in these assets.  As explained by

Defendants' Head of Growth Nate Hindman, attracting investments from crypto asset owners (known as "liquidity providers" or "LPs") is "the most important competitive issue in the AMM space."

5.      To attract such investments, Defendants offered different investment products described as "versions" of Bancor, though some of these versions operated side-by-side.  Bancor Version 1 ("v1") launched in 2017 followed by v2 in April 2020 and v2.1 in October 2020.

6.      Versions 2 and 2.1 first introduced the feature of "impermanent loss protection," insurance for losses caused by depositing crypto assets in an exchange rather than holding them yourself.  Defendants touted impermanent loss protection to LPs as a flagship feature of Bancor, and it successfully attracted LPs to the protocol.  At its height, LPs had more than $2.3 billion worth of crypto assets invested in v2.1.

7.      However, v2.1 also created serious deficits for the protocol—the quantity of the crypto assets held by Bancor was insufficient to meet its obligations to LPs.  If a sufficiently large number of LPs withdrew their investments at the same time, the protocol would crumble, much like a run on the bank.

8.      Defendants knew about these deficits and the associated risks and concealed them from LPs, hoping to grow their way out of the problem.  Defendants doubled down on increasing liquidity on the platform, authorizing inflationary "liquidity rewards" and admitting more and more crypto assets (and hence liquidity) to the exchange.  Yet every (secret) analysis Defendants commissioned during 2021 showed that the fees generated by the protocol had not covered Defendants' impermanent loss protection guarantee.

9.      Consistent with their prior efforts to fill an ever-widening hole, on May 11, 2022, Defendants launched Version 3 of the protocol ("v3").  Defendants designed v3 to amass even

greater liquidity through an enhanced investment program for LPs (the "LP Program"). Defendants guaranteed LPs immediate "100% protection" against impermanent loss. They explicitly targeted retail investors by promising "some of the most competitive returns anywhere . . . without asking users to take on any risk." Defendants also claimed that Bancor trading fees consistently paid for the impermanent loss protection provided in prior versions of the protocol, knowing those fees had consistently fallen dramatically short. Nineteen days after launch, the LP Program had attracted $300 million worth of LP investment.

10.     To invest in the LP Program, LPs access Bancor's website or its app and transfer custody and control of eligible crypto assets from their crypto "wallets," secure electronic storage used to control crypto assets, to the protocol. The protocol aggregates the crypto assets provided by LPs and issues them "pool tokens" in return—tokens that represent their investment pursuant to the terms of the LP Program. LPs lose possession and control over their crypto assets when they invest and accordingly they take on risks associated with the protocol.

11.     Inevitably, on June 19, 2022, certain of these risks materialized: a spike in withdrawals triggered significant payment obligations to LP Program investors. Instead of making those payments, Defendants unilaterally purported to "suspend" impermanent loss protection, which meant that withdrawing LPs incurred the very losses that Defendants had promised to "100% protect" against. Defendants also imposed additional severe haircuts on withdrawing LPs, initially without disclosing them at all, but instead simply failing to pay withdrawing LPs amounts they were indisputably owed under the terms of their investment in the LP Program. Plaintiffs and other U.S. investors lost tens of millions of dollars as a result. In many instances, the loss was catastrophic for the individual investor.

12.     The securities laws are intended to warn investors of risks like those that hobbled Bancor and the LP Program.  The LP Program is a binding investment contract and a security under U.S. law.  Had Defendants complied with applicable registration and disclosure requirements, Plaintiffs and other class members would not have invested in the LP Program, and they would have avoided losses approaching 50% of their LP Program investment.  Accordingly, Defendants owe damages, restitution, and other relief to Plaintiffs and those similarly situated.

## II.     PARTIES

### A.     Plaintiffs

13.     Plaintiff Mislav ("Michael") Basic is an individual and a resident of Austin, Texas. Mr. Basic first became a Bancor LP on June 28, 2021.  He made multiple additional deposits throughout 2021 and 2022, for a combined total investment in v2.1 of the protocol of approximately 400,000 LINK tokens, a crypto asset.  In early May 2022, Mr. Basic temporarily withdrew 100% of his investment, in anticipation of the launch of v3 and its LP Program.  On May 16, 2022, Mr. Basic deposited 550,000 LINK in the LP Program, an investment valued at the time at $3,921,500.  He withdrew his entire LP stake on June 23, 2022, losing 255,655 LINK ($1,787,028).

14.     Plaintiff Nathan Gruber is an individual and a resident of Milton, Georgia, and the brother of Plaintiff Oren Gruber.  Mr. Gruber became a Bancor LP on January 12, 2021, when he provided approximately 20,000 LINK to v2.1.  On May 14, 2022, Mr. Gruber transferred 75,875.26 LINK—about 60% of the total liquidity he provided to Bancor at that time—to the LP Program, then valued at $533,403.  On May 17, 2022, Mr. Gruber transferred 50,995.411 LINK ($394,195) to the LP Program.  On May 31, 2022, Mr. Gruber temporarily withdrew his May 14 investment, and noticed an apparent (and unexpected) loss.  However, relying on representations to him by Bancor personnel in Austin, TX, between June 9-11, 2022, Mr. Gruber maintained his

remaining 50,995.411 LINK investment in the LP Program.  On or about July 10, 2022, Mr. Gruber withdrew that investment, incurring a loss of approximately 22,600.399 LINK ($141,026).

15.    Plaintiff Oren Gruber is an individual and a resident of Roswell, Georgia, and the brother of Plaintiff Nathan Gruber.   On May 24, 2022, Mr. Gruber transferred 15,851 LINK ($112,701) from Bancor v.2.1 to the Bancor v3 LP Program.   On June 16, 2022, Mr. Gruber deposited 13,847 LPL tokens ($37,663), another crypto asset, in the LP Program.  On June 19, 2022, he deposited an additional 7,360 LINK ($47,545).  On June 30, 2022, Mr. Gruber withdrew his LINK deposit from the LP Program, incurring a loss of 10,328.45 LINK ($63,313).  On July 11, 2022, Mr. Gruber withdrew his LPL deposit, incurring a loss of 4,389.31 LPL ($12,290).

16.    Plaintiff Kevin Boudreau is an individual and a resident of Ponte Vedra Beach, Florida.  On May 12, 2022, Mr. Boudreau transferred approximately 30,000 LINK ($192,900) from Bancor v2.1 to the Bancor v3 LP Program.   He invested approximately 20,000 LINK ($147,200) on May 13, 2022.  Mr. Boudreau withdrew his investment in part on November 29, 2022, incurring a loss of 7,900 LINK ($57,986).   He withdrew the balance on May 9, 2023, incurring a loss of 8,000 LINK ($53,280).

17.    Plaintiff Daniel Schwaibold is an individual and a resident of Charleston, South Carolina.  Between April 4, 2021 and November 11, 2021, Mr. Schwaibold deposited a total of 124,748 LINK in Bancor v2.1.   Between May 3, 2021 and April 16, 2022, Mr. Schwaibold deposited a total of 67,787 BNT tokens, a crypto asset native to the Bancor Protocol, to Bancor v2.1.   On May 12, 2022, Mr. Schwaibold transferred his LINK investment (then valued at $802,130) and his BNT investment (then valued at $92,190) to the LP Program.  On May 16, 2022, Mr. Schwaibold deposited an additional 5,334 BNT ($7,574).  On July 11, 2022, Mr. Schwaibold withdrew 81,516 BNT and 63,456 LINK from the LP Program.  On July 12, 2022, Mr. Schwaibold

withdrew 63,456 LINK from the LP Program.  Mr. Schwaibold lost a total of 56,711 LINK ($343,102).

18.     Plaintiff Alex Thomas is an individual and a resident of Omaha, Nebraska, and the son of Plaintiff Gregory Thomas.  Mr. Thomas transferred 15,325 LINK tokens ($98,540) from Bancor v2.1 to the Bancor v3 LP Program on May 12, 2022.  Mr. Thomas withdrew his investment on July 14 and July 20, 2022.  He lost a total of approximately 6,900 LINK ($42,366).

19.     Plaintiff Gregory Thomas is an individual and a resident of Omaha, Nebraska, and the father of Plaintiff Alex Thomas.  On May 13, 2022, Mr. Thomas invested 25,000 LINK ($184,000) in the Bancor v3 LP Program.  Mr. Thomas withdrew his investment less than two months later, on July 14 and July 21, 2022.  He lost a total of approximately 11,240 LINK ($69,014).

20.     Plaintiff Benjamin Ayers is an individual and a resident of Rome, Georgia.  On May 19, 2022, Mr. Ayers deposited 5 ETH, another crypto asset (then worth about $9,966) in the Bancor v3 LP Program.  On May 20, he deposited 7,106.62 LINK ($50,386).  Mr. Ayers withdrew his investment less than two months later.  On July 10, 2022, he withdrew his ETH deposit at a loss of 2.1 ETH ($2,466).  On July 11, 2022, he withdrew his LINK investment at a loss of 3,128.86 LINK ($19,149).

