**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

FILED

2023 OCT 24  PM 3: 18

CLERK, US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____

| | |
|---|---|
| MISLAV BASIC, NATHAN GRUBER, KEVIN BOUDREAU, DANIEL SCHWAIBOLD, and KEITH ZACHARSKI, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>BPROTOCOL FOUNDATION, LOCALCOIN LTD., GALIA BEN-ARTZI, GUY BEN-ARTZI, EYAL HERTZOG, YEHUDA LEVI, and BANCOR DAO,<br><br>*Defendants.* | Case No.:  **1:23-cv-00533-RP**<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   PARTIES ................................................................................................ 5

    A.   Plaintiffs ........................................................................................... 5

    B.   Defendants ....................................................................................... 7

III.  JURISDICTION AND VENUE ............................................................. 12

IV.  BACKGROUND CONCEPTS ............................................................... 14

    A.   Crypto Assets and Automated Market Makers ................................. 14

    B.   Decentralized Autonomous Organizations ("DAOs") ....................... 16

    C.   Characteristics of AMM Liquidity Pools .......................................... 16

V.   A BRIEF HISTORY OF BANCOR ....................................................... 18

    A.   Defendants Raise $153 Million in an ICO of Bancor's Native Token ............................. 18

    B.   Defendants Launch the Protocol, Rolling Out a Series of Investment Products called "Versions" ....................................................................................... 20

VI.  DEFENDANTS MARKET TWO KEY FEATURES TO INVESTORS: SINGLE-SIDED STAKING AND IMPERMANENT LOSS PROTECTION ......................... 23

    A.   Single-sided liquidity deposits and pool "rebalancing" ..................... 23

    B.   Protection Against Impermanent Loss .............................................. 25

VII. DEFENDANTS AGGRESSIVELY SOLICIT CRYPTO DEPOSITS FROM INVESTORS IN THE UNITED STATES .................................................. 26

    A.   Defendants targeted U.S. investors through in-person pitches at crypto conferences and a network of U.S.-based personnel, partners, and promoters ............................. 27

    B.   Defendants solicited investment through online content targeted to niche U.S. crypto communities ................................................................................... 32

    C.   Defendants intentionally concealed the purported restriction on U.S. investment in v3 .. 39

VIII.   DEFENDANTS KNOWINGLY MISREPRESENTED KEY FACTS ABOUT BANCOR AND THE RISKS OF THE LP PROGRAM ............................. 41

IX.  DEFENDANTS CONTROL THE BANCOR DAO TO BENEFIT THEMSELVES AND MISLEAD LPS ABOUT THE EXTENT OF THAT CONTROL ................... 49

X.   BANCOR ENTERS A "DEATH SPIRAL" AND DEFENDANTS UNILATERALLY "SUSPEND" IL PROTECTION AND COVERTLY CEASE REBALANCING PAYMENTS TO LPS ............................................................................. 56

    A.   Defendants suspend impermanent loss protection ............................ 57

    B.    Defendants stop paying the rebalancing reimbursements.................................................. 59

**XI.  INVESTMENTS IN THE LP PROGRAM ARE SECURITIES.................................... 61**

**XII. CLASS ALLEGATIONS ................................................................................................ 64**

    *1.   Numerosity ................................................................................................................ 65*

    *2.   Typicality................................................................................................................... 65*

    *3.   Adequacy................................................................................................................... 65*

    *4.   Prominence and Superiority ..................................................................................... 65*

**XIII.   CAUSES OF ACTION ............................................................................................ 66**

**PRAYER FOR RELIEF..................................................................................................... 79**

Plaintiffs Mislav ("Michael") Basic, Nathan Gruber, Kevin Boudreau, Daniel Schwaibold, and Keith Zacharski (collectively, "Bancor Investor Group" or "Lead Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against Defendants Galia Ben-Artzi, Guy Ben-Artzi, Eyal Hertzog, and Yehuda Levi (collectively, the "Individual Defendants"), Bprotocol Foundation (the "Foundation"), LocalCoin Ltd. ("LocalCoin" and, together with the Foundation, the "Entity Defendants") and Bancor DAO.  Each Lead Plaintiff's allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of relevant whitepapers, press releases, media reports, and other publicly disclosed reports and information about Defendants.

## I.       PRELIMINARY STATEMENT

1.       To make up for secret deficits in their online crypto asset exchange, Defendants promised Plaintiffs an investment that was free from certain risks.  This promise was false, as Defendants knew at the time, and Plaintiffs and others similarly situated lost millions as a result.

2.       The Individual Defendants co-founded LocalCoin (in 2016) and the Foundation (in 2017) to develop and launch the Bancor Protocol (the "Protocol"), an automated platform for trading crypto assets.  The Protocol aggregates crypto assets deposited by investors ("Liquidity Providers" or "LPs") to create a functioning crypto asset exchange (also described as an "automated market maker," or "AMM").  In return, the Protocol offers investors a portion of the fees charged to traders using the exchange.

3.       Although the Individual and Entity Defendants subsequently purported to transfer governance of the Protocol to a decentralized autonomous organization or "DAO"—Defendant Bancor DAO—they retained near-total control over both.  They controlled Bancor directly by controlling its capital, employees, software code, partnerships, promotional activities and

purportedly open communication channels, and indirectly by dominating and manipulating Bancor DAO. As a result, they control virtually every element of the Protocol's operations. We use the term "Bancor" to refer collectively to the Protocol, Bancor DAO, the Individual Defendants, the Entity Defendants, and their agents, following the practice of the Defendants themselves.

4.     To facilitate trades in crypto assets—and to be competitive among online crypto exchanges—Bancor must maintain sufficient liquidity in these assets. As explained by Bancor Head of Growth Nate Hindman, attracting investment from Liquidity Providers is "the most important competitive issue in the AMM space."

5.     To attract such investments, Defendants offered a series of investment products described as "versions" of Bancor. Bancor Version 1 ("v1") launched in 2017, followed by Version 2 ("v2") in April 2020, Version 2.1 ("v2.1") in October 2020 and Version 3 ("v3")—the principal security at issue in this action—on May 11, 2022.

6.     In Versions 2 and 2.1, Defendants first introduced so-called "impermanent loss protection" ("IL Protection"), which they described as insurance against a certain type of loss endemic to AMM liquidity pools or—put differently—losses incurred by investing crypto assets in an AMM rather than simply holding them. Defendants touted impermanent loss protection to LPs as a flagship feature of Bancor, and it successfully attracted LPs to the Protocol. At its height, LPs had more than $2.3 billion worth of crypto assets invested in v2.1.

7.     However—unbeknownst to investors—v2.1 also generated serious deficits because the fees generated by the Protocol were insufficient to cover their obligations to LPs. Therefore, if a sufficiently large number of LPs withdrew their investments at the same time, the Protocol would crumble, much like a run on the bank.

8.      Defendants knew about these deficits and the associated risks and concealed them from LPs, hoping to grow their way out of the problem.  Defendants doubled down on increasing liquidity on the platform, manipulating DAO governance procedures to admit more and more crypto assets (and hence liquidity) to the exchange and authorizing inflationary "liquidity rewards."  Yet every (secret) analysis Defendants had commissioned during 2021 showed that the fees generated by the Protocol had not covered Defendants' IL Protection guarantee (let alone the high rates of return promised to investors).

9.      Consistent with their prior efforts to fill an ever-widening hole, on May 11, 2022, Defendants launched Version 3.

10.     Defendants presented v3 as the apotheosis of the original vision they had promoted beginning in 2017.  They deployed an aggressive marketing campaign teasing the release of v3 almost a year before it launched.  Emphasizing the purportedly successful performance of prior versions of the Protocol, Defendants presented v3 as a safe and user-friendly investment product that improved upon those versions and overcame their limitations by, among other things, removing IL Protection waiting periods and "caps" on LP investment.  They even presented the delayed release of v3 as a sign of its sophisticated design and security.  As Defendant Yehuda Levi explained in a November 2021 promotional event for the much-anticipated release, v3 represented "the first time in almost five years" that Defendants had implemented their "holistic" vision of the Protocol, implementing "all kinds of subsystems that we wanted to do for a long time," looking at the Protocol in "a more holistic way that we couldn't do until now."  And as Bancor Head of Research Mark Richardson explained at the same event, Defendants had "ma[d]e sure that our product is as easy and safe to use as possible" so it could be "open and available to everyone."

11.    Defendants designed v3 to amass even greater liquidity through an enhanced investment program for LPs (the "LP Program"). In contrast to prior versions, which gradually insured an LP's investment against impermanent loss, the LP Program guaranteed investors *immediate* "100% protection" against impermanent loss. It also permitted unlimited LP investment for the first time.

12.    In the months-long marketing campaign for v3 preceding its launch, Defendants explicitly targeted retail investors by promising "some of the most competitive returns anywhere . . . without asking users to take on any risk." Bancor Head of Research Mark Richardson told U.S. audiences that "You shouldn't have to know about impermanent loss. You just provide liquidity, get your interest, and that's the end of it." Defendants also claimed that Bancor trading fees consistently paid for the impermanent loss protection provided in prior versions of the Protocol, knowing that in reality those fees had fallen short. Just nineteen days after the launch of v3, the LP Program had attracted $300 million worth of LP investment.

13.    Inevitably, on June 19, 2022, Bancor's luck ran out: a spike in withdrawals triggered significant payment obligations to LP Program investors. Instead of making those payments, Defendants unilaterally purported to "suspend" impermanent loss protection, which meant that withdrawing LPs incurred 100% of the very losses that Defendants had promised to "100% protect" against. Defendants also imposed *additional* severe haircuts on withdrawing LPs, initially without disclosing them. They announced only the purported "suspension" of IL Protection and then failed to pay withdrawing LPs certain other amounts they were owed under the terms of their investment in the LP Program. Lead Plaintiffs and other U.S. investors lost (at least) tens of millions of dollars as a result. In many instances, that loss was catastrophic for the individual investor.

14.     The securities laws are intended to warn investors of risks like those that hobbled Bancor and the LP Program.  Investments in the LP Program are binding investment contracts and securities under U.S. law.    Had Defendants complied with registration and disclosure requirements, Plaintiffs and other class members would not have invested in the LP Program, and they would have avoided losing (on average) about 50% of their respective invested assets. Accordingly, Defendants owe damages, restitution, and other relief to Plaintiffs and to all similarly situated investors in the Bancor v3 LP Program.

## II.     PARTIES

### A.     Plaintiffs

15.     Plaintiff Mislav ("Michael") Basic is an individual and a resident of Austin, Texas. Mr. Basic first became a Bancor LP on June 28, 2021.  He made multiple additional deposits throughout 2021 and 2022, for a combined total investment in v2.1 of the Protocol of approximately 400,000 LINK tokens, a crypto asset.  In early May 2022, Mr. Basic temporarily withdrew 100% of his investment, in anticipation of the launch of v3 and its LP Program.  On May 16, 2022, Mr. Basic deposited 550,000 LINK in the LP Program, an investment valued at the time at $3,921,500.  He withdrew his entire LP stake on June 23, 2022, losing 255,654.885 LINK ($1,748,947.83).

16.     Plaintiff Nathan Gruber is an individual and a resident of Milton, Georgia.  Mr. Gruber became a Bancor LP on January 12, 2021, when he provided approximately 20,000 LINK to v2.1.  On May 14, 2022, Mr. Gruber transferred 75,875.26 LINK—about 60% of the total liquidity he provided to Bancor at that time—to the LP Program, then valued at $533,403.  On May 17, 2022, Mr. Gruber transferred 50,995.411 LINK ($394,195) to the LP Program.  On May 31, 2022, Mr. Gruber temporarily withdrew his May 14 investment, and noticed an apparent (and unexpected) loss.  However, relying on representations to him by Bancor personnel in Austin, TX,

between June 9-11, 2022, Mr. Gruber maintained his remaining 50,995.411 LINK investment in the LP Program. On or about July 10, 2022, Mr. Gruber withdrew that investment, incurring a loss of approximately 22,600.40 LINK ($142,817.57).

17.     Plaintiff Kevin Boudreau is an individual and a resident of Ponte Vedra Beach, Florida. On May 12, 2022, Mr. Boudreau transferred approximately 30,162.99 LINK ($192,900) from Bancor v2.1 to the Bancor v3 LP Program. In addition, he invested approximately 20,069.37 LINK ($147,200) on May 13, 2022. Mr. Boudreau withdrew his investment in part on November 29, 2022, incurring a loss of 7,881.75 LINK ($57,720.42). He withdrew the balance on May 9, 2023, incurring a loss of 7,961.71 LINK ($52,163.54).

18.     Plaintiff Daniel Schwaibold is an individual and a resident of Charleston, South Carolina. Between April 4, 2021 and November 11, 2021, Mr. Schwaibold deposited a total of 124,748 LINK in Bancor v2.1. Between May 3, 2021 and April 16, 2022, Mr. Schwaibold deposited a total of 67,787 BNT tokens, a crypto asset native to the Bancor Protocol, to Bancor v2.1. On May 12, 2022, Mr. Schwaibold transferred his LINK investment (then valued at $802,130) and his BNT investment (then valued at $92,190) to the LP Program. On May 16, 2022, Mr. Schwaibold deposited an additional 5,334 BNT ($7,574). On July 11, 2022, Mr. Schwaibold withdrew 81,516 BNT and 63,456 LINK from the LP Program. On July 12, 2022, Mr. Schwaibold withdrew 63,456 LINK from the LP Program. Mr. Schwaibold lost a total of 56,711 LINK ($348,751.84).

19.     Plaintiff Keith Zacharski is an individual and a resident of Oceanside, California. On June 16, 2022, Mr. Zacharski transferred 26,621.32 LINK (179,028.38) from Bancor v2.1 to the Bancor v3 LP Program. On September 14, 2022, Mr. Zacharksi withdrew that entire amount, but received only 14,315.357 LINK, incurring a loss of 12,305.95 LINK ($89,483.33).