### B.     Defendants

21.     Defendant BProtocol Foundation is a corporation formed under Swiss law, with offices in Zug, Switzerland, and Tel Aviv, Israel.  The Foundation is owned and operated by the Individual Defendants.  The Foundation controls Bancor—including Bancor v3 and the LP Program—directly, through its control of the Bancor "treasury," Bancor employees and contractors, and Bancor marketing and promotional activities targeted to solicit investment in the

LP Program from U.S.-based retail investors like Plaintiffs.[1]   The Foundation further controls Bancor through its domination of Defendant Bancor DAO.

22.     Defendant Bancor DAO ("DAO") is a general partnership headquartered in Zug, Switzerland.   It is governed by holders of vBNT, a "governance token" native to the Bancor protocol (but tradeable and transferable like other crypto assets).   The Foundation and the Individual Defendants control the Bancor DAO through their disproportionate voting power, their control over which proposals are promoted to a Bancor DAO vote, and their purported ability to bypass Bancor DAO governance procedures by exercising certain "emergency" powers.

23.     Defendant Galia Benartzi is a co-founder and co-owner of Defendant BProtocol Foundation and also of LocalCoin Ltd. ("LocalCoin," described below), and the sister of Defendant Guy Benartzi.   A self-described "native to the California Bay Area," Ms. Benartzi became a serial start-up founder upon her 2004 graduation from Dartmouth College.   She has been called the #1 most influential women in crypto and repeatedly featured in lists of the "most influential" and "top" women in crypto and tech, including CNBC's "10 most influential women in the crypto world."   In 2018, Forbes ranked her amongst "Europe's Top 50 Women in Tech." Her net worth has been estimated at $200 million.   Together with the other Individual Defendants, she directs and controls the activities of the Foundation and controls Bancor.   On information and belief, Ms. Benartzi currently resides in Israel.

24.     Defendant Guy Benartzi is a co-founder and co-owner of Defendant BProtocol Foundation and also of LocalCoin, and the brother of Defendant Galia Benartzi.   Together with

---

[1] *E.g.,* "DeFi Dad" live interviews with Mark Richardson and Nate Hindman at Permissionless 2022 in Palm Beach, Florida were "made possible by the BProtocol Foundation."   *See* https://www.youtube.com/watch?v=2K2MxiJuK_M.   Moreover, since the Foundation has retained exclusive control over Bancor's treasury, it has presumptively funded *every* "Bancor" activity alleged herein.

the other Individual Defendants, he directs and controls the activities of the Foundation and controls Bancor.  On information and belief, he currently resides in Israel.

25.     Defendant Eyal Hertzog is a co-founder and co-owner of Defendant BProtocol Foundation and also of LocalCoin.  Together with the other Individual Defendants, he directs and controls the activities of the Foundation and controls Bancor.  On information and belief, he currently resides in Israel.

26.     Defendant Yehuda Levy is a co-founder and co-owner of Defendant BProtocol Foundation and also of LocalCoin.  Together with the other Individual Defendants, he directs and controls the activities of the Foundation and controls Bancor.  On information and belief, he currently resides in Israel.

## III.    JURISDICTION AND VENUE

27.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs assert claims under Sections 5, 12(a)(1), and 15 of the Securities Act, 15 U.S.C. §§ 77e, 77l(a)(1), 77o. This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v.  Jurisdiction of this Court is also founded upon Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), which provides that federal courts have exclusive jurisdiction over violations of the Exchange Act, including Sections 5, 15(a)(1), 20, and 29(b), 15 U.S.C. §§ 77e, 78o(a)(1), 78t, 78cc(b).

28.     This Court also has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(d), because the matter in controversy exceeds the value of $5,000,000, exclusive of interest and costs, and this is a class action in which any member of a class of plaintiffs is a citizen of a State different from any defendant, and in which any member of a class of plaintiffs is a citizen of a State and any defendant is a citizen or subject of a foreign state.  On information and belief, there are thousands of members of the proposed class.

29.    This Court has jurisdiction over the violations of state law under 28 U.S.C. § 1367(a).

30.    This Court has personal jurisdiction over Defendants.    Defendants have purposefully availed themselves of the privilege of conducting activities in the United States in connection with their offer and sales of unregistered securities and their operation of an unregistered exchange, including activities in and directed at the State of Texas.  Examples of these activities include:

a.  persuading Plaintiff Nathan Gruber to maintain his investment in the LP Program by misrepresenting key facts during in-person conversations at a crypto conference in Austin, Texas on or about June 9-11, 2022;

b.  corresponding extensively directly with Plaintiff Michael Basic, a resident of this District, about the LP Program and Defendants' misrepresentations in the offer and sale of the LP Program to Mr. Basic and other investors, while knowing, upon information and belief, that Mr. Basic resides in Austin;

c.  employing multiple U.S. persons, including a "Community Relations Manager and Content Strategist" in Arizona, whose responsibilities include organizing and attending in-person promotional events in the U.S. to solicit investment from U.S. persons like Plaintiffs;

d.  selling the LP Program to thousands of U.S. investors, while concealing their purported ineligibility to participate on the Bancor website and app, and actively and aggressively soliciting their investment;

e.  marketing v3 and offering the LP Program to retail investors at "crypto" conferences throughout the United States, including in Miami, Florida in 2021 and in Denver, Colorado; Palm Beach, Florida; and Austin, Texas in 2022; and

f.  funding and directing vast amounts of online marketing and promotional activities to solicit investment from retail investors like Plaintiffs, much of which is targeted to niche U.S. audiences.

31.     Defendants engaged in conduct that had substantial foreseeable effects throughout the United States and within the State of Texas.

32.     Venue lies in this District under 15 U.S.C. § 77v(a) because one or more Defendants is found or transacts business in this District and because the offers and sales at issue in this action took place in this District.  Defendants marketed, offered and sold the LP Program to residents of this District, including through in-person conversations between June 9-11, 2022 in Austin, Texas.

## IV.     BACKGROUND CONCEPTS

### A.     Crypto Assets and Automated Market Makers

33.     Crypto assets are digital assets that—to date—are not issued by any government or central authority.  A "token" is a unit of a specific crypto asset.  Tokens are fungible and tradeable.

34.     A decentralized exchange ("DEX") enables the exchange of crypto assets without any form of third-party oversight of users' trading activity.  In contrast to centralized exchanges (like the New York Stock Exchange or centralized crypto asset exchanges such as Coinbase), DEXs do not require traders to transfer custody of their crypto assets to a central authority or "trusted" third party in order to execute a trade.  Instead, transactions are securely and publicly recorded on a "blockchain," which functions as a kind of immutable ledger and exists on a network of computers.

35.     Different blockchains record transactions of different types of crypto assets.  All or nearly all crypto asset transactions relevant to this lawsuit are recorded on the Ethereum blockchain.  The nodes that validate transactions on the Ethereum blockchain are clustered more densely in the United States than in any other country.

36.     Crypto assets are typically designated by three- or four-letter symbols, like stocks.  For example, Ethereum—the "native" token of the Ethereum blockchain—is denominated "ETH."  Chainlink—the crypto asset native to the Chainlink network, which was launched in 2017 by a company called SmartContract—is denominated "LINK."  "BNT" refers to Bancor's native token and, as noted, "vBNT" refers to Bancor's governance token.

37.     To facilitate asset exchanges between multiple parties, exchanges—whether centralized or decentralized—must have mechanisms to maintain asset liquidity and determine asset prices.  A stock exchange, for example, implements this through an order book system, where buyers and sellers submit orders which specify the price and volume of an asset they would like to buy or sell.  The trading price is determined by matching orders.

38.     Automated Market Makers ("AMMs") are a type of DEX that purport to solve both problems by maintaining pools of particular crypto assets and holding themselves open, on a continuing basis, as willing to facilitate trades in those assets.  In an AMM, trades are executed by "smart contracts" that algorithmically provide prices.  A smart contract is characterized by an address, a balance, and code.  The smart contract acts as custodian of crypto assets, receiving and disbursing assets using algorithms specified by the code.   AMMs generate revenue by charging traders transaction fees.

39.     AMMs depend on crypto asset owners to provide liquidity.   Investors—commonly called "liquidity providers" or "LPs"—deposit their crypto asset into one or more "liquidity pools."

Custody of the deposited assets transfers to the "smart contract" or protocol operating the AMM. In return for their investment, LPs are entitled to a share of the fees paid by traders for exchanging these assets, often referred to as the "interest" or "yield" on their investment.

40.     Thus, a liquidity pool in an AMM is a smart contract that holds crypto assets invested by LPs.  The smart contract's code specifies, among other things, the rules for liquidity provision and for trading, how asset prices are determined, the trading fees that traders pay to utilize the liquidity pool, and the yield that LPs receive on their investment.

41.     Most AMMs are organized as "Decentralized Autonomous Organizations," or "DAOs."  There is no formal corporate structure, liability protection, or organizational hierarchy in a DAO.  Instead, governance rights are distributed in the form of a specific type of token. Holders of that token can propose actions for the associated DAO and vote on proposals.  Proposals are implemented if the requisite number of tokenholders vote in their favor.  All major corporate decisions are made this way, including hiring and firing, and disbursements from the DAO's "treasury" or reserve funds.

**B.     Characteristics of AMM Liquidity Pools**

42.     As explained by Bancor Head of Growth Nathaniel ("Nate") Hindman, "in order to succeed, an AMM has to be attractive to liquidity providers."  Indeed, attracting investment from crypto asset owners like Plaintiffs is "the most important competitive issue in the AMM space."