### B.    Defendants

20.    Defendant Bprotocol Foundation is a private corporation formed under Swiss law, with offices in Zug, Switzerland.  The Foundation is owned, operated, and controlled by the Individual Defendants and their associates.  Defendants Guy Ben-Artzi and Eyal Hertzog have served continuously on its corporate board since its formation in 2017.  On information and belief, the Foundation participates in the governance of Bancor DAO and exercises a veto-proof block of votes over DAO governance.[1]  The Foundation and Defendant LocalCoin control Bancor—including Bancor v3 and the LP Program—directly, through their control of the Bancor Treasury (defined below), Bancor personnel, and Bancor marketing and promotional activities targeted to solicit investment in the LP Program from U.S.-based retail investors like Plaintiffs.[2]

21.    Defendant LocalCoin, Ltd. is a private corporation formed under Israeli law, headquartered in Tel Aviv.  LocalCoin is owned and operated by Defendants Galia Ben-Artzi, Guy Ben-Artzi, Eyal Hertzog, and several others, including non-party Draper Associates, the Silicon Valley-based venture capital firm led by billionaire investor Tim Draper, and non-party Amatzi

---

[1] The Foundation participates through its "wallets," secure electronic storage used to control crypto assets.  Wallet addresses known or suspected to be controlled by the Foundation include:

   0xf727e20e081aae428e7c6be07b156bb21ab587a7,
   0xc32E1289b5765b2C4d8a6aA925cbd2A29d35cC22,
   0x005ff7F807e62c58185234C6E98859D56D2e56F1,
   0xD1D846312B819743974786050848D9B3d06b9b55,
   0xd7c810f6316f6b83ae3eeda44583e4a8a0ae95c4,
   0x95a9bd206ae52c4ba8eecfc93d18eacdd41c88cc,
   0xdfee8dc240c6cadc2c7f7f9c257c259914dea84e,
   0x157Db2630417A2802CB0a5D75D49163f9c5c064B.

[2] *E.g.,* "DeFi Dad" live interviews with Mark Richardson and Nate Hindman at the crypto conference Permissionless 2022 in Palm Beach, Florida were "made possible by the Bprotocol Foundation."  *See* https://www.youtube.com/watch?v=2K2MxiJuK_M.  Moreover, since the Foundation has retained exclusive control over Bancor's Treasury, it has presumptively funded *every* "Bancor" activity alleged herein.

Ben-Artzi (the father of Defendants Galia and Guy Ben-Artzi).  On information and belief, LocalCoin is the direct employer of all Bancor personnel, including non-parties Richardson, Hindman, Loesch, Albert, and Barber (among others).  Defendants describe LocalCoin as the "core developer for the Bancor Protocol."  More accurately, and as described in the Israeli press, LocalCoin is the "Israeli company that operates Bancor."  LocalCoin and the Foundation control Bancor—including Bancor v3 and the LP Program—directly, through their control of the Bancor Treasury, Bancor personnel, and Bancor marketing and promotional activities targeted to solicit investment in the LP Program from U.S.-based retail investors like Plaintiffs.

22.    Defendant Bancor DAO is an unincorporated general partnership that is not registered in any jurisdiction and has no physical office, location, mailing address, directors, or appointed agents.  Bancor DAO is comprised of all individual holders of vBNT, a "governance token" native to the Protocol (but tradeable and transferable like other crypto assets).  Holders of vBNT vote on proposals to govern the DAO much like shareholders vote on proposals to govern a corporation.  Bancor DAO exists and communicates online, including through a "governance forum" at https://gov.bancor.network/ (the "Governance Forum"), an online voting mechanism at https://vote.bancor.network/#/, and a series of other webpages and online channels.  Although Bancor DAO purportedly governs itself and the Protocol in a "democratic and transparent" decentralized system,[3] in reality the Individual and Entity Defendants control the Bancor DAO through their disproportionate voting power in Bancor DAO, their control over the content of "community" discussions, their control over which proposals are promoted to a DAO vote, and

---

[3] *See, e.g.*, https://support.bancor.network/hc/en-us/articles/5425550065426-What-is-the-Bancor-DAO- ("Bancor is owned and operated by its community as a . . . [DAO and t]he Bancor Protocol is governed via a democratic and transparent voting system which allows all stakeholders to get involved and shape Bancor's future.").

their purported ability to bypass DAO governance procedures by exercising certain "emergency" powers. The Individual and Entity Defendants control the Protocol both through their control of Bancor DAO and directly.

23.     Defendant Galia Ben-Artzi is a co-founder of Bancor, the Foundation, and LocalCoin, an owner of LocalCoin, the sister of Defendant Guy Ben-Artzi, and the niece of Israeli Prime Minister Benjamin Netanyahu. A self-described "native to the California Bay Area," Ms. Ben-Artzi became a serial start-up founder upon her 2004 graduation from Dartmouth College. She has been called the #1 most influential woman in crypto and repeatedly featured in lists of the "most influential" and "top" women in crypto and tech, including CNBC's "10 most influential women in the crypto world." Her net worth has been estimated at $200 million. She has made multiple public appearances to promote the Protocol and solicit investment, including in conferences in New York and San Francisco. She directs and controls the activities of LocalCoin and its employees and personnel in her capacities as an owner and director of LocalCoin and a Bancor co-founder. On information and belief, she controls the activities of the Foundation through her relationship with her brother, Defendant Guy Ben-Artzi. On information and belief, Ms. Ben-Artzi currently resides in Israel.

24.     Defendant Guy Ben-Artzi is a co-founder of Bancor, the Foundation, and LocalCoin, a Director of the Foundation, the brother of Defendant Galia Ben-Artzi, and the nephew of Israeli Prime Minister Benjamin Netanyahu. He directs and controls the activities of the Foundation as its founder and director. He directs and controls the activities of LocalCoin and its employees and personnel in his capacities as a Director of the Foundation, a Bancor co-founder and, on information and belief, through his relationship with his sister, Defendant Galia Ben-Artzi. On information and belief, he currently resides in Israel.

25.     Defendant Eyal Hertzog is a co-founder of Bancor, the Foundation, and LocalCoin, and a Director of the Foundation.  He directs and controls the activities of the Foundation as its founder and director.  He directs and controls the activities of LocalCoin and its and its employees and personnel in his capacities as an owner and director of LocalCoin, a Bancor co-founder and as Bancor's "Product Architect."  On information and belief, he currently resides in Israel.

26.     Defendant Yehuda Levi is a co-founder of Bancor, the Foundation and LocalCoin, its former Chief Technology Officer, and its current Head of Smart Contracts.  He directs and controls the activities of LocalCoin and its employees (*i.e.*, the Bancor "core team") in his capacity as a Bancor co-founder and senior team member.  He is a member of Bancor DAO and serves as an "Administrator" on the Governance Forum under the username "yudi."  On information and belief, he currently resides in Israel.

27.     Non-party Mark Richardson ("Richardson") is a paid employee or contractor of Defendant LocalCoin.  From January 2021 through October 2022, Defendants generally identified Richardson as the Bancor "Head of Research."  According to his LinkedIn profile, Richardson has been the "CEO" of the "Bancor Protocol" since approximately 2022.  Richardson is a member of Bancor DAO and serves as an "Administrator" on the Governance Forum under the username "mbr."  On information and belief, he currently resides in Australia.

28.     Non-party Nate Hindman ("Hindman") is a paid employee or contractor of Defendant LocalCoin.  Defendants have presented Hindman as the Bancor "Head of Growth" since December 2017.  Hindman is a member of Bancor DAO and serves as an "Administrator" on the Governance Forum under the username "Nate Hindman."  He co-authored the Topaze Blue Reports (defined below) with Loesch.  On information and belief, Hindman currently resides in the United States.

29.     Non-party Stefan Loesch ("Loesch") is a Director at Topaze Blue, a boutique advisory firm based in London.  He is also a Bancor "Senior Advisor" and is, on information and belief, a paid employee or contractor of Defendant LocalCoin.  Loesch co-authored the Topaze Blue Reports (defined below) with Hindman.  On information and belief, Loesch currently resides in the UK.

30.     Non-party Jen Albert ("Albert") is a paid employee or contractor of Defendant LocalCoin.  From January to December 2022, Albert was the Bancor "Community Liaison."  Her job responsibilities included "hosting live events" and "creat[ing] enjoyable community engagement activities such as a launch party and giveaways."  She was promoted in December 2022 and is described as Bancor's "Community Lead" and its "Community Relations Manager and Content Strategist."  Albert is a member of Bancor DAO and serves as an Administrator on the Governance Forum under the username "Here2DeFi."  She frequently moderates other Bancor communication and community channels, including on Telegram (@JensTelegram), X (formerly Twitter) (@Here2DeFi), Discord, and periodic "Bancor Community Calls," some of which are recorded and made publicly available on Bancor's YouTube channel.  On information and belief, Albert resides in Phoenix, Arizona.

31.     Non-party Rick Barber ("Barber") was a paid employee or contractor of Defendant LocalCoin until about June 2023.  His job responsibilities included "evaluating the events that the Bprotocol Foundation should sponsor on Bancor's behalf"; "ensuring brand visibility and stakeholder engagement"; "orchestrating speaker line-ups, scheduling participant attendance, designing the booth, and managing travel arrangements" for Bancor-sponsored events; and "collaborat[ing] with other team members" to "promot[e] the Bancor protocol to target audiences." On information and belief, Barber resides in Ennis, Texas.

### III.   JURISDICTION AND VENUE

32.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs assert claims under Sections 5, 12(a)(1), and 15 of the Securities Act, 15 U.S.C. §§ 77e, 77l(a)(1), 77o.  This Court also has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v.  This Court has jurisdiction over the Exchange Act claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), which provides that federal courts have exclusive jurisdiction over violations of the Exchange Act, including Sections 5, 10(b), 15(a)(1), 20, and 29(b), 15 U.S.C. §§ 77e, 78j, 78o(a)(1), 78t, 78cc(b).

33.     This Court has subject-matter jurisdiction over state law claims asserted in this action under 28 U.S.C. § 1367(a).

34.     This Court has specific personal jurisdiction over all Defendants because they have purposefully availed themselves of the privilege of conducting activities in the United States in connection with their offer and sale of unregistered securities, their operation of an unregistered exchange, and their fraudulent efforts to induce investment from U.S.-based retail crypto investors. Examples of these activities include:

      a.     persuading Plaintiff Nathan Gruber to maintain his investment in the LP Program by misrepresenting key facts during in-person conversations at a crypto conference in Austin, Texas on or about June 9-11, 2022;

      b.     corresponding directly with U.S.-based investors, including Plaintiff Michael Basic, a resident of this District, about the LP Program and misrepresenting the offer and sale of investments in the LP Program to Mr. Basic and other investors, while knowing, upon information and belief, that Mr. Basic resides in Austin;

      c.     employing multiple U.S. persons, including a "Community Relations Manager and Content Strategist" in Arizona, whose responsibilities include organizing and

attending in-person promotional events in the U.S. and to solicit investment from U.S. persons like Plaintiffs;

        d.      soliciting, securing and publicizing venture capital investment from prominent U.S. investors, including Tim Draper;

        e.      soliciting investment from and knowingly selling investments in the LP Program to thousands of U.S. investors—including Plaintiffs Nathan Gruber and Mike Basic, and billionaire Mark Cuban, among others—while concealing their purported ineligibility to participate;

        f.      marketing v3 and offering the LP Program to retail investors at crypto conferences throughout the United States, including in Miami, Florida in 2021 and in Denver, Colorado; Palm Beach, Florida; and Austin, Texas in 2022;

        g.      funding and directing related events in the U.S., including (among others) an "afterparty" for Bancor LPs in Miami, just days after v3 was officially announced;

        h.      funding and directing online marketing and promotional activities to solicit investment from retail investors like Plaintiffs, much of which is targeted to niche U.S. audiences; and

        i.      presenting favorable tax treatment as a potential benefit of v3 for U.S.-based investors.

35.      This Court also has specific personal jurisdiction over all Defendants because they are partners in Defendant Bancor DAO, an unincorporated general partnership which has purposefully availed itself of the privilege of conducting activities in the United States in connection with the offer and sale of unregistered securities, the operation of an unregistered exchange, and the fraudulent efforts to induce investment from U.S.-based retail crypto investors.

36.     Defendants engaged in conduct that had substantial foreseeable effects throughout the United States and within the State of Texas.

37.     Venue lies in this District under 15 U.S.C. § 77v(a) because one or more Defendants is found or transacts business in this District and because offers and sales at issue in this action took place in this District.  Defendants marketed, offered and sold the LP Program to residents of this District, including in-person on June 9, 10 and 11, 2022, in Austin, Texas.

## IV.    BACKGROUND CONCEPTS

### A.    Crypto Assets and Automated Market Makers

38.     Crypto assets are digital assets that—to date—are not issued by any government or central authority.  A "token" is a unit of a specific crypto asset.  Tokens are fungible and tradeable.

39.     A decentralized exchange ("DEX") enables the exchange of crypto assets without any form of third-party oversight of users' trading activity.  In contrast to centralized exchanges (like the New York Stock Exchange or centralized crypto asset exchanges such as Coinbase), DEXs do not require traders to transfer custody of their crypto assets to a central authority or a "trusted" third party in order to execute a trade.  Instead, transactions are securely and publicly recorded on a "blockchain," which functions as a kind of immutable ledger and exists on a network of computers.

40.     Different blockchains record transactions of different types of crypto assets.  All or nearly all crypto asset transactions relevant to this lawsuit are recorded on the Ethereum blockchain.  The nodes that validate transactions on the Ethereum blockchain are clustered more densely in the United States than in any other country.

41.     Crypto assets are typically designated by three- or four-letter symbols, like stocks. For example, Ethereum—the "native" token of the Ethereum blockchain—is denominated "ETH."

Chainlink—the crypto asset native to the Chainlink network—is denominated "LINK." "BNT" refers to Bancor's native token and, as noted, "vBNT" refers to Bancor's governance token.

42.     To facilitate asset exchanges between multiple parties, exchanges—whether centralized or decentralized—must have mechanisms to maintain asset liquidity and determine asset prices. A stock exchange, for example, implements this through an order book system, where buyers and sellers submit orders which specify the price and volume of an asset they would like to buy or sell. The trading price is determined by matching orders.

43.     Automated Market Makers ("AMMs") are a type of DEX that purport to solve both problems by maintaining pools of particular crypto assets and holding themselves open, on a continuing basis, as willing to facilitate trades in those assets. In an AMM, trades are executed by "smart contracts" that algorithmically provide prices. A smart contract is characterized by an address, a balance, and code. The smart contract acts as custodian of crypto assets, receiving and disbursing assets using algorithms specified by the code. AMMs generate revenue by charging traders transaction fees.