43.     But most AMMs are characterized by two features that are undesirable to LPs.

44.     *First*, most AMMs maintain their liquidity pools in asset pairs, which facilitate exchanges between those specific crypto assets.  To invest, LPs must deposit both assets exchanged in the relevant liquidity pool, in a specific ratio.

45.     For example, to contribute to a liquidity pool that facilitates trades between TKN A and TKN B, the LP would be required to deposit both TKN A and TKN B tokens, in a ratio

specified by the AMM's smart contract (and generally tied to the exchange rate between the two assets at the time of deposit).  Hypothetically, if the value of one TKN A token was $1 and the value of one TKN B token was $2, an LP wishing to invest 100 TKN A may simultaneously be required to invest 50 TKN B.

46.     *Second*, trading activity can cause the exchange rate *within* an AMM liquidity pool—the price of each asset in terms of the other asset—to diverge from market prices, creating an opportunity for arbitrage.  Continuing the hypothetical above, if the external market value of one TKN A token rose to $2 while the value of TKN B held constant, traders would purchase TKN A at the more favorable "in-pool" price of 0.5 TKN B (and sell TKN B at the above-market price of 2 TKN A).  That activity would continue until the liquidity pool prices matched those of the external market.

47.     As a result, LPs incur so-called "impermanent loss" ("IL").  As Defendants have explained in their promotional materials and developer documents, IL is the difference between "the value of your tokens in a liquidity pool (including fees collected) versus the value of simply holding the tokens in your wallet."  No loss is realized by the LP if the relative price of the assets in the liquidity pool returns to its original level (when the LP invested) by the time they withdraw their investment.  But, as Hindman explained in a May 2020 post promoting Bancor v2.1: "More often than not, impermanent loss becomes permanent, eating into your trade income or leaving you with negative returns."

V.    THE FOUNDATION RAISES $153 MILLION IN AN ICO OF BANCOR'S
      NATIVE TOKEN AND LAUNCHES THE PROTOCOL

48.    In May 2017, Defendants Hertzog, Guy Benartzi & Galia Benartzi released a draft whitepaper entitled "Bancor Protocol,"[2] in which they formally presented Bancor and announced an imminent initial coin offering ("ICO") of BNT to fund its development.  Defendants proposed to revolutionize crypto asset exchange systems by creating AMM liquidity pools pairing a crypto asset deposited by LPs with network-generated "smart tokens"—*i.e.*, BNT—which would "implement the Bancor protocol, providing continuous liquidity while automatically facilitating price discovery" for every crypto asset with which it was paired.

49.    Describing the Foundation as a "Swiss nonprofit" whose "core objective" was "the establishment of the Bancor protocol as a global standard for intrinsically tradeable currencies," the draft whitepaper explained that users could "generate BNT" (that is, acquire BNT tokens) by "contributing" to a "fundraiser" (*i.e.*, the ICO) scheduled for June 12, 2017.   The ICO raised over $153 million in a matter of hours.   According to the March 2018 version of Defendants' whitepaper, "half" of the initial supply of BNT were distributed to ICO participants, while "the other half [was] held by the Bprotocol Foundation" and allocated to the Foundation's "long term budget," "existing and future team and advisors," "partnerships" and "community grants."

50.    Defendants have offered several versions of Bancor since its launch, with some versions operating side-by-side.   Bancor Version 1 ("v1") launched in 2017 followed by v2 in April 2020 and v2.1 in October 2020.   At its height, investors had more than $2.3 billion worth of crypto assets invested in v2.1.

---

[2] The draft was subtitled: "Continuous Liquidity and Asynchronous Price Discovery for Tokens through their Smart Contracts; aka 'Smart Tokens.'"  The final version is dated March 18, 2018, and entitled "Bancor Protocol: Continuous Liquidity for Cryptographic Tokens through their Smart Contracts."

51.     Version 2 first introduced the features of "single-sided staking" and "Impermanent Loss Protection," described below.

52.     Version 2 also introduced "liquidity mining rewards," through which Bancor distributed additional BNT to LPs "to win more conversions in the market, which generates more fees for liquidity providers and results in increasing APY [yield] and protocol revenue."  As described below, through its control of the Bancor DAO, the Foundation aggressively pushed to extend liquidity mining rewards, reaping windfalls for itself but leaving Bancor insolvent.

53.     Defendants proposed v3 to the Bancor DAO by posting "BIP15: Proposing Bancor 3"[3] on the Bancor Governance Forum in or about March 2022, and then promoting it to a vote in or about April 2022.

54.     Defendants launched v3 on May 11, 2022.  Version 3 introduced many enhanced features and new products, including the LP Program at issue here.  These enhanced features included "Single-Sided Staking across 150+ tokens," "Instant Impermanent Loss Protection," "unlimited liquidity provision," "Auto-Compounding" and "Dual" Rewards, and "Composable Single-Sided Pool Tokens."  Bancor described v3's LP Program as "[t]he Ultimate DeFi Liquidity Solution empowering DAOs and their token holders to drive community-sourced liquidity and access safer, more sustainable DeFi yields that are 100% protected from Impermanent Loss."  The. LP Program also introduced withdrawal and other fees to be paid by LPs.  Defendants encouraged investors in v2.1 to transfer their assets to the LP Program.  By May 30, 2022, the LP Program had attracted $300 million worth of LPs' investments.

---

[3] "BIP" stands for "Bancor Improvement Proposal."

VI.   **DEFENDANTS AGGRESSIVELY SOLICIT INVESTMENT FROM U.S.
LIQUIDITY PROVIDERS AND MISREPRESENT KEY FACTS ABOUT
BANCOR**

A.   **Defendants marketed two key features to investors: single-sided staking and
impermanent loss protection**

55.   Defendants solicited investment by emphasizing two distinctive features about the

LP Program: single-sided liquidity deposits and protection from impermanent loss.

1.   **Single-sided liquidity deposits and pool "rebalancing"**

56.   Beginning with v2, Bancor removed the standard AMM requirement that LPs

deposit crypto assets in pairs (and in a specific ratio) by minting its own network token, BNT, in

proportion to each LP's investment.  As Bancor explained in a tweet, "[t]he protocol co-invests

$BNT alongside LPs."

57.   In the LP Program, the LP provides only one side of the asset pair.  This is Bancor's

single-sided liquidity deposit feature.  For example, if an LP deposited 100 LINK, the protocol

would mint an equivalent amount of BNT.  These tokens end up in the LINK:BNT liquidity pool.

So too with any other crypto asset deposit—ETH tokens are deposited into an ETH:BNT liquidity

pool, LPL into an LPL:BNT pool, and so on.  BNT acts as the connective tissue of the Bancor

protocol, mediating the exchanges between all other crypto assets traded on Bancor.

58.   When an LP invests a crypto asset in Bancor—for example, by depositing 100

LINK into the LINK:BNT liquidity pool—they receive an equivalent amount of "pool tokens"

(here, 100) representing their investment in the pool and Bancor's promise to return their

investment upon withdrawal.

59.   When LPs withdraw their liquidity, they exchange their pool tokens for the tokens

they originally provided, plus fees earned and other "rewards."   However, instead of receiving

100% of their original crypto asset investment, withdrawing LPs may receive a "partial

reimbursement in BNT," due to fluctuations in the market price of the asset invested and resulting arbitrage opportunities against the corresponding liquidity pool.  Likewise, fees are accrued in BNT and often paid to the LP in BNT.  Upon withdrawal, the protocol "burns" (or destroys) the pool tokens exchanged by the LP.

60.    For example, suppose an LP provides 500 TKN to the protocol as an investment, and suppose the value of each TKN is $1.  Suppose also that the value of BNT is $1.  Upon the LP's investment, the protocol mints 500 BNT, such that the pool liquidity ratio reflects the exchange price of TKN:BNT.  This TKN:BNT pair is a liquidity pool supporting trades between TKN and BNT, with an implied exchange price of 1:1.  If the market value of TKN rises to $1.2, traders will purchase TKN from the TKN:BNT liquidity pool, decreasing the amount of TKN and increasing the amount of BNT in the pool.  This process will continue until the implied exchange price is 1.2 TKN to 1 BNT, and the liquidity pool is "rebalanced" to reflect this ratio.   It is possible to calculate this rebalancing,[4] which results in 456 TKN and 547 BNT.

61.    If the LP withdraws now, they are entitled to their 456 TKN as well as 47 BNT— the amount compensating the LP for the loss of 44 TKN (and equal to the current amount of BNT minus the original 500 BNT supplied by the protocol).  The 47 BNT "reimburse" the LP for the TKN deposited but not returned.  The mechanics of the protocol require all 547 BNT in the liquidity pool to be burnt and the relevant reimbursement (here, 47 BNT) to be newly minted.

62.    Defendants offered a second example.  Suppose an LP deposits 3 TKN, valued at $1.33, and suppose (as before) the value of BNT is $1.  The protocol will mint 4 BNT to pair with the 3 TKN (the liquidity ratios reflect the exchange rate).  When the value of TKN rises to $3,

---

[4] This calculation is based on the formula used to calculate the exchange price as well as the formula for the price of one token in terms of another.

arbitrageurs will trade until the pool "rebalances" at 2 TKN and 6 BNT.  If the LP withdraws their investment at this point, the protocol will provide them 2 TKN and 3 BNT—2 tokens in the numeraire of their original investment, plus 3 BNT equivalent to 1 TKN.