44.     AMMs depend on crypto asset owners to provide liquidity. Investors—commonly called "liquidity providers" or "LPs"—deposit their crypto asset into one or more "liquidity pools." Custody of the deposited assets transfers to the "smart contract" or protocol operating the AMM. In return for their investment, LPs are entitled to a share of the fees paid by traders who use the exchange, often referred to as the "interest" or "yield" on the LP's investment.

45.     Thus, an AMM liquidity pool is a smart contract that holds crypto assets invested by LPs and makes them available for exchange. The smart contract's code specifies, among other things, the rules for liquidity provision and for trading, how asset prices are determined, the trading fees that traders pay to use the liquidity pool, and the yield that LPs receive on their investment.

### B.    Decentralized Autonomous Organizations ("DAOs")

46.    Most AMMs are organized as "Decentralized Autonomous Organizations," or "DAOs."

47.    DAOs are—at least in theory—a social coordination technology that deploys blockchain-based smart contracts to facilitate collective action by unrelated parties *without* a centralized coordinating authority.  They are open to participation by anyone who acquires the DAOs' "governance token."

48.    DAOs are often presented as highly democratic and transparent governance structures that offer a fundamentally decentralized approach to governance in which control is spread among its members.  Governance rights are distributed in the form of a specific type of token. Holders of that token can vote on proposals, which are implemented if the requisite number of tokenholders vote in favor.  All major decisions are made this way, including hiring and firing, disbursements from the DAO's "treasury" or reserve funds, and—in the case of AMMs like the Protocol—material changes to the features, functionality, and rules of the shared investment.

49.    A growing number of U.S. courts and legal commentators have recognized that DAOs generally constitute partnerships under U.S. law.

50.    However, the actual governance authority in many DAOs is highly concentrated and the original founders, developers, and promoters of the underlying protocol retain significant control over its management, design, and promotion.  This is true for Bancor.

### C.    Characteristics of AMM Liquidity Pools

51.    As explained by Bancor Head of Growth Nathaniel ("Nate") Hindman, "in order to succeed, an AMM has to be attractive to liquidity providers."  Indeed, attracting investment from crypto asset owners like Plaintiffs is "the most important competitive issue in the AMM space."

52.    But most AMMs are characterized by two features that are undesirable to investors.

53.     *First*, most AMMs maintain their liquidity pools in asset pairs, which facilitate exchanges between those specific crypto assets.   To invest, LPs must deposit both assets exchanged in the relevant liquidity pool, in a specific ratio.

54.     For example, to contribute to a liquidity pool that facilitates trades between TKN A and TKN B, the LP would be required to deposit both TKN A and TKN B tokens, in a ratio specified by the AMM's smart contract (and generally tied to the exchange rate between the two assets at the time of deposit).  Hypothetically, if the value of one TKN A token was $1 and the value of one TKN B token was $2, an LP wishing to invest 100 TKN A would simultaneously be required to invest 50 TKN B.

55.     *Second*, trading activity can cause the exchange rate *within* an AMM liquidity pool—the price of each asset in terms of the other asset—to diverge from market prices, creating an opportunity for arbitrage.  Continuing the hypothetical above, if the external market value of TKN A token rose to $2 while the value of TKN B held constant, traders would purchase TKN A at the more favorable "in-pool" price of 0.5 TKN B (and sell TKN B at the above-market price of 2 TKN A).  That activity would continue until the liquidity pool prices matched the market.

56.     As a result, LPs incur so-called "impermanent loss."  As Defendants have explained in their promotional materials and developer documents, impermanent loss is the difference between "the value of your tokens in a liquidity pool (including fees collected) versus the value of simply holding the tokens in your wallet."  No loss is realized by the LP if the relative price of the assets in the liquidity pool returns to its original level (when the LP invested) by the time they withdraw their investment.  But, as Hindman explained in a May 2020 post promoting Bancor: "More often than not, impermanent loss becomes permanent, eating into your trade income or leaving you with negative returns."

## V.    A BRIEF HISTORY OF BANCOR

### A.    Defendants Raise $153 Million in an ICO of Bancor's Native Token

57.    Defendants Guy and Galia Ben-Artzi and Eyal Hertzog incorporated LocalCoin under Israeli law in or about August 16, 2016.

58.    In or about April 2017, the Individual Defendants incorporated the Foundation under Swiss law.  The Foundation's purpose was "the establishment of the Bancor protocol as a global standard for intrinsically tradeable currencies."  Defendants Hertzog and Guy Ben-Artzi were identified respectively as "President" and "Member" of the Foundation's board.  Both served continuously as Foundation board members through at least October 2022.  On information and belief, they continue to do so.

59.    In May 2017, Defendants Hertzog, Guy Ben-Artzi, and Galia Ben-Artzi published a draft whitepaper entitled "Bancor Protocol,"[4] in which they formally presented Bancor and announced an imminent initial coin offering ("ICO") of BNT to fund its development.  Defendants proposed to revolutionize crypto asset exchange systems by creating AMM liquidity pools that paired crypto assets deposited by investors with network-generated "smart tokens" instead of another crypto asset.  Those smart tokens—i.e., BNT—would "implement the Bancor protocol, providing continuous liquidity" in the crypto asset with which it was paired "while automatically facilitating price discovery" for that asset.  In effect, Defendants proposed to solve liquidity constraints across a theoretically unlimited array of crypto assets, no matter how niche or how

---

[4] The draft was subtitled: "Continuous Liquidity and Asynchronous Price Discovery for Tokens through their Smart Contracts; aka 'Smart Tokens.'"  The final version is dated March 18, 2018, and entitled "Bancor Protocol: Continuous Liquidity for Cryptographic Tokens through their Smart Contracts."

new.  The draft whitepaper explained that users could "generate BNT" (that is, acquire BNT tokens) by "contributing" to a "fundraiser" (*i.e.*, the ICO) scheduled for June 12, 2017.

60.    With the well-publicized backing of prominent U.S. investors and "advisors" like billionaire venture capitalist Tim Draper, the ICO raised over $153 million in a matter of hours.[5] According to the March 2018 version of Defendants' whitepaper, only "half" of the initial supply of BNT was distributed to ICO participants, while "the other half [was] held by the Bprotocol Foundation" and allocated to the Foundation's "long term budget," "existing and future team and advisors," "partnerships," and "community grants."

61.    At the time of the ICO, BNT ownership was extremely concentrated—the top 100 BNT wallet addresses controlled about 84% of all BNT.  That concentration persists to this day: 100 wallet addresses control about 89% of all BNT.

62.    Defendants have never publicly accounted for this concentration in BNT nor confirmed how much of if they control.  However, taken together, public statements—including the allocation of BNT from the ICO described in Defendants' 2018 whitepaper, statements by billionaire U.S. investors Tim Draper and Mark Cuban identifying themselves as investors and statements by Defendants publicly welcoming them, and statements by multiple "Bancor" personnel (employees of Defendant LocalCoin) confirming they are BNT holders—suggest that a substantial portion of the concentrated BNT ownership is directly or indirectly controlled by the Individual and Entity Defendants.

---

[5] For example, just prior to the ICO, Defendant Galia Ben-Artzi published a posted titled "Tim Draper of Draper Associates Invests in Bancor:  Venture Capitalist Tim Draper Will Explore Creating an Always Liquid VC Smart Token on the Bancor Platform," stating that Mr. Draper was "contributing to the Bancor Network Token launch," "joining the Bancor Advisory Board," and was "excited about the potential of the Bancor protocol to democratize to bring continuous liquidity to a new generation of user-generated tokens emerging in the blockchain ecosystem."

63.     Likewise, and despite repeated requests from members of the class, Defendants have never publicly explained what happened to the $153 million raised in the ICO or the profits they have earned since launching the Protocol (collectively, the Bancor "Treasury").

64.     On January 8, 2018, the Individual Defendants filed a patent application with the U.S. Patent and Trademark Office for an invention titled "Methods for Exchange and Evaluating Virtual Currency," i.e., the technology underlying the Protocol.[6] The Individual Defendants were listed as the "inventors" of the Protocol. The application was later granted[7]

65.     The Individual Defendants then assigned the patent jointly to LocalCoin and the Foundation, which are its current owners. The USPTO recorded that assignment on November 13, 2019.

**B.     Defendants Launch the Protocol, Rolling Out a Series of Investment Products called "Versions"**

66.     Defendants have offered several versions of Bancor since its launch, with some versions operating side-by-side.

67.     Bancor v1 launched in or about the winter of 2017.

68.     Bancor v2 launched in April 2020, followed by v2.1 in October 2020.

69.     Versions 2 and 2.1 first introduced the features of "single-sided staking" and "Impermanent Loss Protection," described below.

70.     Version 2 also introduced "liquidity mining rewards," through which Bancor distributed additional BNT to LPs "to win more conversions in the market, which generates more fees for liquidity providers and results in increasing APY [yield] and protocol revenue," according to a DAO proposal. As described below, through its control of the Bancor DAO, the Foundation

---

[6] They filed a provisional application was filed one year earlier, on January 7, 2017.

[7] Patent No. US 11,574,291 B2 (Feb. 7, 2023).

aggressively pushed to extend liquidity mining rewards, reaping windfalls for itself but ultimately leaving Bancor insolvent.

71.     At its height, investors had more than $2.3 billion worth of crypto assets invested in v2.1.

72.     Defendants officially announced the advent of v3 on November 28, 2021, kicking off an intensive months-long marketing campaign.  Richardson, Hindman and Albert were the most frequent public faces of Bancor in that marketing campaign, which presented v3 as the long-awaited realization of the original vision promoted by Defendants since 2017.

73.     In or about March 2022, Defendants proposed the terms of the v3 investment contract to the Bancor DAO by posting "BIP15: Proposing Bancor 3" ("BIP15") on the Governance Forum, and then promoting it to a (successful) vote in or about April 2022.[8]

74.     BIP15 described the material terms of the LP Program at issue here.  These terms included "Single-Sided Staking across 150+ tokens," "Instant Impermanent Loss Protection," "unlimited liquidity provision," "Auto-Compounding" and "Dual" Rewards, and "Composable Single-Sided Pool Tokens."  BIP15 promised LPs that "[t]he value of a user's principal, and all fees and rewards earned thereon, are immediately and permanently protected against the effects of price divergence (the phenomenon commonly referred to as 'impermanent loss')."  BIP15 also described the fees LPs could expect in exchange for their liquidity, including rewards and other "staking incentives."  Bancor described v3's LP Program as "[t]he Ultimate DeFi Liquidity Solution empowering DAOs and their token holders to drive community-sourced liquidity and access safer, more sustainable DeFi yields that are 100% protected from Impermanent Loss."

---

[8] "BIP" stands for "Bancor Improvement Proposal."

75.     In addition, BIP15 stated: "Bancor 3 is under the exclusive control of Bancor DAO. The existing governance policies and processes are inherited by the new release, and vBNT continues to serve as the voting token."   BIP15 also introduced a withdrawal wait time, and withdrawal and certain other fees to be paid by LPs.

76.     In addition to BIP15, other Bancor-proposed BIPs set forth certain terms of the LP Program.  For example, BIP17 proposed an initial list of crypto assets eligible for trading on v3, while BIP18 set forth the LP Program's "liquidity mining rewards"—a form of interest earned by LPs.  BIP21 and BIP22 described the emergency powers of the Bancor DAO "Multi-Sig," a committee of seven including three Foundation appointees and four appointees from "other crypto projects" identified by the Foundation.  According to these proposals, the Multi-Sig committee had the power to "pause" the Protocol.  Specifically, neither this committee nor Bancor DAO is allowed to otherwise "intervene with the withdrawal of funds."

77.     Defendants launched v3 on May 11, 2022.  They strongly encouraged v2.1 investors to migrate their investments to v3 by creating and promoting "one click migration," advertising v3's purportedly superior features (*e.g.*, immediate IL Protection), and announcing the end of certain v2.1 rewards programs upon the launch of v3.  They encouraged v2.1 investors and "newbies" alike to invest additional crypto assets in their new—and newly unlimited—investment product.  By May 30, 2022, the LP Program had attracted $300 million worth of LPs' investments.

78.     As described in Section X, v3 entered a "death spiral" about a month after it launched.  Defendants initially attempted to dissuade v3 investors from withdrawing through a series of false assurances, including that the purported "IL Protection suspension" was only temporary.

79.     In or about November 2022, Defendants began promoting "Carbon," a purported "next generation" successor to v3 which would help recover losses.  For example, in a November 28 Governance Forum post entitled "Introducing Carbon:  an update to the Bancor DAO and Community," Albert asserted: "I strongly believe [Carbon] has the potential not only to restore reserves in Bancor v2.1 and v3, but transform DeFi by attracting vastly more liquidity and trading on-chain."  No such restoration or recovery materialized.

80.     Starting in or about May 2023—*i.e.*, about when this lawsuit was initially filed—Defendants began "sunsetting" v3 through Bancor DAO.  As of the date of this filing, that process is still underway.

81.     Class members who remained invested in the LP Program in the hopes of being made whole face loss amounts well over 50% if they were to withdraw their investment now.

## VI.     DEFENDANTS MARKET TWO KEY FEATURES TO INVESTORS: SINGLE-SIDED STAKING AND IMPERMANENT LOSS PROTECTION

82.     Defendants solicited investment by emphasizing two distinctive features about the LP Program: single-sided liquidity deposits and protection from impermanent loss.

### A.     Single-sided liquidity deposits and pool "rebalancing"

83.     Beginning with v2, Bancor removed the standard AMM requirement that LPs deposit crypto assets in pairs (and in a specific ratio) by minting its own network token, BNT, in proportion to each LP's investment.  As Bancor explained in a tweet, "[t]he protocol co-invests $BNT alongside LPs."

84.     In the LP Program, the LP provides only one side of the asset pair.  This is Bancor's single-sided liquidity deposit feature.  For example, if an LP deposited 100 LINK, the Protocol would mint 100 LINK's worth of BNT.  These tokens end up in the LINK:BNT liquidity pool.  So too with any other crypto asset deposit—ETH tokens are deposited into an ETH:BNT liquidity

pool, LPL into an LPL:BNT pool, and so on. BNT acts as the connective tissue of the Protocol, mediating the exchanges between all other crypto assets traded on Bancor.

85.     When an LP invests a crypto asset in Bancor—for example, by depositing 100 LINK into the LINK:BNT liquidity pool—they receive "pool tokens" representing their investment in the pool and Bancor's promise to return their investment in full—plus all yield and rewards—upon withdrawal.