63.     Thus, single-sided liquidity deposits as implemented by Defendants require a significant portion of LPs' investments to be paid out in BNT when there is a deficit in the original token—when, that is, the quantity of the original token is insufficient to reimburse the totality of all LPs' stakes in that token.

64.     And this was the case with the LP Program: the protocol was always in deficit, as Defendants knew.  As a result, LPs' withdrawals almost always included a significant amount of BNT as reimbursement for the "rebalancing losses" described above.

### 2.     Protection Against Impermanent Loss

65.     The flagship feature of the LP Program that Defendants used to induce investment was so-called "IL protection," or—so they said—total protection from the risk of loss associated with providing tokens to the Bancor protocol rather than holding them.

66.     As explained, IL is calculated as a function of the old and the new exchange rates. In the context of the first example (an LP initially providing 500 TKN), if the LP had simply held these amounts outside of the protocol, the value of their holdings would be $600 (500 TKN * $1.2). Following the rebalancing described above, the value of the LP's investment is $594.20 (456 TKN * $1.2 + 47 BNT * $1).  Impermanent loss amounts to the difference between these totals, $5.80.

67.     As Defendants recognized, impermanent loss *always* means that investment in an AMM leads to loss against a hold strategy.  When one token gains in value, AMMs (including Bancor) sell the rising asset into the rally, meaning they cannot profit from subsequent price increases.

68.     Defendants promised to protect LPs in the LP Program from IL.  Leading up to, and on the day of, the release of the LP Program, Bancor told LPs they were "100% protected from Impermanent Loss" in the LP Program.  This was a lie.

**B.     Defendants targeted US retail investors**

69.     Although the Bancor Terms of Use purported to restrict the LP Program to non-U.S. residents, Defendants hid that fact from U.S. investors and actively solicited their investments.  Bancor's Terms of Use were concealed on its website; an LP would have to navigate through a drop-down menu to find them (and then review them in detail to find the purported exclusion).  In contrast to most crypto companies that do not accept investment from U.S. investors, Bancor does not require LPs to view, read, or agree to the Terms of Use at any point prior to investing, on its website or in the Bancor app.  Bancor does not use any type of geo-blocking software to limit access or provide any form of prompt, warning, or pop-up message alerting LPs to the purported restriction.  It neither asks investors to certify that they are not U.S. residents or domiciliaries, nor does it request any identifying information that would normally be used to indicate a U.S. investor.

70.     Instead, Defendants engaged in promotional activities that intentionally targeted U.S. investors and actively solicited investment from U.S. investors, including Plaintiffs.  In so doing, they focused on retail investors, aggressively marketing the purported security of Bancor's IL risk protection—which, they said, guaranteed LPs "100% upside exposure" on their investment.  Likewise, Defendants touted the profits LPs could earn by investing their crypto assets in the LP Program, centering "Impermanent Loss Protection" as a key part of this pitch.  As a result, they insisted, investors in Bancor's LP Program would yield higher and safer returns than were available through alternative AMMs or a "hold" strategy.

71.     Defendants made these representations in-person at industry conferences throughout the U.S., including in Texas, Florida, and Colorado.  They directly solicited investments from multiple U.S. investors, including Mr. Nathan Gruber.  They recruited U.S.-based persons to serve as Bancor "community liaisons" in strategic locations like Miami and Phoenix, whose responsibilities included "hosting live events" and "creat[ing] enjoyable community engagement activities such as a launch party and giveaways."   In at least one instance, Bancor rewarded a volunteer "liaison" by offering her paid employment as a Bancor "Community Relations Manager and Content Strategist" (which she accepted).

72.     And, in addition to the deluge of content Defendants funded and made available on Twitter, Discord, YouTube, Medium.com, the Bancor website, and other channels, Defendants funded promotional activities that targeted niche U.S. audiences and engaged in extended direct conversations with U.S.-based LPs.

73.     For example, from June 9-12 2022, Plaintiff Nathan Gruber attended the annual Consensus conference in Austin, Texas, where he spoke at length with three of Defendants' representatives, including Bancor Head of Growth Nate Hindman, Head of Research Mark Richardson and Integration Analyst Joshua Schone.  Mr. Gruber notified them that—in the course of executing a temporary withdrawal of certain LINK tokens from the LP Program around May 30 (intending to switch "wallets" and then reinvest)—he had unexpectedly incurred losses that appeared to be the result of IL.  The representatives replied that Mr. Gruber's experience was a one-off error and that Mr. Gruber would be made whole.  They assured Mr. Gruber that the LP Program had abundant BNT and LINK reserves and faced a negligible risk of ever depleting them. Relying on those representations, Mr. Gruber maintained his remaining position in the LP

Program, resulting in a loss of 22,600 LINK when he withdrew that investment several weeks later.

74.     Similarly, at a May 2022 conference in Palm Beach, Richardson and Hindman sat for a 25-minute interview with "DeFi Dad," a prominent Florida-based "super-user, educator, and investor in DeFi" used by Defendants to promote Bancor.  Throughout the interview—"made possible by the Bprotocol Foundation," as a note on the YouTube page explains, and posted on May 29, 2022—DeFi Dad refers positively to his own investments with Bancor and in the LP Program, at one point saying that its rewards and protections seems "too good to be true." Richardson and Hindman never correct DeFi Dad to remind him (and viewers) that U.S. investors are discouraged from the LP Program.  Instead, a haunted-looking Richardson—perhaps mindful of the deficits continuing to build at that very moment on the protocol—says that one of the LP Program's innovations is that it "incentivizes liquidity without driving your token price into the ground."  This, too, would prove to be a lie.

75.     Not only did Defendants target U.S. investors, but they targeted U.S. retail investors by emphasizing the LP Program's simplicity and safety.  Speaking at a crypto conference in Miami in November 2021 about the LP Program, Bancor Head of Research Mark Richardson told the audience, "You shouldn't have to know about impermanent loss.  You just provide liquidity, get your interest, and that's the end of it."

76.     Likewise, at crypto conferences throughout the United States, Defendants advertised Bancor as "Simple. Safe. Staking."  Defendants' representatives handed out condoms with the catchphrase: "Always use impermanent loss protection." The packaging advertised: "Bancor is the only DEX that fully protects users from IL. No matter how your tokens move in price, you're always earning from volatility with ZERO risk of IL."



Bancor also sold t-shirts which sported the message "Set It. Forget It."

77.     Bancor's public website advertised the LP Program as taking "'stake and chill' to a whole new level," and "level[ing] the playing field for everyday users seeking safe and sustainable yield."   In blog posts, Defendants encouraged Bancor's users to proselytize to "that normie friend who's been asking for a lesson on earning double-digit yield in DeFi," going so far to offer "bounties" for content legible to everyday investors.   Defendants also claimed that impermanent loss protection "made the act of depositing tokens in an AMM pool safer, easier, and more lucrative for everyday token holders," saying that "Bancor is the only AMM where users can 'stake and forget' their tokens with full exposure to a single asset and zero risk of impermanent loss."   The aim, according to Bancor's Head of Growth, was to create a "set it and forget" AMM solution, so "lazy liquidity [could] actually be lazy," and users did not need to understand the complexity and risk.

78.     Similarly, on July 19, 2021, Defendants described Bancor's "IL protection" program as "the simplest, safest, and smartest solution to earn passive income in any market condition."



79.     And, on December 12, 2021, Defendants told prospective LPs that they should not even have to understand the risk of impermanent loss.



80.     Defendants also promoted potential returns to LPs through Bancor's website and social media presences.  For example, on January 7, 2022, Defendants advertised the LP Program as "creating more yield for LPs."



81.     Defendants advertised on Bancor's public website that retail investors could earn returns on their investment, urging LPs to "Grow your" Ethereum, Bitcoin, and other tokens.  An "Earn" tab on that same website facilitated retail investors' access the LP Program while promising investors they could "Deposit a single token and maintain 100% upside exposure while earning fees and rewards."  On a snapshot of the public website taken in March 2022, Defendants told investors that "[w]ith Bancor 3, we want you to earn more while doing less."

82.     Yet after the protocol crashed and Plaintiffs and other LPs suffered heavy losses, the Foundation and Individual Defendants distanced themselves from these solicitations and deflected blame to LPs.  "We understand you may have . . . miscalculated the risks involved in DeFi and AMMs specifically and as such we are trying to be understanding towards the frustration you displayed," the Foundation wrote one frustrated LP.

### C.    Defendants knowingly misrepresented the risks of the LP Program

83.    The protection Defendants offered was primarily protection from impermanent loss—protection that Defendants knew they could not provide.  On Bancor's website and various social media platforms, Defendants repeatedly misrepresented material risks and features of the LP Program, including IL protection.  In a May 27, 2022 "fireside chat" posted to YouTube, for example, Head of Research Mark Richardson, claimed "[W]e're generating some of the most competitive returns anywhere in DeFi without asking users to take on any risk. I have nothing to be afraid of."  He also said that "with BNT, [a death spiral] is literally impossible."  These statements were false when made, as Defendants knew and subsequent events would prove.