86.     Accordingly, when an LP withdraws from the Protocol, they exchange their pool tokens for the tokens they originally provided, plus their earned fees and other "rewards." However, instead of receiving 100% of the tokens originally invested, withdrawing LPs may receive a "partial reimbursement in BNT," due to fluctuations in the market price of the asset invested and resulting arbitrage opportunities against the corresponding liquidity pool. Likewise, fees and rewards are accrued in BNT and often paid to the LP in BNT. Upon withdrawal, the protocol "burns" (or destroys) the pool tokens exchanged by the LP.

87.     For example, suppose an LP provides 500 TKN to the protocol as an investment, and suppose the value of each TKN is $1. Suppose also that the value of BNT is $1. Upon the LP's investment, the Protocol mints 500 BNT, such that the pool liquidity ratio reflects the exchange price of TKN:BNT. This TKN:BNT pair is a liquidity pool supporting trades between TKN and BNT, with an implied exchange price of 1:1. If the market value of TKN rises to $1.2, traders will purchase TKN from the TKN:BNT liquidity pool, decreasing the amount of TKN and increasing the amount of BNT in the pool. This process will continue until the implied exchange

price is 1.2 TKN to 1 BNT, and the liquidity pool is "rebalanced" to reflect this ratio. It is possible to calculate this rebalancing, which results in 456 TKN and 547 BNT.[9]

88.     If the LP withdraws now, they are entitled to their 456 TKN as well as 47 BNT—the amount compensating the LP for the loss of 44 TKN (and equal to the current amount of BNT minus the original 500 BNT supplied by the protocol). The 47 BNT "reimburse" the LP for the TKN deposited but not returned. The mechanics of the Protocol require all 547 BNT in the liquidity pool to be burnt and the relevant reimbursement (here, 47 BNT) to be newly minted.

89.     Defendants offered a second example. Suppose an LP deposits 3 TKN, valued at $1.33, and suppose (as before) the value of BNT is $1. The Protocol will mint 4 BNT to pair with the 3 TKN (the liquidity ratios reflect the exchange rate). When the value of TKN rises to $3, arbitrageurs will trade until the pool "rebalances" at 2 TKN and 6 BNT. If the LP withdraws their investment at this point, the protocol will provide them 2 TKN and 3 BNT—2 tokens in the numeraire of their original investment, plus 3 BNT equivalent to 1 TKN (at withdrawal).

90.     Thus, single-sided liquidity deposits as implemented by Defendants require a significant portion of LPs' investments to be paid out in BNT when there is a deficit in the original token—when, that is, the quantity of the original token is insufficient to reimburse the totality of all LPs' stakes in that token.

91.     And this was the case with the LP Program: the Protocol was always in deficit, as Defendants alone knew. As a result, LPs' withdrawals almost always included a significant amount of BNT as reimbursement for the "rebalancing losses" described above.

   **B.     Protection Against Impermanent Loss**

---

[9] This calculation is based on the formula used to calculate the exchange price as well as the formula for the price of one token in terms of another.

92.     The flagship feature of the LP Program that Defendants used to induce investment was so-called "IL Protection," or—so they said—total protection from the risk of loss associated with providing tokens to the Protocol rather than holding them.

93.     As explained, IL is calculated as a function of the old and the new exchange rates. In the first example (an LP initially providing 500 TKN), if the LP had simply held these amounts outside of the Protocol, the value of their holdings would be $600 (500 TKN * $1.2).  Following the rebalancing described above, the value of the LP's investment is $594.20 (456 TKN * $1.2 + 47 BNT * $1).  Impermanent loss amounts to the difference between these totals, $5.80.

94.     As Defendants recognized, AMM mechanics mean that investors virtually always incur this type of loss against a hold strategy.  When one token gains in market value, AMMs (including Bancor) sell the rising asset into the rally, meaning they cannot profit from subsequent price increases.

95.     Defendants promised to protect LPs in the LP Program from IL.  Leading up to, and on the day of, the release of the LP Program, Bancor told LPs they were "100% protected from Impermanent Loss" in the LP Program.  This was a lie.

## VII.   DEFENDANTS AGGRESSIVELY SOLICIT CRYPTO DEPOSITS FROM INVESTORS IN THE UNITED STATES

96.     Defendants engaged in in-person and online promotional activities that intentionally targeted U.S. investors and solicited investment from U.S. investors, including Lead Plaintiffs.  In so doing, they focused on retail investors, marketing the purported security of Bancor's IL risk protection—which, they said, guaranteed LPs "100% upside exposure" on their investment.  Likewise, Defendants touted the profits LPs could earn by investing their crypto assets in the LP Program, centering "Impermanent Loss Protection" as a key part of this pitch.  As a

result, they insisted, investors in Bancor's LP Program would yield higher and safer returns than were available through alternative AMMs or a "hold" strategy.

**A.    Defendants targeted U.S. investors through in-person pitches at crypto conferences and a network of U.S.-based personnel, partners, and promoters**

97.    Defendants made these representations in-person at industry conferences throughout the U.S., including in Texas, Florida, New York, California, and Colorado.  At these conferences, Bancor personnel engaged U.S. investors in extended, direct conversations in which they solicited investment in the LP Program and discouraged withdrawal. [10]  Not only did Defendants target U.S. investors, but they targeted U.S. retail investors by emphasizing the LP Program's simplicity and safety.

98.    In the lead-up to the launch of v3, Bancor heavily advertised these conference appearances and funded related promotional activities and "after-parties."

99.    For example, on December 1, 2021—shortly after Defendants officially "announced" v3—they hosted an afterparty during DecentralCon in Miami, Florida, billed as "LP's Paradise with Bancor."  Multiple Bancor personnel promoted the event, including Hindman, who invited those in the Miami area to "DM me for details," noting that there would be "live aerial performances in a giant tiki bungalow."

100.    U.S.-based investors attended the conference and posted footage from the Bancor after-party (including the aerial performances), including one who commented "@Bancor afterparty was honestly the first time I thought 'maybe #DeFi is just too profitable somehow.'"

---

[10] A partial list of conferences attended by Bancor personnel in connection with the marketing and launch of v3 include: DecentralCon in Miami, Florida, in November and December 2021 ("DecentralCon 2021"); Ethereum Denver from February 11-20, 2022 in Denver, Colorado ("Ethereum Denver 2022"); Permissionless in Palm Beach, Florida in May 2022 ("Permissionless 2022"), and Consensus in Austin, Texas in June 2022 ("Consensus 2022").

**Coop** 🔲 🐱
@coopernicus01                                                    ...

⬚ ⬚ ⬚ afterparty was honestly the first time I thought "maybe ⬚ ⬚
is just too profitable somehow". It was too cool...

Free drinks, ⬚ ⬚ ⬚ private concert, whatever this video is. It was
amazing.



0:15

12:36 PM · Dec 2, 2021

🗨 2          ↻ 7          ♡ 51          🔖 1          ⬆

   101.   Richardson presented live at DecentralCon 2022, telling the audience: "You shouldn't have to know about impermanent loss. You just provide liquidity, get your interest, and that's the end of it."

102.    At the end of the weeklong Ethereum Denver 2022 conference, Defendants sponsored a "community pub crawl" in Denver.  They also sponsored a DeFi & Fashion event in New York City in February 2022.

103.    In May 2022, just after v3 launched and just prior to Permissionless 2022 in Palm Beach, Defendants posted:



104.   During the conference, Richardson and Hindman sat for a 25-minute in-person interview with "DeFi Dad," a prominent Florida-based "super-user, educator, and investor in DeFi" used by Defendants to promote Bancor.   Throughout the interview—which was "made possible by the Bprotocol Foundation," as explained on the YouTube page containing the interview—DeFi Dad refers positively to his own investments with Bancor and in the LP Program, at one point saying that its rewards and protections seems "too good to be true."   Richardson and Hindman never correct DeFi Dad to remind him (and viewers) that U.S. investors are discouraged from the LP Program.   Instead, a haunted-looking Richardson—perhaps mindful of the deficits continuing to build at that very moment on the Protocol—says that one of the LP Program's innovations is that it "incentivizes liquidity without driving your token price into the ground."   This would prove to be a lie.

105.   From June 9-12 2022, Plaintiff Nathan Gruber attended Consensus 2022 in Austin, Texas, where he spoke at length with three of Defendants' representatives, including Richardson, Hindman, and Integration Analyst Joshua Schone.   Mr. Gruber notified them that—in the course of executing a temporary withdrawal of certain LINK tokens from the LP Program around May 30 (intending to switch wallets and then reinvest)—he had unexpectedly incurred losses that appeared to be the result of IL.   The representatives replied—falsely—that Mr. Gruber's experience was a one-off error, that IL Protection was fully deployed, and that Mr. Gruber would be made whole.   They assured Mr. Gruber that the LP Program had abundant BNT and LINK reserves and faced a negligible risk of ever depleting them.   Relying on those representations, Mr. Gruber maintained his remaining position in the LP Program, resulting in a loss of 22,600 LINK when he withdrew that investment several weeks later.

106.   Defendants advertised Bancor as "Simple. Safe. Staking."   Defendants'
representatives handed out Bancor condoms at crypto conferences throughout the U.S which read:
"Always use impermanent loss protection."  The packaging advertised: "Bancor is the only DEX
that fully protects users from IL. No matter how your tokens move in price, you're always earning
from volatility with ZERO risk of IL."



107.   In a related post, Defendants reminded users: "always practice Safe DEX."

 **Bancor**
@Bancor

...

The _____ collection aims to remind users to protect the tokens they love and always practice Safe DEX.

With Bancor Safe Staking, you can stake single-sided with 100% protection from impermanent loss.

Provide liquidity, simply and safely:



7:26 PM · Feb 25, 2022

108.    Bancor also sold t-shirts which sported the message: "Set It. Forget It."

**B.      Defendants solicited investment through online content targeted to niche U.S. crypto communities**

109.    In addition to the Governance Forum, Defendants funded and published a deluge of promotional content on X (formerly Twitter), YouTube, Medium, Discord, Reddit, Github, Telegram, the "Bancor" website, and other online and media channels.[11]  Many of these channels hosted purportedly "open" community discussion and debate.

---

[11] URLs associated these online channels include:

- https://twitter.com/bancor

110.    Much of this content targeted niche audiences of U.S.-based retail investors in crypto.

111.    To solicit investment in Bancor v3 from U.S.-based retail investors like Plaintiffs, Defendants hired U.S.-based community "organizers" and promoters (Albert and Barber).  They also partnered regularly with influencers and promoters who were prominent within particular communities of U.S.-based crypto investors.

112.    One example is "DeFi Dad," the prominent Florida-based "super-user, educator, and investor in DeFi," whose recorded interview with Richardson and Hindman at Permissionless 2022 was "made possible by the Bprotocol Foundation."

113.    Another example is "ChainLinkGod," a "Community Ambassador" for Chainlink, the network behind LINK, a crypto asset popular with U.S.-based retail investors (including Lead Plaintiffs, all of whom invested LINK in v3).

114.    On November 29, 2021—shortly after formally announcing the advent of v3 and just prior to Defendants' presentations and after-party at DeCentralCon in Miami—Defendants streamed an online "Round Table" titled "Bancor3: A First Look."  Participants included

---

- https://www.youtube.com/channel/UCA125wWsdbsG1XPenWcBkyg
- https://bancor.medium.com/
- https://www.reddit.com/r/Bancor/
- https://github.com/bancorprotocol
- https://t.me/bancor (Bancor Telegram channel available via application only)
- https://bancor.network/
- https://blog.bancor.network/

Links to additional channels are available on Bancor's website, at https://support.bancor.network/hc/en-us/articles/4417224986898-Communication-channels

Defendant Yehuda Levi, Richardson, Hindman, ChainLinkGod, and DeFi Dad. The Round Table was then published to Bancor's YouTube channel.

115. To introduce v3, Richardson began by asserting the "creeping influence" of "the old Gods of Finance," who were "start[ing] to introduce their own versions" of decentralized finance which "play[ed] up to sophisticated actors." In contrast, said Richardson, "at Bancor we really reject idea that finance is something that only the elite can perform … we want it to be open and available to everyone. And for that, we need to make sure that our product is as easy and safe to use as possible."

116. Several participants opined as to the best new features in v3. DeFi Dad speculated that auto-compounding rewards would result in more favorable treatment under the U.S. tax code, adding that he was "obviously focusing on those of us in the U.S." ChainLinkGod agreed that "automatic compounding" was "significant for the potential tax implications" and also for the "gas implications" (*i.e.*, reduced fees) which would permit investors to "boost your yield significantly more . . . especially if you're a smaller token holder."

117. ChainLinkGod explained that Bancor was his "go-to answer" for investors seeking to "earn yield" on their LINK tokens because he would "never" "suggest anything that has impermanent loss" and "most other yield farms are not very long lasting."

118. In response to a listener question, Richardson explained that by migrating to v3, "the chances of getting the token [invested] back [upon withdrawal] and getting no BNT [would be] improved," adding: "especially if you're a smaller liquidity provider, migrating to Version 3 will mean that it's much more likely that the improved algorithm will be able to reimburse you entirely in the TKN that you provided."

119.     Defendant Yehuda Levi explained that "the difference between v3 and every [prior] version" launched since v1 is that v3 represented "the first time that we [re-built] everything from scratch" and could implement "all kinds of subsystems that we wanted to do for a long time," looking at the Protocol in "a more holistic way that we couldn't do until now."

120.     Richardson explained that the v3 pool tokens were "brand new," "very special" and "know[] . . . the Protocol's obligations to its users."  He also noted that, in a hypothetical impermanent loss event, the "Bancor Protocol would be on the line for reimbursing users for [their] losses."

121.     Bancor's public website advertised the LP Program as taking "'stake and chill' to a whole new level," and "level[ing] the playing field for everyday users seeking safe and sustainable yield."  In blog posts, Defendants encouraged LPs to proselytize to "that normie friend who's been asking for a lesson on earning double-digit yield in DeFi," going so far to offer "bounties" for content legible to everyday investors.  Defendants also claimed that IL protection "made the act of depositing tokens in an AMM pool safer, easier, and more lucrative for everyday token holders," saying that "Bancor is the only AMM where users can 'stake and forget' their tokens with full exposure to a single asset and zero risk of impermanent loss."  The aim, according to Hindman, was to create a "set it and forget" AMM solution, so "lazy liquidity [could] actually be lazy," and users did not need to understand the complexity and risk of their investments.

122.     Similarly, on July 19, 2021, Defendants described Bancor's "IL Protection" program as "the simplest, safest, and smartest solution to earn passive income in any market condition."