84.    While Defendants were marketing IL protection, they received internal, confidential reports—commissioned by the Foundation—showing Bancor did not generate enough fees to offer this protection.  Indeed, the protocol was critically vulnerable to a "death spiral" in the value of BNT, as in fact happened in June 2022.

85.    In late July and early August 2022, a former employee ("Employee") of Defendants revealed the existence of reports that contradicted Defendants' claim that the protocol generated enough fees to cover Bancor's IL protection—and that Bancor knew of this contradiction since at least 2021.

86.    In late 2020, Defendants had hired an economic consulting firm specializing in crypto, Topaze Blue,[5] to prepare reports for them about the economic health of the protocol.  In part, Topaze Blue analyzed whether the protocol was generating enough fees to pay out the IL protection to LPs.

---

[5] Topaze Blue, based in London, describes itself as "a boutique advisory firm providing consulting and training.  [O]ur core areas of expertise are fintech, crypto and regulations."

87.     It was not.  According to the latest available 2021 Topaze Blue report—released to the Bancor community after a general outcry following the Employee's whistleblowing disclosures—the fees generated by the Bancor protocol were sufficient to cover only 31% of Bancor's obligations under Defendants IL protection guarantee.  In other words, the fees that were supposed to cover 100% of IL were only enough to cover 31% of IL.   In terms of BNT, the protocol's fees collected totaled only 6.85 million BNT, while its IL protection obligations totaled 22.21 million BNT.  Topaze Blue vividly demonstrates this shortfall in the following graph:



88.     Putting the available Topaze Blue reports together, during the entire time Defendants commissioned these reports, Bancor never had the ability to cover the LP Program's signature IL protection with fees.



89.     The Employee also revealed that these reports were shared with Defendants and other high-ranking Bancor developers and Foundation members.   Prior to the June 2022 suspension of IL protection, Defendants had not shared these reports, or their content, with Bancor's LPs.

90.     The information revealed by the Topaze Blue reports directly contradicts information Defendants provided to Plaintiffs and other LPs, including information intended to induce investors to provide liquidity under the LP Program.  It also shows that the protocol was unable to compensate LPs in the event of a mass withdrawal—an event that ultimately came to pass.

91.     For instance, on January 12, 2021, Defendants tweeted that "protocol revenue is covering the cost of IL protection."  In fact, Bancor's fees were sufficient to cover only 40% of IL protection in January 2021.



92.     On January 15, 2021, Bancor tweeted that "the cost of Bancor's impermanent loss

insurance is far exceeded by revenue earned by the protocol from swap fees."



However, on both January 14, 2021 and January 15, 2021—the same day as the tweet—Topaze

Blue showed that Bancor's swap fees covered 46% and 40%, respectively, of Bancor's IL

protection obligations.

93.     On October 25, 2021, Nate Hindman, Bancor's Head of Growth, advertised that the IL protection was covered by fees generated from protocol-owned liquidity and that "the model has sustained itself for a year now," despite knowing that, for all the months analyzed by Topaze Blue, the fees had never been sufficient to cover IL protection for all LPs.



94.     On January 8, 2022, Hindman tweeted that Bancor's "trading fees" pay for the IL protection, and that "[t]he protocol always aspires to achieve network fees > network IL and has done so effectively." Neither of these statements were true, as the Topaze Blue reports show.



95.     Defendants not only lied to the market but also to investors directly.   When Defendants announced the LP Program, investors and potential investors had questions, including about how Defendants planned to meet Bancor's IL protection obligations.   Mark Richardson, Bancor Head of Research, misrepresented how Bancor was handling its IL protection obligations to LPs, stating that impermanent loss was "offset" by fees.   Hindman also implied, falsely, that protocol fees were sufficient to "cover IL."



96.     On February 22, 2022, Nate Hindman, Head of Growth, again claimed that "IL protection has been working quite well for over a year now" and that "[p]rotocol fees [are] regularly outpacing IL compensation."   These statements were also misleading.   In fact, protocol fees had not covered LPs' impermanent loss throughout most of 2021—as reports provided to Defendants by their own consultants described.



97.     Defendants' misrepresentations were material because they went to the heart of the LP Program.   On the day Defendants launched the LP Program, May 11, 2022, Defendants advertised on Twitter that the LP Program provided safe and sustainable "yields" "100% protected from Impermanent Loss."   But LPs' investments were not "100% protected" from impermanent loss.   Instead, Defendants' ability to pay this loss protection rested on a precarious and continued acquisition of liquidity.   And like many investment schemes using today's investors to pay yesterday's, a sudden shock—the BNT death spiral, described below—brought the entire edifice crashing down.



98.     Plaintiffs and others similarly situated relied on Defendants' misrepresentations and omissions to their detriment.  Had Plaintiffs known that the flagship IL protection feature of the LP Program was a myth, they would not have invested in the LP Program or would have demanded more favorable terms from the LP Program for their investment.  Instead, and as a consequence of Defendants' misrepresentations, Plaintiffs and others similarly situated lost millions of dollars in crypto assets.

## VII.    DEFENDANTS CONTROL THE BANCOR DAO TO BENEFIT THEMSELVES AND MISLEAD LPS ABOUT THE EXTENT OF THAT CONTROL

99.     When an investor provides liquidity to Bancor, custody and control of the deposited crypto assets transfers from the investor to Bancor.  Bancor does not segregate the crypto assets received from different investors, but instead pools them together and then promises to pay LPs in the form of yield, or certain other "rewards" or earning opportunities, subject to Bancor's performance and to certain terms and conditions that are largely within Defendants' discretion.  As

a result, the nature and quality of Bancor's governance is a material factor in the investment decisions of LPs, including Plaintiffs and others similarly situated.

100. In late 2020, the Foundation and Individual Defendants purported to transfer control of Bancor from the Foundation to the Bancor DAO.

101. The Bancor DAO is comprised of the holders of special "voting-tokens," which are issued by the protocol and denominated "vBNT." In theory, vBNT-holders can propose and vote on all Bancor governance matters. An investor—or any other BNT-holder—acquires those rights by depositing their BNT tokens into specific Bancor liquidity pools. In return, Bancor issues vBNT tokens in proportion to the number of BNT tokens deposited. Those vBNT tokens dictate the relative voting power of their holder within the Bancor DAO.

102. In theory—and in any functioning DAO—that system enables the community of LPs and other Bancor users to collectively manage their pooled investments for their collective benefit, via majority or supermajority decisions reached according to stipulated voting procedures. And, in theory, that system protects LPs from the risks of mismanagement, disloyalty, and self-dealing by individual directors or managers in a corporation.

103. In reality, however, the Foundation and Individual Defendants dominated and controlled Bancor—and therefore Plaintiffs' investments. They exercised that control to gatekeep proposals considered by the DAO, manipulate DAO votes, unilaterally hire and fire all Bancor employees and contractors and set the (undisclosed) terms of their compensation, and control the Bancor treasury, all to their own benefit.

104. The Foundation and Individual Defendants dominated and controlled Bancor in two principle ways. *First*, the Foundation acquired a veto-proof majority stake in vBNT, which it used to get its way in certain DAO votes, including by causing otherwise-rejected proposals to achieve

majority or supermajority support in the Bancor DAO voting system.  For example, in June 2021, the Foundation exercised 6.2 million vBNT—representing 65.6% of the vote—to reverse the community's rejection of a proposed extension of the liquidity mining rewards program.  As a result, the Foundation earned an additional 5.38 million BNT over the course of the program.

105.    Likewise, the Foundation repeatedly exercised disproportionate voting power to increase the number of crypto assets available for exchange on Bancor, overriding the result that would have obtained if the Bancor DAO functioned without their thumb on the scale.

106.    By increasing the number of crypto assets that could be exchanged on Bancor, Defendants increased trading activity and fees and, therefore, their own revenue, at the expense of the protocol's solvency.  In extending the mining rewards program, for example, the Foundation hastened the inflation of BNT that ultimately led to the BNT death spiral.  And the Foundation and Individual Defendants increased the number of assets available for exchange while simultaneously learning that the protocol could not cover IL protection with fees earned from trades—an apparent and desperate attempt by Defendants to plug the protocol's known (to them) deficits.

107.    *Second*, in addition to manipulating and controlling the Bancor DAO from within, Defendants subvert it entirely from without.  Defendants exercise direct control over Bancor.  Unusually for a DAO, the Bancor DAO's treasury is controlled not by the DAO but by the Foundation.  The Foundation thus is able to nullify DAO decisions by not funding them.  The Foundation and Individual Defendants also control which proposals appear on the DAO, and have deleted those proposals they don't like (including proposals asking for an accounting from the Foundation).

108.    In addition, Defendants use their unilateral control over Bancor funds to hire, fire and supervise key employees, contractors and advisors, and to set the (undisclosed) terms of their

compensation.  That, in turns, enables Defendants to learn and conceal highly material information about Bancor's operations and financial performance—for example, the Topaze Blue reports—from the very investors who purportedly govern Bancor and whose investments are at stake in its success or failure.