**Bancor**
@Bancor                                                          ...

↗ Bancor adoption is constantly rising! ↗

A growing # of LPs realize Bancor has the simplest, safest & smartest solution to earn passive income in any market condition

Stake w/ single-token exposure & IL protection & start earning stress-free yield



**hildobby** @hildobby_ · Jul 19, 2021
Despite the market crash, the number of protected positions and wallets on @Bancor just keeps on rising ↗



8:40 AM · Jul 19, 2021

123.    And, on December 12, 2021, Defendants told prospective LPs that they should not even have to understand the risk of impermanent loss.



**Bancor**
@Bancor                                                    ...

**Will most DeFi users eventually understand
impermanent loss? No.**

**Should they have to? No.**

**With Safe Staking on Bancor, there's no need to worry
about IL because you're 100% protected:**

124.    Defendants also promoted potential returns to LPs through Bancor's website and

social media presences.  For example, on January 7, 2022, Defendants advertised the LP Program

as "creating more yield for LPs."



**Bancor** ☁️
@Bancor

Let's dive into           Dual-Sided Rewards 🧩🧩

This long-awaited feature lets DAOs attract more liquidity for their token – creating more yield for LPs & marketing buzz around the Bancor Protocol.

Time for a 🧵

12:08 PM · Jan 7, 2022

💬 6          🔁 32          ♡ 109          🔖 7          ⬆️

125.     Defendants advertised on Bancor's public website that retail investors could earn returns on their investment, urging LPs to "Grow your" Ethereum, Bitcoin, and other tokens.  An "Earn" tab on that same website facilitated retail investors' access the LP Program while promising investors they could "Deposit a single token and maintain 100% upside exposure while earning

fees and rewards." On an archived version of the public website taken in March 2022, Defendants told investors that "[w]ith Bancor 3, we want you to earn more while doing less."

126.   Yet after the Protocol crashed and Plaintiffs and other LPs suffered heavy losses, the Foundation and Individual Defendants distanced themselves from these solicitations and deflected blame to LPs. "We understand you may have . . . miscalculated the risks involved in DeFi and AMMs specifically and as such we are trying to be understanding towards the frustration you displayed," the Foundation wrote one frustrated LP.

**C.**   **Defendants intentionally concealed the purported restriction on U.S. investment in v3**

127.   Although the Bancor Terms of Use purported to restrict the LP Program to non-U.S. residents, Defendants hid that fact from U.S. investors and actively solicited their investments.

128.   Until at least May 2023, Bancor's "Terms of Use" were concealed on its website; an LP would have to navigate through a drop-down menu to find them (and then review them in detail to find the purported exclusion). In contrast to most crypto companies that do not accept investment from U.S. investors, Bancor did not require LPs to view, read, or agree to the Terms of Use at any point prior to investing, on its website or in the Bancor app.

129.   Furthermore, Bancor did not use any type of geo-blocking software to limit access or provide any form of prompt, warning, or pop-up message alerting LPs to the purported restriction. It did not ask investors to certify that they were not U.S. residents or domiciliaries or request any identifying information that would normally be used to indicate a U.S. investor.

130.   In contrast to locating Bancor's purported "Terms of Use", investing in the LP Program is easy. A prospective LP simply pressed a single button on Bancor's website application to connect their wallet to the Protocol. The prospective LP would then view the available v3

liquidity pools and the rates that LPs would receive for investing the corresponding crypto asset. The LP would then enter the amount of each crypto asset they wished to invest, and press "accept," transferring their tokens from their wallet to Bancor and receiving a pool token in return.  At this point, their investment was complete.

131.    Throughout this period, Defendants not only solicited investments from U.S. investors, but they publicly promoted their success.  For example, in June 2021, Defendants published a post formally welcoming billionaire investor Mark Cuban to Bancor DAO.



132.     Similarly, many of the individual DAO-members with whom Defendants interacted online and in-person were U.S. persons, which Defendants knew.  Examples include Plaintiffs Nathan Gruber and Mike Basic, DeFi Dad, ChainLinkGod, and U.S.-based Bancor personnel like Jen Albert and Rick Barber, among others.

133.     For these reasons, at the time of their respective v3 investments, no member of the Bancor Investor Group—which is comprised of sophisticated and experienced individual crypto investors—was aware that any "Terms of Use" purported to exclude the very U.S.-based investors that Defendants so strenuously courted.

134.     At about the time this lawsuit was filed, Defendants' public-facing online practices with respect to U.S. investors changed drastically.  Starting in or about May 2023, Defendants first incorporated geo-blocking and a pop-up warning, which reads: "Limited access in your location[.] According to the Terms of Service, users in your location are not able to use this site.  If you are already a liquidity provider, you are only able to withdraw your funds."  Defendants also newly required U.S.-based users to affirmatively "click" on something—a button labelled "I understand" at the bottom of the pop-up message—in order to proceed to the site.

## VIII.  DEFENDANTS KNOWINGLY MISREPRESENTED KEY FACTS ABOUT BANCOR AND THE RISKS OF THE LP PROGRAM

135.     The protection Defendants offered was primarily protection from impermanent loss—protection that Defendants knew they could not provide.  On Bancor's website and various social media platforms, Defendants repeatedly misrepresented material risks and features of the LP Program, including IL protection.  In a May 27, 2022 "fireside chat" posted to YouTube, for example, Head of Research Mark Richardson, claimed "[W]e're generating some of the most competitive returns anywhere in DeFi without asking users to take on any risk. I have nothing to

be afraid of."  He also said that "with BNT, [a death spiral] is literally impossible."  These statements were false when made, as Defendants knew and subsequent events would prove.

136.    While Defendants were marketing IL Protection, they received internal, confidential reports—commissioned by the Foundation—showing Bancor did not generate enough fees to offer this protection.  Indeed, the Protocol was critically vulnerable to a "death spiral" in the value of BNT, as in fact happened in June 2022.

137.    As revealed by a former employee ("Employee") of Defendants after the death spiral, Defendants had commissioned and received reports that contradicted their claim that the Protocol generated enough fees to cover their IL Protection guarantee—and Defendants knew of this contradiction since at least 2021.

138.    In late 2020, Defendants had hired an economic consulting firm specializing in crypto, Topaze Blue, to prepare reports for them about the economic health of the Protocol (the "Topaze Blue Reports"). [12]   The Topaze Blue Reports—which were co-authored by Bancor "Senior Advisor" Loesch and Head of Growth Hindman—analyzed the performance of the Protocol, including whether it generated enough fees to pay out IL protection to LPs.

139.    It did not.  According to the latest available 2021 Topaze Blue report—released to the Bancor community after a general outcry following the Employee's whistleblowing disclosures—the fees generated by the Protocol were sufficient to cover only 31% of Bancor's obligations under Defendants' IL protection guarantee.  In other words, the fees that were supposed to cover 100% of IL were only enough to cover 31% of IL.  In terms of BNT, the Protocol's fees

---

[12] The complete set of publicly-available Topaze Blue Reports are currently available at: https://github.com/bancorprotocol/economic-analysis/tree/main/v2_1/topazeblue_reports.

collected totaled only 6.85 million BNT, while its IL protection obligations totaled 22.21 million

BNT.  Topaze Blue vividly demonstrates this shortfall in the following graph:



140.    Putting the available Topaze Blue reports together, during the entire time

Defendants commissioned these reports, Bancor never had the ability to cover the LP Program's

signature IL protection with fees.



141.    The Employee also revealed that the Topaze Blue Reports were shared with Defendants and other high-ranking Bancor developers and Foundation members.  Defendants never shared the reports (or their content) with Bancor LPs, who in turn did not have access to them prior to the June 2022 death spiral.

142.    The information in the Topaze Blue Reports directly contradicts the information Defendants provided to Plaintiffs and other LPs, including information intended to induce their investment in the LP Program.  It also shows that the Protocol was unable to compensate LPs in the event of a mass withdrawal, which later transpired.

143.    For instance, on January 12, 2021, Defendants tweeted that "protocol revenue is covering the cost of IL protection."  In fact, Bancor's fees were sufficient to cover only 40% of IL protection in January 2021.

 **Bancor** ⋮
@Bancor
⋯

**In sum, protocol revenue is covering the cost of IL protection & generating a profit for the protocol & its owners,        holders**

**The results lend credence to the sustainability of v2.1 & support our belief that it offers a compelling answer to the problems of 1st generation AMMs**

7:34 AM · Jan 12, 2021

144.    On the same day, Defendants published a "report" which purported to analyze "on-chain data collected October 24, 2020-January 6, 2021 to analyze the growth and overall health of the protocol."  The report "highlights" included that "the value of swap fees earned by the protocol exceeded the total cost of impermanent loss compensation paid to liquidity providers by a margin of more than 5X," which "indicate[d] protocol revenue is covering the cost of impermanent loss protection, and generating a profit for the protocol and its owners (BNT holders)."

145.   On January 15, 2021, Bancor tweeted that "the cost of Bancor's impermanent loss insurance is far exceeded by revenue earned by the protocol from swap fees."



**Bancor**
@Bancor                                                    ...

**The chart below shows the cost of Bancor's impermanent loss insurance is far exceeded by revenue earned by the protocol from swap fees.**

**- Total IL compensation paid to LPs ≈ $64K
- Fees earned by the protocol & .       LPs in same period ≈ $560K**

**More:**



5:30 AM · Jan 15, 2021

146.   However, on both January 12, 2021 and January 15, 2021, the Topaze Blue Reports showed that Bancor's swap fees covered 46% and 40%, respectively, of Bancor's IL Protection obligations.

147.   On October 25, 2021, Hindman advertised that IL Protection was covered by fees generated from Protocol-owned liquidity and that "the model has sustained itself for a year now," despite knowing that—in all the months analyzed by Topaze Blue—the fees had never been sufficient to cover IL Protection for all LPs.



**Nate Hindman**
@NateHindman

Replying to

Bancor generates fees from protocol-owned liquidity that are used to cover IL

The model has sustained itself for a year now and V3 makes IL protection easier to use, and cheaper for both LPs and the protocol

11:29 AM · Oct 25, 2021

148.    On January 8, 2022, Hindman tweeted that Bancor's "trading fees" pay for IL

Protection, and that "[t]he protocol always aspires to achieve network fees > network IL and has

done so effectively."  Neither of these statements were true, as the Topaze Blue reports show.



**Nate Hindman**
@NateHindman

Replying to

Imagine thinking Bancor has claimed to solve IL and that we would be so naive to design a system that just gives out free BNT

(The protocol provides its BNT into pools alongside LPs and uses "trading fees" from protocol-provisioned BNT to compensate for any IL incurred by LPs)

4:57 AM · Jan 8, 2022

149.    Defendants not only lied to the market but also to investors directly.  When

Defendants announced the LP Program, investors and potential investors had questions, including

about how Defendants planned to meet Bancor's IL protection obligations.   Richardson

46

misrepresented how Bancor was handling those obligations, stating that impermanent loss was "offset" by fees. Hindman also implied, falsely, that Protocol fees were sufficient to "cover IL."

SJ Williams @sjw1199 · Nov 19, 2021

Replying to

How is it that the protocol doesn't suffer IL on a grand scale? Nobody insures the protocol.

Mark Richardson

@MBRichardson87

Replying to

It does - but the vortex fee offsets it. This is the insurance premium paid by all LPs, equal to 15% of all revenue.

5:21 PM · Nov 19, 2021

Nate Hindman

@NateHindman

The equilibrium is that the protocol earns fees from its own pools and uses those fees to cover IL. It's not like the protocol is just paying gov tokens out of pocket.

it Works

150. On February 22, 2022, Hindman again claimed that "IL protection has been working quite well for over a year now" and that "[p]rotocol fees [are] regularly outpacing IL compensation." These statements were also misleading. In fact, Protocol fees had not covered LPs' impermanent loss throughout most of 2021—as the Topaze Blue Reports demonstrated.

David Seto Esq @dtseto · Feb 22, 2022

Don't think there is a way to fix IL problem in AMM. IL is how the price equilibrates to market price. One external solution is Bancor where you get reimbursed for your IL in BNT native tokens but not sure how stable that is.

Nate Hindman

@NateHindman

Bancor's IL protection has been working quite well for over a year now - 1000s of LPs earning IL-protected yield and $200m+ in LP earnings last year. Protocol fees regularly outpacing IL compensation.

Pools have been capped until now, but those caps are coming off in

8:49 PM · Feb 22, 2022



151.   Defendants' misrepresentations were material because they went to the heart of the LP Program.   On the day Defendants launched the LP Program, May 11, 2022, Defendants advertised on Twitter that the LP Program provided safe and sustainable "yields" "100% protected from Impermanent Loss."   But LPs' investments were not "100% protected" from impermanent loss.   Instead, Defendants' ability to pay this loss protection rested on a precarious and continued acquisition of liquidity.   And like many investment schemes using today's investments to pay yesterday's investors, a sudden shock—the BNT death spiral, described below—brought the entire edifice crashing down.

 **Bancor**
@Bancor                                                        ...

1/ Bancor 3 is here!
The Ultimate DeFi Liquidity Solution empowering DAOs and their token holders to drive healthy liquidity and access safer, more sustainable yields that are 100% protected from Impermanent Loss.

See what's new ▉ or dive right in



10:08 AM · May 11, 2022

**249** Retweets   **84** Quotes   **732** Likes   **61** Bookmarks

152.   Plaintiffs and others similarly situated relied on Defendants' misrepresentations and omissions to their detriment.   Had Plaintiffs known that the flagship IL Protection feature of the LP Program was a myth, they would not have invested in the LP Program or would have

demanded more favorable terms from the LP Program for their investment. Instead, and as a consequence of Defendants' misrepresentations, Plaintiffs and others similarly situated lost millions of dollars in crypto assets.

## IX.   DEFENDANTS CONTROL THE BANCOR DAO TO BENEFIT THEMSELVES AND MISLEAD LPS ABOUT THE EXTENT OF THAT CONTROL

153.   In late 2020, the Foundation and Individual Defendants purported to transfer control of the Protocol to Bancor DAO. In theory—and in any functioning DAO—a DAO governance system enables its members to collectively manage their pooled investments for their collective benefit, via majority or supermajority decisions reached according to stipulated voting procedures. And, in theory, that system protects LPs from the risks of mismanagement, disloyalty, and self-dealing by individual directors, officers, managers or any other controlling actor.