109.    It also permits the Foundation and Individual Defendants to engage in outright self-dealing.  Bancor's "core developer" is LocalCoin which—like the Foundation—is owned and operated by the Individual Defendants.  Despite its subpar performance—including two successful and costly hacks of Bancor—LocalCoin remains Bancor's principal developer.  Defendants refuse to disclose any information about the compensation paid to LocalCoin, which appears to work exclusively for Defendants.

110.    Several public-facing statements confirm the reality that Bancor is controlled by the Foundation.  The Foundation consistently publicly identifies itself as "Bancor."  It uses a public-facing email address: "contact@bancor.network."  The Foundation asserts ownership of all intellectual property associated with Bancor and claims "all rights in" the Bancor "Token Liquidity Network"—that is, the protocol itself.  The Foundation "maintains the right to select its markets and jurisdictions to operate and may restrict or deny the use of" the protocol at its discretion.  The Foundation also puts out press releases regarding Bancor's latest investment products.

111.    Finally, the Foundation and Individual Defendants mislead LPs about the extent of their direct control over the protocol.  On March 29, 2022—and with knowledge of the protocol's inability to pay IL protection—the Foundation and the Individual Defendants proposed and supported a DAO proposal to create an emergency council containing 3 Foundation members and 4 Foundation-nominated members.  This emergency council could take actions including pausing trading on the protocol, but—per the DAO proposal—it could not "intervene with the withdrawal

of funds, save for the adjustments to the protection mechanism."  The Foundation and Individual Defendants described this proposal as one of many "closely related proposals submitted for community review and approval, which propose the high-level details of Bancor 3" and hence of the LP Program.  The DAO proposal passed on April 15, 2022.

112.    However, as discussed below, in June 2022 the emergency council not only suspended IL protection, but it also suspended rebalancing reimbursements, intervening with withdrawals to a far greater extent than promised in the DAO proposal and represented to LPs.  In addition, Defendants knew that the DAO proposal misrepresented the limits of their authority because the code undergirding this emergency ability was written by Defendants and their agents.

113.    Plaintiffs and others similarly situated relied on Defendants' misrepresentations and omissions about the Defendant-controlled council's emergency authority to their detriment. Had Plaintiffs known that Defendants ultimately had the power to tamper with LP withdrawals beyond suspending IL protection, potentially cutting in half LPs' investments, LPs would not have invested in the LP Program or would have demanded more favorable terms.

## VIII.   BANCOR ENTERS A "DEATH SPIRAL" AND DEFENDANTS UNILATERALLY "SUSPEND" IL PROTECTION AND COVERTLY CEASE REBALANCING PAYMENTS TO LPS

114.    On May 16, 2022, days after the launch of the LP Program, Rick Barber, Events Strategist at Bancor, claimed that Bancor's "very sound treasury" and "ample protocol owned liquidity" would prevent "anything catastrophic happening due to market price action."  Hindman further assured liquidity providers, "the overall value of your deposit is fully protected" because "part of your deposit can be received in an equivalent value of BNT."  On June 19, 2022, Richardson affirmed that a "death spiral is literally impossible" in a videotaped interview.  But a death spiral is exactly what happened in June 2022.

115.    On June 10, 2022, the price of the BNT token plummeted from $1.30 to $1.22 in a single day and continued to fall in the following days.  By June 17, 2022, the price of BNT was $0.55.  At the same time, the dollar value of attempted withdrawals began to increase.

116.    The LP community began expressing concern about a potential death spiral risk to the BNT token (and the value of users' LP deposits).  A death spiral would be caused by increased withdrawals, resulting in higher and higher BNT pay-outs to cover the dollar value of rebalancing reimbursements and impermanent loss.  As LPs left the protocol, they would sell BNT to repurchase their originally deposited tokens, which then would create additional sell pressure in the BNT market, driving BNT's price down further.  This, in turn, would require even higher BNT pay-outs to cover deficits, creating an ever-accelerating downward spiral on BNT price.  As the amount of BNT needed to fairly compensate an investor increased, BNT liquidity would dry up, leaving insufficient BNT for LPs to repurchase their originally deposited tokens. This is exactly what happened.

117.    On June 16, Richardson held an emergency Bancor community call on Telegram. In that call, he claimed that the majority of the withdrawals from the liquidity pools were from the now insolvent Crypto platform "Celsius;" that the Bancor team had been conferring with Celsius; that Celsius had already completed the majority of their withdrawals and sales of BNT tokens; and that the Bancor community was "through the worst of it."  Richardson and the Bancor team also assured everyone that things would stabilize soon and advised LPs not to panic.

### A.    Defendants suspend impermanent loss protection

118.    On June 19, three days after Richardson told everyone that things would be fine, the Defendants announced that "impermanent loss protection is temporarily paused due to hostile market conditions."



**Bancor** ✔
@Bancor                                          ...

Due to hostile market conditions, Bancor's
Impermanent Loss Protection is temporarily paused. IL
protection will be reactivated on the protocol as the
market stabilizes.

More info: blog.bancor.network/market-conditi…

We're hosting a community AMA in 15 minutes:

119.    In response, LP withdrawals from Bancor liquidity pools continued to increase, and

the price of BNT continued to plunge, as shown in the graph below.



120.    In a call led by Richardson, Defendants through their representatives claimed that

the suspension of IL protection was due to an "attack."   Richardson claimed that the pending

withdrawals (made up of Celsius and hundreds of individual LPs trying to get out with their funds

intact) constituted a "hostile antagonist against the Bancor protocol," and that these actors were

trying to destroy the protocol through a combination of mass withdrawal and shorting the price of the BNT token.  Bancor's blog blamed "hostile market conditions."

121.    As a result of this "attack," Richardson revealed that Defendants had used "emergency" powers to suspend IL protection.  Richardson repeatedly emphasized that the suspension was only temporary.  Defendants made similar assurances on Bancor's blog.

122.    Neither Richardson nor the blog mentioned the Topaze Blue reports, which had repeatedly shown that the protocol did not generate enough fees to cover IL protection.  Instead, Richardson stated that he "doesn't think there is anything broken with the impermanent loss protection design."

### B.    Defendants stop paying the rebalancing reimbursements

123.    In addition to suspending IL protection, Defendants stopped Bancor from reimbursing LPs for rebalancing losses.   Thus, contrary to Defendants' representations, Defendants were not only withholding BNT owed through the IL protection program, but also BNT owed to LPs from the rebalancing of their tokens—a considerably larger amount, nearly 50% of many LPs' investments.

124.    On June 19, Defendants suspended the minting of BNT upon withdrawal, period. To return to the first example, when an LP invests 500 TKN and the value of TKN increases 20%, the TKN:BNT liquidity pool "rebalances" by selling off 46 TKN in exchange for 47 BNT.  This 47 BNT belongs to the LP, but it is only "minted" by the protocol upon withdrawal.  Per Bancor's formula, the impermanent loss associated with this example amounts to just 4 BNT.

125.    When Defendants suspended IL protection, they suspended not only payment of the 4 BNT, but also payment of the 47 BNT.  They did this without explanation and without notice to LPs.

126.    Defendants admitted as much.  In private Telegram messages between Richardson and Plaintiff Michael Basic on June 20, 2022, Richardson admitted that "to adjust the IL protection, the BNT minter is essentially denied any minting ability."  "But that's more than just not paying out IL," Mr. Basic responds.  "It's not paying out the rebalancing of the pool."

127.    Richardson responds: "Yeah – I need to adjust it, but needs another smart contract." Mr. Basic observed that "people are getting hosed way more than just IL protection," and Richardson again agreed ("Yeah, I am aware.  I need to set something up.").

128.    The following day, Mr. Basic again confirmed his understanding using the 500 TKN:500 BNT example.  Richardson agreed that the protocol was not paying out the rebalancing reimbursements by saying "Yeah, you are correct. The way we stopped the meltdown is to essentially switch off the BNT minter. Therefore, it is not just turning off ILP. It is more severe than that."  Richardson "would have preferred to say that BNT distribution is being stopped – as that is actually what we did."

129.    Other LPs were also shocked to learn that nearly half the value of their investment had been destroyed by Defendants' supposed suspension of IL protection.  An LP "TJ" exclaimed in the official Discord channel: "I thought that when I withdrew my Link that I'd only lose out on 20 or so Link.  Not 2700!!!!!!  That's pure theft!!!!!"

130.    After the June 19 death spiral, Defendants attempted to claim their definition of "impermanent loss" included the rebalancing losses that LPs suffered.  As they tried to explain, "the process by which BNT is distributed to cover deficits has been referred to as Bancor's 'Impermanent Loss Protection mechanism'. But in reality, IL is a bit of a misnomer and IL may not be the best term for it since the BNT distribution mechanism covers more than that."

131.     But this, too, is inaccurate.  Both a website devoted to Bancor's promotion of impermanent loss protection and the protocol's development notes include the standard definition of impermanent loss: the value of tokens in a liquidity pool as compared to the value of simply holding the tokens.  Defendants attempt to cover their tracks can only be explained if they knew they had misrepresented the treatment of rebalancing losses.

## IX.     THE LP PROGRAM IS A SECURITY

132.     The Securities and Exchange Acts set a regime of full and fair disclosure.  Those who offer and sell securities to the investing public must provide sufficient, accurate information to allow investors to make informed decisions before they invest.