154.   In reality, however, the Individual and Entity Defendants dominated and controlled Bancor—and therefore Plaintiffs' investments. They exercised that control to gatekeep proposals presented to and considered by the DAO, to manipulate DAO votes, to unilaterally hire and fire all Bancor employees and contractors and set the (undisclosed) terms of their compensation, to develop and issue the LP Program, and to control the Bancor Treasury, all to their own benefit.

155.   Multiple public-facing statements confirm the reality that Bancor is controlled by the Entity Defendants (which are in turn fronts for the Individual Defendants, as explained below).

156.   Before the June 2022 death spiral, the Foundation consistently publicly identified itself as "Bancor." It uses a public-facing email address: "contact@bancor.network." Its former public website—subsequently taken down—featured prominent "Bancor" logos and referred to the Foundation as the "Bancor Foundation." Together with LocalCoin, the Foundation asserts ownership of intellectual property associated with Bancor and claims "all rights in" the Bancor "Token Liquidity Network"—that is, the Protocol itself. The Foundation purports to "maintain[]

the right to select its markets and jurisdictions to operate and may restrict or deny the use of" the Protocol at its discretion. The Foundation also puts out press releases regarding Bancor's latest investment products and purports to copyright Bancor publications.

157.    LocalCoin publicly describes itself as the "core developer" of the Protocol. LocalCoin employees and contractors have public "@bancor.network" email addresses, including Richardson (mark@bancor.network), Hindman (nate@bancor.network), and Loesch (stefan@bancor.network). Bancor personnel have expressly confirmed to v3 investors that they are employed by LocalCoin, which is in turn "contracted with" the Foundation.

158.    The Individual and Entity Defendants dominate and control Bancor in two principal ways. *First*, they acquired a veto-proof majority stake in vBNT. The Bancor DAO is comprised of the holders of special "voting-tokens," which are issued by the protocol and denominated "vBNT." vBNT-holders can propose and vote on Bancor governance matters. They acquire those rights by depositing their BNT tokens into specific Bancor liquidity pools. In return, Bancor issues vBNT tokens in proportion to the number of BNT tokens deposited. Those vBNT tokens dictate the relative voting power of their holder within the Bancor DAO, much like a shareholder's voting power is often dictated by the shares they own.

159.    Following the Bancor ICO, the Foundation reserved 20% of the approximately 80 million newly issued BNT for itself, 20% for "partners," and 10% for founders (*i.e.*, the Individual Defendants) and other Bancor insiders. The Foundation's huge BNT reserve gives it a decisive voice in the governance of the DAO. At the time of the ICO, BNT ownership was extremely concentrated—the top 100 BNT wallet addresses controlled about 84% of all BNT. The concentration of vBNT is similar, with the top 100 vBNT wallet addresses controlling 85% of all

vBNT. This is not a coincidence. Bancor DAO's governance is centralized and controlled by a small number of users, including the Foundation.

160.    In the run-up to v3, the Foundation used its vBNT stake to get its way in certain DAO votes, including by causing otherwise-rejected proposals to achieve majority or supermajority support in the Bancor DAO voting system. For example, in June 2021, the Foundation exercised 6.2 million vBNT—representing 65.6% of the vote—to ultimately reverse the community's rejection of a proposed extension of the liquidity mining rewards program. As a result, the Foundation earned an additional 5.38 million BNT over the course of the program.

161.    Likewise, the Foundation repeatedly exercised disproportionate voting power to increase the number of crypto assets available for exchange on Bancor, overriding the result that would have obtained if the Bancor DAO functioned without the Foundation's thumb on the scale. For example, in series of votes from June 3 through August 5, 2021, to "whitelist" certain crypto assets on the Protocol, the Foundation's vote was sufficient to change the result (by reaching a quorum or the required supermajority) in at least 18 instances. They did so while learning that the Protocol could not cover IL Protection with fees earned from trades in an apparent attempt to plug the Protocol's known (only to them) deficits.

162.    By increasing the number of crypto assets that could be exchanged on Bancor, and by authorizing inflationary rewards programs, Defendants increased trading activity and fees and, therefore, their own revenue, at the expense of the Protocol's longer-term solvency. In extending the mining rewards program, for example, the Foundation hastened the inflation of BNT that ultimately led to the BNT death spiral.

163.    Related, the Individual and Entity Defendants—and their agents, including but not limited to Albert, Richardson, and Hindman—controlled and manipulated the purportedly "open"

community discussions that took place on the Governance Forum and other dedicated Bancor communications channels.  Following the June 2022 death spiral, content related to LocalCoin, the Foundation, the Bancor Treasury, and the Entity Defendants' ownership Bancor-related intellectual property disappeared from the Governance Forum and from Banor Discord and Telegram channels.  At least one user who raised those issues was subsequently "banned" from the ~9,000 user Bancor Telegram channel.  Likewise, the Governance Forum account of a participant named "Ordinator" was suspended for the purported "reason" that there was "[n]o constructive purpose to their actions other than creating dissent within the community."  Some— but not all—of Ordinator's Governance Forum posts remained publicly available; others were deleted.

164.    *Second*, in addition to manipulating and controlling the Bancor DAO from within, Defendants subverted it entirely from without.  Defendants exercise direct control over Bancor. Unusually for a purported DAO, the Bancor Treasury is controlled not by the DAO but by the Foundation.  The Foundation is thus able to control Bancor operations through its undisclosed funding decisions, and to nullify purported DAO decisions simply by not funding them.  The Foundation also exercises emergency powers unauthorized by, and unknown to, Bancor LPs.

165.    For example, the Foundation and Individual Defendants misled LPs about the extent of their direct control over the Protocol.  On March 29, 2022—and with knowledge of the Protocol's inability to pay IL Protection—the Foundation and the Individual Defendants proposed and supported a DAO proposal to create an emergency council containing three Foundation members and four Foundation-nominated members (the "Multi-Sig").  This emergency council could take actions including pausing trading on the Protocol, but could not "intervene with the withdrawal of funds, save for the adjustments to the protection mechanism."  The Foundation and

Individual Defendants described this proposal as one of many "closely related proposals submitted for community review and approval, which propose the high-level details of Bancor 3" and hence of the LP Program.  The DAO proposal passed on April 15, 2022.

166.    However, as discussed below, in June 2022 the emergency council not only suspended IL protection, but it also suspended rebalancing reimbursements, intervening with withdrawals to a far greater extent than promised in the DAO proposal and represented to LPs.[13]

167.    The Individual and Entity Defendants use their unilateral control over Bancor funds to hire, fire, and supervise key employees, contractors and advisors, and to set the (undisclosed) terms of their compensation.  That, in turns, enables Defendants to learn highly material information about Bancor's operations and financial performance—for example, the Topaze Blue Reports—and to conceal it from the very investors who purportedly govern Bancor and whose investments are at stake in its success or failure.

168.    A Bancor "admin" admitted that the Foundation uses its money to "promote adoption of the protocol and pay salaries of full-time [Bancor] contributors" but does not disclosure what it pays Bancor employees and contractors (like LocalCoin).  Thus, for example, the Foundation's wallet sends monthly payments to a wallet identified as Richardson's, consistent with Richardson's representations regarding his pay.

169.    The Foundation also unilaterally paid consultants like BlockChainIL. BlockChainIL was founded by the Individual Defendants and describes itself as a crypto lab and

---

[13] Plaintiffs and others similarly situated relied on Defendants' misrepresentations and omissions about the Defendant-controlled council's emergency authority to their detriment.  Had Plaintiffs known that Defendants ultimately had the power to tamper with LP withdrawals beyond suspending IL protection, potentially cutting in half LPs' investments, LPs would not have invested in the LP Program or would have demanded more favorable terms.

actively managed investment fund.  The Foundation has not disclosed how much it paid to BlockchainIL, nor for what services.

170.    Similarly, the Foundation is responsible for engaging and funding LocalCoin, the "core developer for the Bancor Protocol," owned and operated by the Individual Defendants. Despite its subpar job performance—including two successful and costly hacks of Bancor—LocalCoin has remained Bancor's "core developer" throughout its tenure.  Defendants refuse to disclose any information about the compensation paid to LocalCoin.  Likewise, the Individual Defendants assigned their U.S. patents for the Protocol jointly to LocalCoin and the Foundation on undisclosed terms.

171.    As this self-dealing suggests, the Foundation and LocalCoin are nothing more than alter egos for the Individual Defendants, entities intended to secretly allow the Individual Defendants to siphon as much as possible from the Protocol.

172.    According to Mark Richardson, the Foundation "doesn't really have a personality" and is "basically a legal contract that dictates exactly what ICO funds can and can[']t be used for." The Foundation has no shareholders or beneficiaries.  In a conversation on August 7, 2022, Defendant Levi described the Foundation as "of course . . . unaccountable."

173.    The Individual Defendants have also identified themselves as part of "Bancor" rather than as affiliated with either Entity Defendant for most of Bancor's history.  In a 2017 Foundation blog post, the Individual Defendants were identified as members of the "Bancor team," including Defendant Galia Ben-Artzi as "Business Development" and Defendant Levi as Chief Technology Officer.

174.    These representations continued over time.  In a November 2021 podcast, Galia Ben-Artzi consistently uses the pronoun "we" to describe Bancor, and repeats the same

promotional material as Bancor's Twitter feed (that the Protocol "co-invests $BNT alongside LPs"): "[T]he reason we can do single-sided token exposure . . . is because of the BNT token itself. . . [Y]ou can think of the Bancor Protocol as providing the other side of that two-sided token liquidity instead of the user."

175.   Likewise, Defendant Guy Ben-Artzi identified himself with Bancor, rather than the Foundation or LocalCoin, in a May 2021 promotional blurb: "Anchorage Digital has proven itself as a smart infrastructure provider with its eye on the future, which we at Bancor firmly believe is DeFi. With Anchorage's custody support, more institutions can securely access BNT."

176.   The Individual and Entity Defendants have effective day-to-day control over Bancor and actual power to influence Bancor's activities, including the development and implementation of the LP Program.

177.   And though the non-DAO have attempted to create an appearance of separation from Bancor and from Bancor DAO since the death spiral, this is known to LPs as a sham.  In an August 19, 2022 post on Bancor's blog, the "Foundation" asserted that it did not "operate or lead" the Protocol and that "[i]t is not [the Foundation's] role to restore funds in the event of a smart contract exploit or vulnerability in the [P]rotocol."  At the same time, however, the Foundation admitted that it "provides on average $10M a year in grants and expenditures to support development on the Bancor protocol, including open-source code, research, audits, bug bounties, analytics, education and legal."

178.   LPs recognized the Foundation's heads-I-win-tails-you-lose position for what it is. One user with the handle "Luminous" observed in a conversation with Mark Richardson that "We see the constant handwaving as a 'separate entity,' yet [the Foundation] raised funds, gives grants, has employees in both orgs [Bancor and LocalCoin], farmed from the onset, sold rewards, and it

pushed through a vote to reenable rewards after the DAO voted to stop them.  This paper argument of being separate is no[t] based in reality as they comingle when convenient and feign separation when support is needed."

## X.    BANCOR ENTERS A "DEATH SPIRAL" AND DEFENDANTS UNILATERALLY "SUSPEND" IL PROTECTION AND COVERTLY CEASE REBALANCING PAYMENTS TO LPS

179.    On May 16, 2022, days after the launch of the LP Program, Barber claimed that Bancor's "very sound treasury" and "ample protocol owned liquidity" would prevent "anything catastrophic happening due to market price action."  Hindman further assured liquidity providers, "the overall value of your deposit is fully protected" because "part of your deposit can be received in an equivalent value of BNT."  On May 19, 2022, Richardson affirmed that a "death spiral is literally impossible" in a videotaped interview.  But a death spiral was already underway.

180.    On June 10, 2022, the price of the BNT token plummeted from $1.30 to $1.22 in a single day and continued to fall in the following days.  By June 17, 2022, the price of BNT was $0.55.  At the same time, the dollar value of attempted withdrawals began to increase.

181.    The LP community began expressing concern about a potential death spiral risk to the BNT token (and the value of users' LP deposits).  A death spiral would be caused by increased withdrawals, resulting in higher and higher BNT pay-outs to cover the value of rebalancing reimbursements and the IL protection guarantee.  As LPs left the protocol, they would sell BNT to repurchase their originally deposited tokens, which then would create additional sell pressure in the BNT market, driving BNT's price down further.  This, in turn, would require even higher BNT pay-outs to cover deficits, creating an ever-accelerating downward spiral on BNT price.  As the amount of BNT needed to fairly compensate an investor increased, BNT liquidity would dry up, leaving insufficient BNT for LPs to repurchase their originally deposited tokens. This is exactly what happened.

182.     On June 16, Richardson held an emergency Bancor community call on Telegram. In that call, he claimed that the majority of the withdrawals were from the now-insolvent crypto platform Celsius; that the Bancor team had been conferring with Celsius; that Celsius had already completed the majority of their withdrawals and sales of BNT tokens; and that the Bancor community was "through the worst of it." Richardson and the Bancor team also assured everyone that things would stabilize soon and advised LPs not to panic.

**A.     Defendants suspend impermanent loss protection**

183.     On June 19, three days after Richardson told everyone that things would be fine, the Defendants announced that "impermanent loss protection is temporarily paused" due to hostile market conditions.[14]



**Bancor** 🌿  ...
@Bancor

Due to hostile market conditions, Bancor's Impermanent Loss Protection is temporarily paused. IL protection will be reactivated on the protocol as the market stabilizes.

More info:

We're hosting a community AMA in 15 minutes:

184.     In response, LP withdrawals from Bancor liquidity pools continued to increase, and the price of BNT continued to plunge, as shown in the graph below.

---

[14] The suspension applied to v2.1 in addition to v3.  Further, v2.1 investors who had not yet migrated to v3 were required to do so in order to withdraw their investments from the Protocol at all, incurring additional fees.



185.    In a call moderated by Albert and led by Richardson, Defendants through their representatives claimed that the suspension of IL protection was due to an "attack." Richardson claimed that the pending withdrawals (made up of Celsius and hundreds of individual LPs trying to get out with their funds intact) constituted a "hostile antagonist against the Bancor protocol," and that these actors were trying to destroy the Protocol through a combination of mass withdrawal and shorting the price of the BNT token. Bancor's blog likewise blamed "hostile market conditions."