133.     The definition of a "security" under the Securities Act includes a wide range of investment vehicles, including "investment contracts."  Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others.  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946).  Courts have found that novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, and enterprises that exist only on the internet, including crypto assets.

134.     At all times during the class period, the LP Program constituted an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.  The LP Program is therefore a security whose offers and sales were subject to the registration requirements of the federal securities laws.

135.     *First*, Defendants' offer and sale of the LP Program involves an investment of money.  Under the SEC's 2019 "Framework for Investment Contract Analysis of Digital Assets," an investment of "money" may, but need not, take the form of currency issued by a government.

Here, under the LP Program, investors transferred their own crypto assets to the protocol in return for the fees paid by trades in those assets.

136.    LPs put their crypto assets at risk as part of the LP Program.  Defendants have control over all the crypto assets invested in the LP Program and, through their control of the protocol, exercise significant choice in how and when to make these assets available for trading, among other things.  Investors' assets are also at risk of losing money as a result of decisions entirely in the hands of Defendants, like the emergency suspension of IL protection and the shutdown of BNT minting.

137.    LPs also have liquidity and market risk.  Defendants' reserves are not sufficient to meet all LP requests to withdraw, and the Bancor protocol is designed to reduce the value of investors' investments if there is a "run" on the protocol.  As in fact happened, the protocol was unable to timely honor withdrawal requests, and Plaintiffs and similarly situated investors suffered losses while waiting for their withdrawals.

138.    *Second*, LPs and Defendants participated in a common enterprise.  LPs' crypto assets are pooled for Defendants' purposes.  Defendants do not separately segregate or separately manage an individual investor's crypto assets as part of the LP Program.

139.    The fortunes of investors and Defendants are generally tied together: increased liquidity on the platform leads to a more attractive trading environment, through which Defendants reap fees and other financial rewards and LPs' returns increase.  The value of LPs' BNT tokens is also interwoven with and dependent upon the success of the Bancor protocol, as well as the efforts of those who control the protocol.  A robust and well-functioning protocol increases the value of the BNT token, including because investing BNT itself in the protocol allows an LP to vote to authorize distributions related to the protocol's income and profits.

140.    *Third*, LPs reasonably expected to profit from Defendants' efforts.  From Bancor's inception, Defendants marketed the exchange as an investment opportunity, allowing investors to earn "passive income."  As described above, through its website, social media channels, and conference presentations, Defendants advertised that Bancor allowed investors to "earn more while doing less."  They advertised "sustainable yields" and that LPs could "stake and chill;" Defendants' employees told LPs that Bancor provides the most "competitive returns anywhere in DeFi without asking users to take on any risk."

141.    Defendants' efforts are also necessary to the success or failure of the LP Program. Defendants touted the LP Program as uniquely up to the challenge of insuring impermanent loss, offering investors the "the simplest, safest, and smartest solution to earn passive income in any market condition."  Defendants marketed the LP Program as "The Ultimate DeFi Liquidity Solution" with features such as an "Omnipool architecture which dramatically simplifies the protocol's contracts and increases efficiency at every touchpoint."  Defendants' efforts were responsible for all of these features.  Defendants chose Hindman, Richardson, and other apparent Bancor employees and contractors.  Defendants engaged LocalCoin, Bancor's "core developer," and Defendants engaged Topaze Blue to analyze the ongoing performance of the protocol.

142.    Defendants also advertised their technical ability and expertise in automated market making in attempting to sell LPs on the LP Program: "Bancor has been driving innovations since inventing the first on-chain Automated Market Maker (AMM) in 2017."  Defendants' technical expertise extended to determining how many tokens to place in liquidity pools, determining the fees charged to traders, determining what crypto assets are eligible to be traded on the platform, determining and distributing investor returns, and providing a user-friendly investor interface.

143.    LPs are also reasonably led to expect that Defendants have a strong financial incentive to engage in efforts to make the LP Program successful.  For example, Defendants tweeted that "[t]he protocol co-invests $BNT alongside LPs" and Defendants argued (in a paper posted on Bancor's website) "that [protocol owners] also must have some skin in the game and provide economic benefit for the other participants."  Defendants' statements and actions, and the economic reality of the LP Program, lead reasonable investors to expect Defendants to undertake significant and essential technical, analytical, and managerial efforts.

## X.    CLASS ALLEGATIONS

144.    Plaintiffs propose to move to certify the following class: All U.S. residents or domiciliaries who participated as liquidity providers on Bancor v3 on or after May 11, 2022. Excluded from the class are Defendants; corporate officers, members of the boards of directors, and senior executives of Defendants; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants have or had a controlling interest.

145.    The proposed class meets Federal Rule of Civil Procedure 23's requirements for numerosity, commonality, typicality, adequacy, predominance, and superiority.

### 1.    Numerosity

146.    The class is so large that joinder of all parties would be impracticable.

147.    LPs provided approximately $300 million in liquidity under the LP Program in May 2022.  On information and belief, thousands of liquidity providers under the LP Program are U.S. residents or domiciliaries.  The class therefore satisfies the numerosity requirement.

### 2.    Typicality

148.    The Plaintiffs each invested in the LP Program in exchange for promised returns and protections, even though Defendants did not register the LP Program as a security, did not

register as an exchange, and misled Plaintiffs about the returns and protections they promised. The claims of the named Plaintiffs are typical of the claims of all the unnamed class members.

### 3. Adequacy

149. The named Plaintiffs' claims are identical to the claims of other class members, and there are no known conflicts of interest with any other class member.

150. The named Plaintiffs will adequately protect the interests of absent class members. The plaintiffs have retained competent counsel experienced in class action and securities litigation.

### 4. Prominence and Superiority

151. The questions of fact and law common to the class predominate in this action over any questions affecting only individual members of the class.

152. There are questions of law and fact common to members of the class, including, without limitation: whether the LP Program is a security; whether Defendants' offerings, sales, and solicitations of the LP Program violate the registration provisions of the Securities Act; whether Defendants misrepresented material information in connection with the offer or sale of the LP Program (or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading); and whether Defendants are liable to the class members for rescissory damages.

153. Members of the class are readily ascertainable and identifiable. Members of the class may be identified by publicly accessible information and records maintained by Defendants. The public nature of the transactions at issue means it is relatively easy to communicate with investors, the amounts invested in the LP Program are easily ascertainable, and the investors can easily be made whole through addresses associated with the transactions.

## XI. CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
Unregistered Offer and Sale of Securities in Violation of
Sections 5 and 12(a)(1) of the Securities Act of 1933
(Against All Defendants)

154.    Plaintiffs incorporate all prior paragraphs by reference.

155.    15 U.S.C. § 77l(a)(1) provides that "any person who . . . offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him."

156.    15 U.S.C. § 77e(a) (Section 5(a) of the '33 Act) states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

157.    15 U.S.C. § 77e(c) (Section 5(c) of the '33 Act) states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title."

158.    The LP Program is an investment contract within the meaning of Section 2(a)(1) of the '33 Act, 15 U.S.C. § 77b(a)(1), and therefore a security within the meaning of the '33 Act.

159.    During the class period, Defendants directly and indirectly: (a) without a registration statement in effect as to that security, made use of the means and instruments of transportation or communications in interstate commerce or of the mails to sell the LP Program through the use or medium of any prospectus or otherwise, (b) without a registration statement in effect as to that security, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale, and (c) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

160.    As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiffs and members of the class have suffered damages in connection with their respective investments in the LP Program.

161.    As a result of their conduct, Defendants are liable to Plaintiffs and other class members for damages or recission, as well as costs, attorneys' fees, and interest.

### SECOND CAUSE OF ACTION
Fraud in Connection with the Purchase or Sale of Securities
in Violation of Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 thereunder
(Against All Defendants)

162.    Plaintiffs incorporate all prior paragraphs by reference.

163.    Defendants violated Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

164.    Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of a security, "for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order

to make the statements made, in the light of the circumstances under which they were made, not misleading."

165. Defendants carried out a scheme and course of conduct through the means and instrumentalities of interstate commerce to deceive LPs that the LP Program protected them from impermanent loss and that the LP Program protected their rebalancing reimbursements. This caused LPs to place more crypto assets into the LP Program under artificially favorable terms.

166. In connection with the sale of the LP Program, Defendants disseminated, approved, or endorsed the false statements described above, which Defendants knew, or should have known but for their recklessness, were materially misleading. These statements were designed to influence the market for the LP Program, and they failed to disclose material adverse information necessary to make the statements made, given the circumstances under which they were made, not misleading, and misrepresented the truth about Bancor's business and operations.

167. In ignorance of the adverse facts concerning Bancor's business and financial condition, which were concealed by Defendants, Plaintiffs and other members of the class invested in the LP Program by depositing crypto assets on Bancor v3 and were damaged.

168. Plaintiffs and the other members of the class, relying on the materially false and misleading statements described above, invested in the LP Program under terms rendered artificially favorable to Plaintiffs by Defendants' wrongful conduct. Had Plaintiffs and the other members of the class known the truth, they would not have invested in the LP Program by depositing crypto assets on Bancor v3, or would have demanded more favorable terms for their deposits. At the time of Plaintiffs' investments, the true value of the LP Program was substantially lower than the value reflected by the terms offered and agreed to by Plaintiffs and the other

members of the class.  Upon public disclosure of the actual terms of the LP Program, the LP
Program failed, injuring Plaintiffs and class members.