186.    Richardson also blamed the v2.1 rewards programs, which he said had "served a successful marketing purpose," but were "inflationary" and not responsible." He added: "[i]t's a shame that the liquidity mining sins of Version 2.1 had to catch up with us [so] soon."

187.    Richardson revealed that Defendants had used "emergency" powers to suspend "IL Protection" in response to the purported "attack" on the Protocol. Richardson repeatedly

emphasized that the suspension was only temporary. Defendants made similar assurances on Bancor's blog.

188. In response to a listener question about the prospect of a bailout from the Foundation, Richardson responded that he had "discussed [a bailout] with the Foundation" but had no "insight or influence over that." Defendants subsequently took the express position that the Foundation had no obligations to LPs whatsoever, including in public posts in the Governance Forum and other Bancor communication channels.

189. Neither Richardson nor the blog nor any Defendant mentioned the Topaze Blue Reports, which had repeatedly shown that the Protocol did not generate enough fees to cover IL Protection. Instead, Richardson stated that he "d[idn't] think there is anything broken with the impermanent loss protection design."

**B.     Defendants stop paying the rebalancing reimbursements**

190. In addition to suspending IL protection, Defendants stopped Bancor from reimbursing LPs for rebalancing losses. Thus, contrary to Defendants' representations, Defendants were not only withholding BNT owed under the IL Protection program, but also BNT owed to LPs from the rebalancing of their tokens—a considerably larger amount.

191. On June 19, Defendants suspended the minting of BNT upon withdrawal, period. To return to an earlier example, when an LP invests 500 TKN and the value of TKN increases 20%, the TKN:BNT liquidity pool "rebalances" by selling off 46 TKN in exchange for 47 BNT. This 47 BNT belongs to the LP, but it is only "minted" by the Protocol upon withdrawal. Per Bancor's formula, the impermanent loss associated with this example amounts to just 4 BNT.

192. When Defendants purported to "suspend" "IL Protection," they suspended not only payment of the 4 BNT, but also payment of the 47 BNT. They did this without explanation and without notice to LPs.

193.    When pressed, Defendants later admitted as much.  In private Telegram messages between Richardson and Plaintiff Michael Basic on June 20, 2022, Richardson admitted that "to adjust the IL protection, the BNT minter is essentially denied any minting ability."  "But that's more than just not paying out IL," Mr. Basic responds.  "It's not paying out the rebalancing of the pool."

194.    Richardson responds: "Yeah – I need to adjust it, but needs another smart contract." Mr. Basic observed that "people are getting hosed way more than just IL protection," and Richardson again agreed ("Yeah, I am aware.  I need to set something up.").

195.    The following day, Mr. Basic again confirmed his understanding using the 500 TKN:500 BNT example.  Richardson agreed that the Protocol was not paying out the rebalancing reimbursements by saying "Yeah, you are correct.  The way we stopped the meltdown is to essentially switch off the BNT minter. Therefore, it is not just turning off [IL Protection]. It is more severe than that."  Richardson "would have preferred to say that BNT distribution is being stopped – as that is actually what we did."

196.    Other LPs were also shocked to learn that nearly half the value of their investment had been destroyed by Defendants' supposed suspension of IL protection.  An LP "TJ" exclaimed in the official Discord channel: "I thought that when I withdrew my Link that I'd only lose out on 20 or so Link.  Not 2700!!!!!!  That's pure theft!!!!!"

197.    After the June 19 death spiral, Defendants attempted to claim their definition of "impermanent loss" *included* the rebalancing losses that LPs suffered.  As they tried to explain, "the process by which BNT is distributed to cover deficits has been referred to as Bancor's 'Impermanent Loss Protection mechanism'. But in reality, IL is a bit of a misnomer and IL may not be the best term for it since the BNT distribution mechanism covers more than that."

198.    But this, too, was inaccurate.  Both a website devoted to Bancor's promotion of IL Protection and the Protocol's development notes include the standard definition of impermanent loss: the value of tokens in a liquidity pool as compared to the value of simply holding the tokens. Defendants' attempt to cover their tracks can only be explained if they knew they had misrepresented the treatment of rebalancing losses.

## XI.    INVESTMENTS IN THE LP PROGRAM ARE SECURITIES

199.    The Securities and Exchange Acts set a regime of full and fair disclosure.  Those who offer and sell securities to the investing public must provide sufficient, accurate information to allow investors to make informed decisions before they invest.

200.    The definition of a "security" under the Securities Act includes a wide range of investment vehicles, including "investment contracts."  Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others.  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946).  Courts have found that novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, and enterprises that exist only on the internet, including crypto assets.

201.    At all times during the class period, an investment in the LP Program constituted an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.  An investment in the LP Program is therefore a security whose offers and sales were subject to the registration requirements of the federal securities laws.

202.    *First*, Defendants' offer and sale of the LP Program involves an investment of money.  Under the SEC's 2019 "Framework for Investment Contract Analysis of Digital Assets," an investment of "money" may, but need not, take the form of currency issued by a government. Here, under the LP Program, investors transferred their own crypto assets to the Protocol in return

for the fees paid by trades in those assets.  The Protocol aggregates the crypto assets provided by LPs and issues them pool tokens as a functional receipt in return.  LPs thus lose possession and control over their crypto assets when they invest them in the LP Program.

203.    LPs put their crypto assets at risk as part of the LP Program.  Defendants have control over all the crypto assets invested in the LP Program and, through their control of the Protocol, exercise significant choice in how and when to make these assets available for trading, among other things.  Investors' assets are also at risk of losing money as a result of decisions entirely in the hands of Defendants, like the emergency suspension of IL Protection and the shutdown of BNT minting.

204.    LPs also have liquidity and market risk.  Defendants' reserves are not sufficient to meet all LP requests to withdraw, and the Protocol is designed to reduce the value of investors' investments if there is a "run" on the Protocol.  As in fact happened, the Protocol was unable to timely honor withdrawal requests, and Plaintiffs and similarly situated investors suffered losses while waiting for their withdrawals.

205.    *Second*, LPs and Defendants participated in a common enterprise.  LPs' crypto assets are pooled for Defendants' purposes.  Defendants do not separately segregate or separately manage an individual investor's crypto assets as part of the LP Program.

206.    The fortunes of investors and Defendants are generally tied together: increased liquidity on the platform leads to a more attractive trading environment, through which Defendants reap fees and other financial rewards and LPs' returns increase.  The value of LPs' BNT tokens is also interwoven with and dependent upon the success of the Protocol, as well as the efforts of those who control the Protocol.  A robust and well-functioning Protocol increases the value of the BNT

token, including because investing BNT itself in the Protocol allows an LP to vote to authorize distributions related to the Protocol's income and profits.

207.    *Third*, LPs reasonably expected to profit from Defendants' efforts. From Bancor's inception, Defendants marketed the exchange as an investment opportunity, allowing investors to earn "passive income." They marked v3 as the investment product that fully achieved that goal, allowing investors to "earn more while doing less," at in-person conferences, online "round tables" and "fireside chats," on the Governance Forum and Bancor website, and via their robust array of Bancor social media channels, community discussion fora, and U.S. personnel and promoters. They emphasized v3's guaranteed "immediate" "100% IL Protection" and its purportedly sustainable yields. Bancor employees advised LPs that the Protocol would provide the most "competitive returns anywhere in DeFi without asking users to take on any risk," enabling individual LPs to adopt a "stake and chill" investment strategy, irrespective of their level of sophistication.

208.    Defendants' efforts are also necessary to the success or failure of the LP Program. Defendants touted the LP Program as uniquely up to the challenge of insuring impermanent loss, offering investors the "the simplest, safest, and smartest solution to earn passive income in any market condition." Defendants marketed the LP Program as "The Ultimate DeFi Liquidity Solution" with features such as an "Omnipool architecture which dramatically simplifies the protocol's contracts and increases efficiency at every touchpoint." Defendants' efforts were responsible for all of these features. Defendants chose Hindman, Richardson, and other apparent Bancor employees and contractors. Defendants engaged LocalCoin, Bancor's "core developer," and Defendants engaged Topaze Blue to analyze the ongoing performance of the Protocol.

209.    Defendants also advertised their technical ability and expertise in automated market making in attempting to sell LPs on the LP Program: "Bancor has been driving innovations since inventing the first on-chain Automated Market Maker (AMM) in 2017." Defendants' technical expertise extended to determining how many tokens to place in liquidity pools, determining the fees charged to traders, determining what crypto assets are eligible to be traded on the platform, determining and distributing investor returns, and providing a user-friendly investor interface.

210.    LPs are also reasonably led to expect that Defendants have a strong financial incentive to engage in efforts to make the LP Program successful. For example, Defendants tweeted that "[t]he protocol co-invests $BNT alongside LPs" and Defendants argued (in a paper posted on Bancor's website) "that [protocol owners] also must have some skin in the game and provide economic benefit for the other participants." Defendants' statements and actions, and the economic reality of the LP Program, lead reasonable investors to expect Defendants to undertake significant and essential technical, analytical, and managerial efforts.

## XII.    CLASS ALLEGATIONS

211.    Plaintiffs propose to move to certify the following class: All U.S. residents or domiciliaries who participated as liquidity providers on Bancor v3 on or after May 11, 2022. The proposed class includes investors who withdrew from v3 in whole or in part and those who are still invested in v3.

212.    Plaintiffs also propose to move to certify a Texas subclass: All Texas residents or domiciliaries who participated as liquidity providers on Bancor v3 on or after May 11, 2022.

213.    Excluded from the class and the subclass are Defendants, their agents and representatives; corporate officers, board members, senior executives and managing partners, members of their immediate families, their legal representatives, heirs, successors or assigns; and any entities in which Defendants have or had a controlling interest.

214.    The proposed class and subclass meet Federal Rule of Civil Procedure 23's requirements for numerosity, commonality, typicality, adequacy, predominance, and superiority.

### 1.    Numerosity

215.    The class and subclass are so large that joinder of all parties would be impracticable.

216.    LPs provided approximately $300 million in liquidity under the LP Program in May 2022. On information and belief, thousands of liquidity providers under the LP Program are U.S. residents or domiciliaries, including thousands of Texas residents or domiciliaries. The class therefore satisfies the numerosity requirement.

### 2.    Typicality

217.    The Plaintiffs each invested in the LP Program in exchange for promised returns and protections, even though Defendants did not register the LP Program as a security, did not register as an exchange, and misled Plaintiffs about the returns and protections they promised. The claims of the named Plaintiffs are typical of the claims of all the unnamed class members.

### 3.    Adequacy

218.    The named Plaintiffs' claims are identical to the claims of other class members, and there are no known conflicts of interest with any other class member.

219.    The named Plaintiffs will adequately protect the interests of absent class members. They have retained competent counsel experienced in class action and securities litigation.

### 4.    Prominence and Superiority

220.    The questions of fact and law common to the class predominate in this action over any questions affecting only individual members of the class.

221.    There are questions of law and fact common to members of the class, including, without limitation: whether the LP Program is a security; whether Defendants' offerings, sales, and solicitations of investments in the LP Program violate the registration provisions of the

Securities Act; whether Defendants misrepresented material information in connection with the offer or sale of the LP Program (or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading); and whether Defendants are liable to the class members for rescissory damages.

222.     Members of the class are readily ascertainable and identifiable.  Members of the class may be identified by publicly accessible information and records maintained by Defendants. The public nature of the transactions at issue means it is relatively easy to communicate with investors, the amounts invested in the LP Program are easily ascertainable, and the investors can easily be made whole through addresses associated with those transactions.

## XIII.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION
Unregistered Offer and Sale of Securities in Violation of
Sections 5 and 12(a)(1) of the Securities Act of 1933
(Against All Defendants)

223.     Plaintiffs incorporate all prior paragraphs by reference.

224.     15 U.S.C. § 77l(a)(1) (Section 12(a)(1) of the Securities Act) provides that "any person who . . . offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him."

225.     15 U.S.C. § 77e(a) (Section 5(a) of the Securities Act) states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

226.    15 U.S.C. § 77e(c) (Section 5(c) of the Securities Act) states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title."

227.    Investments in the LP Program ("providing liquidity" to v3) are investment contracts within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), and therefore securities within the meaning of the Securities Act.

228.    During the class period, Defendants sold investments in the LP Program to Plaintiffs and class members.

229.    Defendants sold investments in the LP Program both by transferring to class members title to pool tokens representing, and redeemable for, these investments and by soliciting the purchase of investments in the LP Program by Plaintiffs and the class members with a self-interested financial motive.

230.    Defendants therefore directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

231.    No registration statement for investments in the LP Program has been filed with the SEC or has been in effect with respect to the offering of investments in the LP Program.

232.   As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiffs and members of the class have suffered damages in connection with their respective investments in the LP Program.

233.   As a result of their conduct, Defendants are liable to Plaintiffs and other class members for damages or recission, as well as costs, attorneys' fees, and interest.

**SECOND CAUSE OF ACTION**
Fraud in Connection with the Purchase or Sale of Securities
in Violation of Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 thereunder
(Against All Defendants)

234.   Plaintiffs incorporate all prior paragraphs by reference.

235.   Defendants violated Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

236.   Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of a security, "for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

237.   Defendants used the means and instrumentalities of interstate commerce to deceive LPs that investments in the LP Program protected them from impermanent loss, that the LP Program protected their rebalancing reimbursements, and that the LP Program was under the exclusive control of Bancor DAO. This caused LPs to provide more liquidity to—that is, place more crypto assets into—the LP Program under artificially favorable terms.

238.   In connection with the sale of investments in the LP Program, Defendants disseminated, approved, or endorsed the false statements described above, which Defendants

knew, or should have known but for their recklessness, were materially misleading.  These statements were designed to influence the market for investments in the LP Program, and these statements materially misrepresented the truth about, and omitted material information about, Bancor's business and operations.

239.   Defendants thus misled Plaintiffs and other members of the class to invest in the LP Program by depositing crypto assets on Bancor v3.  Plaintiffs and the other members of the class relied on Defendants' materially false and misleading statements to invest in the LP Program under terms rendered artificially favorable to Plaintiffs by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the class known the truth, they would not have invested in the LP Program, or would have demanded more favorable terms for their deposits.  At the time of Plaintiffs' investments, the true value of an investment in the LP Program was substantially lower than the value reflected by the terms offered and agreed to by Plaintiffs and the other members of the class.

240.   Upon public disclosure of the actual terms of the LP Program, the LP Program failed, injuring Plaintiffs and class members.