169.     As a direct and proximate result of Defendants' conduct, Plaintiffs and other
members of the class suffered damages, and Defendants are liable for damages or recission, as
well as costs, attorneys' fees, and interest.

### THIRD CAUSE OF ACTION
Violations of Sections 5 and 29(b) of the Exchange Act of 1934
(Against All Defendants)

170.     Plaintiffs incorporate all prior paragraphs by reference.

171.     Section 5 of the Exchange Act makes it unlawful "for any broker, dealer or
exchange, directly or indirectly, to make use of . . . any means or instrumentality of interstate
commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction
of the United States to effect any transaction in a security . . . unless such exchange (1) is registered
as a national securities exchange under Section 78f of this title, or (2) is exempted from such
registration."   15 U.S.C.  § 78e.   An "exchange" is defined to include "any organization,
association, or group of persons, whether incorporated or unincorporated, which constitutes,
maintains, or provides a market place or facilities for bringing together purchasers and sellers of
securities or for otherwise performing with respect to securities the functions commonly performed
by a stock exchange as that term is generally understood, and includes the market place and the
market facilities maintained by such exchange." 15 U.S.C. § 78c(1).

172.     Throughout the class period and currently, Defendants have made use of means and
instrumentalities of interstate commerce for the purpose of using a facility of an exchange within
and subject to the jurisdiction of the United States.

173.     At all relevant times, Defendants were neither registered as a securities exchange
under Section 78f, nor exempted from such registration requirement.

174.   While operating as an unregistered exchange, Defendants entered into investment contracts with Plaintiffs and other class members whereby Plaintiffs agreed to transfer custody and control of their crypto assets to Bancor v3 to provide "liquidity" for the exchange, and Defendants agreed to pay Plaintiffs a portion of the associated trading fees, to provide them with "100% protection" against "impermanent loss," purportedly funded by trading fees, and—upon withdrawal—to return the crypto assets Plaintiffs deposited or 100% of their then-current market value.

175.   Every LP Program investment contract thus provided that Defendants would operate in violation of section 5 of the Exchange Act.  Such contracts are null and void under Section 29(b) of the Exchange Act.

176.   As a result, Plaintiffs and other class members are entitled to void their LP Program investment contracts and to recover rescissory damages.

**FOURTH CAUSE OF ACTION**
Unregistered Broker and Dealer under
Sections 15(a)(1) and 29(b) of the Exchange Act of 1934
(Against All Defendants)

177.   Plaintiffs incorporate all prior paragraphs by reference.

178.   In relevant part, section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer … to make use of … any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security … unless such broker or dealer is registered in accordance with subsection (b) of this section." 15 U.S.C. § 78o(a)(1).

179.   A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others."  *Id*. § 78o(a)(4)(A).  Additionally, an entity is a broker if it assists issuers with structuring a securities offering, identifies a potential purchaser, or advertises

a securities offering.  Defendants operated as a broker during the class period by, among other things, facilitating the sale of the LP Program and other crypto assets on the exchange for compensation, marketing the LP Program and the exchange to users, and working with issuers to list crypto assets on the Bancor exchange.

180.    A "dealer" includes an entity "engaged in the business of buying and selling securities … for such person's own account," insofar as such transactions are part of that person's "regular business."  Defendants operated as a dealer during the class period by acting as a seller of securities on a regular basis, issuing the LP Program, facilitating the sale of the LP Program and the purchase and sale of other crypto assets on the exchange, having regular customers, and providing customers with access to services that allow the purchase of such securities, and by maintaining custody over their customers' digital assets.  Defendants have also held themselves out as willing to buy or sell securities on a continuous basis.

181.    Throughout they class period, Defendants have made use of the means and instrumentalities of interstate commerce to effect transactions in and to induce and attempt to induce purchases and sales of securities, without being registered in accordance with subsection (b) of section 15 of the Exchange Act.

182.    Each deposit to the LP Program constitutes a contract between Defendants and a Plaintiff or class member.  Pursuant to these contracts, Plaintiffs and class members paid Defendants fees to withdraw their deposits as well as other fees.

183.    Such contracts are null and void under section 29(b) of the Exchange Act and, as a result, Plaintiffs and the class are entitled to void those contracts and recover recessionary damages with respect to deposits to the LP Program, as well as costs, attorneys' fees, and interest.

184.     As a result of their conduct, Defendants are liable to Plaintiffs and other class members for damages or recission, as well as costs, attorneys' fees, and interest.

### FIFTH CAUSE OF ACTION
Violations of Section 15 of the Securities Act of 1933
(Against Bprotocol Foundation and the Individual Defendants)

185.     Plaintiffs incorporate all prior paragraphs by reference.

186.     The Foundation and the Individual Defendants, by virtue of their office, BNT holdings, or agreements or understandings, during the class period, had the power and authority to direct the management and activities of the Bancor DAO, and to cause the Bancor DAO to engage in the wrongful conduct described above.

187.     The Foundation and the Individual Defendants, separately or together, have the power to direct or cause the direction of the management and policies of the Bancor DAO.

188.     The Foundation and the Individual Defendants jointly participated in, or aided and abetted, the Bancor DAO's sale and solicitation of securities, including the LP Program, in violation of Sections 5 and 12(a)(1) of the Securities Act.

189.     The Foundation and the Individual Defendants, separately or together, jointly participated in the Bancor DAO's failure to register the LP Program and submit registration statements.

190.     As a result of the Foundation and Individual Defendants' conduct, they are liable to Plaintiffs and other class members for damages or recission, as well as costs, attorneys' fees, and interest.

### SIXTH CAUSE OF ACTION
Violation of Section 20 of the Exchange Act of 1934
(Against Bprotocol Foundation and the Individual Defendants)

191.     Plaintiffs incorporate all prior paragraphs by reference.

192.    During the class period, the Foundation and the Individual Defendants acted as controlling persons of the Bancor DAO within the meaning of Section 20(a) of the Exchange Act. By virtue of their BNT holdings, positions and their power to control public statements about Bancor, the Foundation had the power and ability to control the actions of the Bancor DAO and its agents.

193.    By reason of such conduct, the Foundation and the Individual Defendants are liable to Plaintiffs and other class members for damages or recission, as well as costs, attorneys' fees, and interest.

## SEVENTH CAUSE OF ACTION
Breach of Contract
(Against All Defendants)

194.    Plaintiffs incorporate all prior paragraphs by reference.

195.    Every Plaintiff and class member entered into a binding agreement (an "LP Program Investment Agreement") when they invested in the Bancor v3 LP Program.  The terms of the LP Program Investment Agreement are set forth in BIP15 (the v3 proposal Defendants enacted via Bancor DAO).

196.    Every plaintiff and class member fully performed their obligations under their respective LP Program Investment Agreement(s) by transferring custody and control of their crypto assets to Bancor.

197.    Defendants breached their obligations to Plaintiffs and class members under every LP Program Investment Agreement by failing to deliver *any "*protection" against IL loss and by returning less than 100% of the then-current market value of Plaintiffs' crypto asset investments upon withdrawal.

198.    Plaintiffs and the class suffered damages as a direct result of Defendants' breach.

199.    As a result of Defendants' conduct, they are liable to Plaintiffs and other class members for damages, as well as costs and interest.

### EIGHTH CAUSE OF ACTION
Unjust Enrichment
(Against All Defendants)

200.    Plaintiffs incorporate all prior paragraphs by reference.

201.    As a result of the misconduct alleged herein, Defendants were enriched at the expense of Plaintiffs and other class members, whom they exposed to violations of the securities laws, misrepresentations and significant financial losses.

202.    Defendants directly profited from their decision to subject Plaintiffs and the class to these harms, as they were able to collect substantial fees from trading activity that occurred on the protocol as well as liquidity rewards because of their misconduct.

203.    It is against principles of equity and good conscience for Defendants to keep the profits they gained from their misconduct.

204.    As a result of Defendants' conduct, they are liable to Plaintiffs and other class members for damages or recission, as well as costs, attorneys' fees, and interest.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.  Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as lead counsel;

B.  Awarding Plaintiffs and the members of the class damages or rescissory damages and interest;

C.  Awarding Plaintiffs' reasonable costs, including attorneys' fees; and

D.  Awarding such equitable, injunctive or other relief as the Court may deem just and

proper.

### JURY DEMAND

Plaintiffs demand a trial by jury.


DATED:   May 11, 2023                    Respectfully Submitted,



*/s/ Joe Kendall*
_____
Joe Kendall
Texas Bar No. 11260700
KENDALL LAW GROUP, PLLC
3811 Turtle Creek Blvd., Suite 1450
Dallas, TX 75219
Telephone: 214-744-3000
214-744-3015 (fax)
jkendall@kendalllawgroup.com


HOPPIN GRINSELL LLP
Timothy W. Grinsell
Margaret B. Hoppin
 11 Broadway
 New York, NY 10004
 Telephone:  646-475-9550
 tim@hoppingrinsell.com
 margot@hoppingrinsell.com

*Attorneys for Plaintiffs*