241.   As a direct and proximate result of Defendants' conduct, Plaintiffs and other members of the class suffered damages, and Defendants are liable for damages or recission, as well as costs, attorneys' fees, and interest.

<div align="center">

**THIRD CAUSE OF ACTION**
Unregistered Exchange in
Violation of Sections 5 and 29(b) of the Exchange Act of 1934
(Against All Defendants)

</div>

242.   Plaintiffs incorporate all prior paragraphs by reference.

243.   Section 5 of the Exchange Act makes it unlawful "for any broker, dealer or exchange, directly or indirectly, to make use of . . . any means or instrumentality of interstate

commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security . . . unless such exchange (1) is registered as a national securities exchange under Section 78f of this title, or (2) is exempted from such registration." 15 U.S.C. § 78e.

244.    An "exchange" is defined to include "any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood, and includes the market place and the market facilities maintained by such exchange." 15 U.S.C. § 78c(1).

245.    Throughout the class period, Defendants made use of means and instrumentalities of interstate commerce to operate as an unregistered exchange for trading securities, including investments in the LP Program and other crypto assets, within and subject to the jurisdiction of the United States.

246.    At all relevant times, Defendants were neither registered as a securities exchange under Section 78f, nor exempted from such registration requirement.

247.    While operating as an unregistered exchange, Defendants entered into investment contracts with Plaintiffs and other class members whereby Plaintiffs agreed to transfer custody and control of their crypto assets to Bancor v3 to provide "liquidity" for the exchange, and Defendants agreed to pay Plaintiffs a portion of the associated trading fees, to provide them with "100% protection" against "impermanent loss," purportedly funded by trading fees, and—upon withdrawal—to return the crypto assets Plaintiffs deposited or 100% of their then-current market value.

248.    Every LP Program investment contract is in violation of section 5 of the Exchange Act.  Such contracts are null and void under Section 29(b) of the Exchange Act.

249.    As a result, Plaintiffs and other class members are entitled to void their LP Program investment contracts and to recover rescissory damages.

## FOURTH CAUSE OF ACTION
Unregistered Broker and Dealer
in Violation of Sections 15(a)(1) and 29(b) of the Exchange Act of 1934
(Against All Defendants)

250.    Plaintiffs incorporate all prior paragraphs by reference.

251.    In relevant part, section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer … to make use of … any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security … unless such broker or dealer is registered in accordance with subsection (b) of this section." 15 U.S.C. § 78o(a)(1).

252.    A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others."  *Id.* § 78(a)(4)(A).  Additionally, an entity is a broker if it assists issuers with structuring a securities offering, identifies a potential purchaser, or advertises a securities offering.  Defendants operated as a broker during the class period by, among other things, facilitating the sale of investments in the LP Program and other crypto assets—some of which are themselves securities under federal law—on the exchange for compensation, marketing investments in the LP Program and the exchange to users, and working with issuers to list crypto assets on the Bancor exchange.

253.    A "dealer" includes an entity "engaged in the business of buying and selling securities … for such person's own account," insofar as such transactions are part of that person's "regular business."  Defendants operated as a dealer during the class period by acting as a seller of

71

securities on a regular basis, issuing investments in the LP Program (including pool tokens) and other crypto assets (including BNT), facilitating the sale of such investments and the purchase and sale of other crypto assets on the exchange, having regular customers, providing customers with access to services that allow the purchase of such securities, and by maintaining custody over their customers' digital assets. Defendants have also held themselves out as willing to buy or sell securities on a continuous basis.

254.    Throughout the class period, Defendants have made use of the means and instrumentalities of interstate commerce to effect transactions in and to induce and attempt to induce purchases and sales of securities, without being registered in accordance with subsection (b) of section 15 of the Exchange Act.

255.    Each deposit to the LP Program constitutes a contract between Defendants and a Plaintiff or class member. Under these contracts, Plaintiffs and class members paid Defendants fees to withdraw their deposits as well as other fees.

256.    Such contracts are null and void under section 29(b) of the Exchange Act and, as a result, Plaintiffs and the class are entitled to void those contracts and recover recessionary damages with respect to deposits to the LP Program, as well as costs, attorneys' fees, and interest.

257.    As a result of their conduct, Defendants are liable to Plaintiffs and other class members for damages or recission, as well as costs, attorneys' fees, and interest.

## FIFTH CAUSE OF ACTION
Control Person Liability under the Securities Act
Section 15 of the Securities Act of 1933
(Against the Entity Defendants and the Individual Defendants)

258.    Plaintiffs incorporate all prior paragraphs by reference.

259.    The Entity Defendants and the Individual Defendants, by virtue of their office, BNT holdings, or agreements or understandings, during the class period, had the authority to direct the

activities of the Bancor DAO, and to cause the Bancor DAO to engage in the wrongful conduct described above.

260.    The Entity Defendants and the Individual Defendants, separately or together, have the power to direct the management and policies of the Bancor DAO.

261.    The Entity Defendants and the Individual Defendants directed Bancor DAO's sale and solicitation of securities, including investments in the LP Program, in violation of Sections 5 and 12(a)(1) of the Securities Act.

262.    The Entity Defendants and the Individual Defendants directed Bancor DAO's failure to register investments in the LP Program and submit registration statements.

263.    As a result of the Entity Defendants and Individual Defendants' conduct, they are liable to Plaintiffs and other class members for damages or recission, as well as costs, attorneys' fees, and interest.

<div align="center">

**SIXTH CAUSE OF ACTION**
Control Person Liability Under the Exchange Act
Section 20 of the Exchange Act of 1934
(Against the Entity Defendants and the Individual Defendants)

</div>

264.    Plaintiffs incorporate all prior paragraphs by reference.

265.    During the class period, the Entity Defendants and the Individual Defendants acted as controlling persons of the Bancor DAO within the meaning of Section 20(a) of the Exchange Act. By virtue of their BNT holdings, positions, and their power to control public statements about Bancor, the Entity Defendants and the Individual Defendants had the power and ability to control Bancor DAO and its agents.

266.    By reason of such conduct, the Entity Defendants and the Individual Defendants are liable to Plaintiffs and other class members for damages or recission, as well as costs, attorneys' fees, and interest.

## SEVENTH CAUSE OF ACTION
Securities Fraud under Texas State Law
in Violation of Tex. Gov't Code § 4008.52
(Against All Defendants)

267.    Plaintiffs incorporate all prior paragraphs by reference.

268.    This Cause of Action is brought on behalf of class members to whom investments in the LP Program were sold in Texas.

269.    The Texas Securities Act forbids the offer or sale of securities "by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading." Tex. Gov't Code § 4008.052.

270.    When issued, investments in the LP Program were securities within the meaning of the Texas Securities Act.

271.    Defendants offered and sold investments in the LP Program directly to members of the class in Texas, who purchased the security from Defendants.

272.    In connection with the offer or sale of investments in the LP Program, Defendants deceived LPs that investments in the LP Program protected them from impermanent loss, that the LP Program protected their rebalancing reimbursements, and that the LP Program was under the exclusive control of Bancor DAO.

273.    Had Plaintiffs and the other members of the class known the truth, they would not have invested in the LP Program, or would have demanded more favorable terms for their deposits. At the time of Plaintiffs' investments, the true value of an investment in the LP Program was substantially lower than the value reflected by the terms offered and agreed to by Plaintiffs.

274.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered damages, and Defendants are liable for damages or recission, as well as costs and attorneys' fees.

## EIGHTH CAUSE OF ACTION
Aiding and Abetting Liability under Texas State Law
Tex. Gov't Code § 4008.055(c)
(Against the Entity Defendants and the Individual Defendants)

275.    Plaintiffs incorporate all prior paragraphs by reference.

276.    This Cause of Action is brought on behalf of class members to whom investments in the LP Program were sold in Texas.

277.    The Texas Securities Act provides that "[a] person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is" jointly and severally liable with the seller, buyer, or issuer. Tex. Gov't Code § 4008.055(c).

278.    Defendants, including Bancor DAO, violated the Texas Securities Act by offering and selling unregistered securities—investments in the LP Program—and by committing securities fraud under the Texas Securities Act.

279.    The Entity Defendants and the Individual Defendants directed and were aware of these violations.  The Entity Defendants and the Individual Defendants also rendered substantial assistance in committing these violations with the intent to deceive Plaintiffs.

280.    Alternatively, the Entity Defendants and the Individual Defendants acted with reckless disregard for the truth of the representations made by Bancor DAO and others under their influence or control.

281.    As a direct and proximate result of Entity Defendants and the Individual Defendants' conduct, Plaintiffs suffered damages, and these defendants are liable for damages or recission, as well as costs and attorneys' fees.

## NINTH CAUSE OF ACTION
Breach of Contract
(Against All Defendants)

282.    Plaintiffs incorporate all prior paragraphs by reference.

283.    Every Plaintiff and class member entered into a binding agreement (an "LP Program Investment Agreement") when they invested in the LP Program.  The terms of the LP Program Investment Agreement are set forth in BIP15, supplemented by BIP16 (describing the beta release of v3), BIP17 (describing initially available tokens and describing certain fees including swap fees), BIP18 (describing v3's liquidity mining rewards), and BIP21 and BIP22 (describing the DAO "multi-sig" authority).  Among other things, in exchange for investing in the LP Program by depositing crypto assets, Plaintiffs and class members would receive investments protected from impermanent loss and from rebalancing losses.

284.    Every Plaintiff and class member fully performed their obligations under their respective LP Program Investment Agreement(s) by transferring custody and control of their crypto assets to Bancor.

285.    Defendants breached their obligations to Plaintiffs and class members under every LP Program Investment Agreement by failing to deliver *any* "protection" against IL loss and by returning less than 100% of the then-current market value of Plaintiffs' crypto asset investments upon withdrawal.

286.    Plaintiffs and the class suffered damages as a direct result of Defendants' breach.

287.    As a result of Defendants' conduct, they are liable to Plaintiffs and other class members for damages, as well as costs and interest.

## TENTH CAUSE OF ACTION
Breach of Fiduciary Duty
(Against the Entity Defendants and the Individual Defendants)

288.    Plaintiffs incorporate all prior paragraphs by reference.

289.    Bancor DAO is an unincorporated general partnership.

290.    The Individual and Entity Defendants control and manage the day-to-day operations of Bancor DAO and of the Protocol. They are thus managing partners of Bancor DAO.

291.    In contrast to Defendants, Plaintiffs and other members of the class did *not* control the Bancor DAO or the Protocol, did *not* manage their day-to-day operations and affairs, and did not otherwise have access to non-public information about Bancor DAO or the Protocol. As a result, no member of the class is a managing partner of Bancor DAO.

292.    Plaintiffs and other class members reasonably reposed special confidence in the Individual and Entity Defendants and their employees and agents, based on their purported superior expertise, their status as "founders" and "inventors" of the Protocol, their specialized and intimate knowledge of the Protocol, and their unique access to and control over the operations of Bancor, Bancor personnel, the Bancor Treasury and the development and performance of the Protocol.

293.    As a result, the Individual and Entity Defendants owed Plaintiffs and other members of the class the highest fiduciary duties recognized in law, including fiduciary duties of good faith, fair dealing, loyalty, due care, and disclosure.

294.    The Individual and Entity Defendants repeatedly breached their fiduciary duties to Plaintiffs and other class members as alleged herein.

295.    These breaches include, among other thing, intentional omissions and misrepresentations related to the historical performance of v2.1, the existence and contents of the Topaze Blue Reports, class members' eligibility to invest in v3, information related to expenditures from the Bancor Treasury, information related to the role, responsibility and authority of the Individual and Entity Defendants with respect to the Protocol and Bancor DAO, information

related to the causes of the death spiral, and information related to the purported suspension of IL Protection (including its scope and duration).

296.    In addition, following the death spiral, the Individual and Entity Defendants breached their duties to Plaintiffs and class members by suspending BNT minting, by misrepresenting the nature of this suspension and its duration, and by inducing LPs to remain invested by falsely promising future recoveries.

297.    Plaintiffs and the class suffered damages as a direct result of these fiduciary duty breaches, including delayed v3 withdrawal dates and corresponding increased loss amounts.

298.    These acts and omissions by Defendant were willful, fraudulent and motivated by self-interest.

299.    As a result of Defendants' conduct, they are liable to Plaintiffs and other class members for damages, exemplary or punitive damages, as well as costs and interest.

## ELEVENTH CAUSE OF ACTION
### Unjust Enrichment
### (Against All Defendants)

300.    Plaintiffs incorporate all prior paragraphs by reference.

301.    As a result of the misconduct described above, Defendants were enriched at the expense of Plaintiffs and other class members, whom they exposed to violations of the securities laws, misrepresentations, and significant financial losses.

302.    Defendants directly profited from their decision to subject Plaintiffs and the class to these harms, as they were able to collect substantial fees from trading activity that occurred on the Protocol as well as liquidity rewards because of their misconduct.

303.    It is against principles of equity and good conscience for Defendants to keep the profits they gained from their misconduct.

304.    As a result of Defendants' conduct, they are liable to Plaintiffs and other class members for damages or recission, as well as costs, attorneys' fees, and interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.  Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as class counsel;

B.  Awarding Plaintiffs and the members of the class damages or rescissory damages and interest;

C.  Awarding Plaintiffs and the members of the class exemplary or punitive damages;

D.  Awarding Plaintiffs' reasonable costs, including attorneys' fees; and

E.  Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

# JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:   October 24, 2023

Respectfully Submitted,

Margaret B. Hoppin
*(pro hac vice)*
Timothy W. Grinsell
*(pro hac vice)*
HOPPIN GRINSELL LLP
11 Broadway
New York, NY 10004
Telephone:  646-475-9550
margot@hoppingrinsell.com
tim@hoppingrinsell.com

Ian W. Sloss
*(pro hac vice)*
Steven L. Bloch
*(pro hac vice)*
Johnathan P. Seredynski
*(pro hac vice)*
SILVER GOLUB & TEITELL LLP
One Landmark Square, Floor 15
Stamford, Connecticut 06901
Telephone: (203) 325-4491
Facsimile: (203) 325-3769
isloss@sgtlaw.com
sbloch@sgtlaw.com
jseredsynki@sgtlaw.com

Joe Kendall
Texas Bar No. 11260700
KENDALL LAW GROUP, PLLC
3811 Turtle Creek Blvd., Suite 1450
Dallas, TX 75219
Telephone: 214-744-3000
Facsimile: 214-744-3015
jkendall@kendalllawgroup.com

*Attorneys for Plaintiffs*