**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **MISLAV BASIC, NATHAN GRUBER,** | § | |
| **KEVIN BOUDREAU, DANIEL** | § | |
| **SCHWAIBOLD, and KEITH** | § | |
| **ZACHARSKI, on behalf of themselves** | § | **A-23-CV-533-RP** |
| **and all others similarly situated,** | § | |
| **Plaintiffs,** | § | |
| **V.** | § | |
| | § | |
| **BPROTOCOL FOUNDATION,** | § | |
| **LOCALCOIN, LTD., GALIA BEN-** | § | |
| **ARTZI, GUY BEN-ARTZI, EYAL** | § | |
| **HERTZOG, YEHUDA LEVI, and** | § | |
| **BANCOR DAO,** | § | |
| **Defendants.** | § | |

**REPORT AND RECOMMENDATION OF**
**THE UNITED STATES MAGISTRATE JUDGE**

TO THE HONORABLE ROBERT PITMAN
UNITED STATES DISTRICT JUDGE:

Before the court are Defendants BProtocol Foundation, LocalCoin, Ltd., Galia Benartzi, Guy Ben-Artzi, Eyal Hertzog, and Yehuda Levi's Motion to Dismiss Plaintiffs' First Amended Class Action Complaint (Dkt. 54) and all related briefing.[1] After reviewing the pleadings, the relevant case law, and the parties' oral arguments, the undersigned submits the following Report and Recommendation to the District Court.

I.    **BACKGROUND**[2]

Generally, Plaintiffs allege they lost money in an online crypto asset exchange run by Defendants, who promised their exchange was an investment that was free from certain risks.

---

[1] The motion was referred by United States District Judge Robert Pitman to the undersigned for a Report and Recommendation as to the merits pursuant to 28 U.S.C. § 636(b), Rule 72 of the Federal Rules of Civil Procedure, and Rule 1 of Appendix C of the Local Rules of the United States District Court for the Western District of Texas. Text Order dated May 9, 2024.

[2] The following facts are taken from Plaintiffs' First Amended Complaint (Dkt. 37).

The Individual Defendants—Galia Ben-Artzu, Guy Ben-Artzi,[3] Eyal Hertzog, and Yehuda Levi—co-founded Defendant LocalCoin (in 2016) and Defendant BProtocal Foundation (the "Foundation") (in 2017) to develop and launch the Bancor Protocol (the "Protocol"), an automated online platform for trading crypto assets. FAC ¶ 2. The Protocol aggregates crypto assets deposited by investors to create a functioning crypto asset exchange. FAC ¶ 2. In return, the Protocol offers investors a portion of the fees charged to traders using the exchange. FAC ¶ 2. The Complaint uses the term "Bancor" to refer collectively to the Protocol, Bancor DAO, the Individual Defendants, LocalCoin, the Foundation, and their agents. FAC ¶ 3.

To facilitate trades in crypto assets—and to be competitive among online crypto exchanges—Bancor must maintain sufficient liquidity in these assets. FAC ¶ 4. To attract such investments, Defendants offered a series of investment products described as "versions" of Bancor. Bancor Version 1 ("v1") launched in 2017, followed by Version 2 ("v2") in April 2020, Version 2.1 ("v2.1") in October 2020, and Version 3 ("v3")—at issue in this action—on May 11, 2022. FAC ¶ 5. In v2 and v2.1, Defendants first introduced so-called "impermanent loss protection" ("IL Protection"), which they described as insurance against a certain type of loss endemic to crypto asset exchanges, specifically losses incurred by investing crypto assets in an exchange rather than simply holding them. Defendants touted IL Protection to investors as a flagship feature of Bancor, and it successfully attracted investors to the Protocol. FAC ¶ 6. v2.1 gradually insured an investment against impermanent loss over time. FAC ¶ 11. However, v2.1 also generated serious deficits because the fees generated by the Protocol were insufficient to cover their obligations to investors. FAC ¶ 7. If a sufficiently large number of investors withdrew their investments at the same time, the Protocol would crumble, much like a run on the bank. FAC ¶ 7.

---

[3] Defendants Galia and Guy Ben-Artzu are siblings. FAC ¶¶ 23-24.

After nearly a year long marketing campaign, v3 was launched on May 11, 2022. FAC ¶ 9. v3 was presented as a safe and user-friendly investment product that improved upon prior versions and overcame their limitations by, among other things, removing the IL Protection waiting periods and "caps" on investment. FAC ¶ 10.

Inevitably, on June 19, 2022, Bancor's luck ran out: a spike in withdrawals triggered significant payment obligations to investors. FAC ¶ 13. Instead of making those payments, Defendants unilaterally purported to "suspend" IL Protection, which meant that withdrawing investors incurred 100% of the very losses that v3 had promised to "100% protect" against. FAC ¶ 10. Defendants also imposed additional severe haircuts on withdrawing investors, initially without disclosing them. FAC ¶ 10. Investors lost millions of dollars. FAC ¶ 10.

Plaintiffs assert nine causes of action against all Defendants: unregistered offer and sale of securities in violation of Sections 5 and 12(a)(1) of the Securities Act (Count I); fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder (Count II); rescission under Sections 5 and 29(b) of the Exchange Act (Count III); rescission under Sections 15(a)(1) and 29(b) of the Exchange Act (Count IV); and five related state law claims.[4] Plaintiffs also asserts control-person claims[5] under the Securities Act (Count V) and the Exchange Act (Count VI).

The Foundation is private corporation formed under Swiss law, with offices in Switzerland. FAC ¶ 20. LocalCoin, Ltd. is a private corporation formed under Israeli law and

---

[4] Plaintiffs' state law claims include securities fraud under Texas state law (Counts VII and VIII)—brought on behalf of class members in Texas—as well as breach of contract (Count IX), breach of fiduciary duty (Count X), and unjust enrichment (Count XI).

[5] The purpose of control-person liability is to "prevent people and entities from using straw parties, subsidiaries, or other agents acting on their behalf to accomplish ends that would be forbidden directly by the securities laws." *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 651 (S.D. Tex. 2021) (citing *Laperriere v. Vesta Insurance Group, Inc.*, 526 F.3d 715, 721 (11th Cir. 2008)).

headquartered in Israel. FAC ¶ 21. Defendant Bancor DAO[6] is an unincorporated general partnership that is not registered in any jurisdiction and has no physical office, location, mailing address, directors, or appointed agents. FAC ¶ 22. Each of the Individual Defendants reside in Israel. FAC ¶¶ 23-26. Plaintiffs allege Defendant Galia Ben-Artzi is a co-founder of Bancor, the Foundation, and LocalCoin, and an owner of LocalCoin. FAC ¶ 23. They allege she directs and controls the activities of LocalCoin and its employees in her capacities as an owner and director of LocalCoin and a Bancor co-founder and controls the activities of the Foundation through her relationship with her brother, Defendant Guy Ben-Artzi. FAC ¶ 23. Plaintiffs allege Guy Ben-Artzi is a co-founder of Bancor, the Foundation, and LocalCoin, and a Director of the Foundation. FAC ¶ 24. They further allege he directs and controls the activities of the Foundation as its founder and director and he directs and controls the activities of LocalCoin and its employees in his capacities as a Director of the Foundation, a Bancor co-founder, and through his relationship with his sister, Defendant Galia Ben-Artzi. FAC ¶ 24. Plaintiffs allege Hertzog is a co-founder of Bancor, the Foundation, and LocalCoin, and a Director of the Foundation. FAC ¶ 25. They also allege he directs and controls the activities of the Foundation as its founder and director and he directs and controls the activities of LocalCoin and its employees as an owner and director of LocalCoin, a Bancor co-founder and as Bancor's "Product Architect." FAC ¶ 25. Plaintiffs allege Levi is a co-founder of Bancor, the Foundation and LocalCoin, previously served as LocalCoin's Chief Technology Officer and currently serves as its Head of Smart

---

[6] Plaintiffs describe DAOs (Decentralized Autonomous Organizations) as "at least in theory—a social coordination technology that deploys blockchain-based smart contracts to facilitate collective action by unrelated parties without a centralized coordinating authority." FAC ¶ 47. They are "often presented as highly democratic and transparent governance structures that offer a fundamentally decentralized approach to governance in which control is spread among its members. Governance rights are distributed in the form of a specific type of token. Holders of that token can vote on proposals, which are implemented if the requisite number of tokenholders vote in favor. All major decisions are made this way . . . ." FAC ¶ 48. "However, the actual governance authority in many DAOs is highly concentrated and the original founders, developers, and promoters of the underlying protocol retain significant control over its management, design, and promotion." FAC ¶ 50.

Contracts. FAC ¶ 26. Plaintiffs assert he directs and controls the activities of LocalCoin and its employees in his capacity as a Bancor co-founder and senior team member. FAC ¶ 26. He is a member of Bancor DAO and serves as an "Administrator" on the Governance Forum. FAC ¶ 26.

Bancor DAO has not responded to the Amended Complaint. The Individual Defendants and the Entity Defendants (the Foundation and LocalCoin) have moved to dismiss the Amended Complaint for the lack of personal jurisdiction and on the basis of *forum non conveniens*. Dkt. 54. They also argue the federal claims should be dismissed because the U.S. securities laws do not apply to their extraterritorial conduct and Plaintiffs have failed to state a viable federal claim for relief. Finally, they argue the state claims should be dismissed for lack of supplemental jurisdiction.

## II.  PERSONAL JURISDICTION

Defendants argue Plaintiffs' allegations fail to provide a basis for asserting jurisdiction over the Individual Defendants or the Entity Defendants.

When the court rules on personal jurisdiction without conducting an evidentiary hearing, the plaintiff bears the burden of establishing only a *prima facie* case of personal jurisdiction.[7] *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96 at *3 (5th Cir. Feb. 5, 2018); *Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 488 (5th Cir. Feb. 5, 2018); *Cent. Freight Lines Inc. v. APA Transport Corp.*, 322 F.3d 376, 380 (5th Cir. 2003). "The district court is not obligated to consult only the assertions in the plaintiff's complaint in determining whether a *prima facie* case for jurisdiction has been made. Rather, the district court may consider the contents of the record at the time of the motion . . . ." *Sangha*, 882 F.3d 96 at *3. The court shall accept as true the non-conclusory uncontroverted allegations of the party seeking to assert

---

[7] Although this court heard the parties' oral arguments on Defendants' motion, it did not conduct an evidentiary hearing.

jurisdiction and resolve all factual conflicts in favor of the party seeking to invoke the court's jurisdiction. *Cent. Freight Lines Inc.*, 322 F.3d at 380. "Although jurisdictional allegations must be accepted as true, such acceptance does not automatically mean that a *prima facie* case for [personal] jurisdiction has been presented." *Sangha*, 882 F.3d 96 at *3.

When a federal court attempts to "exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States." *Cambria Cnty. Employees' Ret. Sys. v. Venator Materials PLC*, 532 F. Supp. 3d 440, 446 (S.D. Tex. 2021) (citing *Busch v Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir 1994)). This means that the relevant forum is the United States as a whole—not any particular state. *Id*. "Even though a defendant's contacts with the entire United States in such cases are determinative of the 'minimum contacts' inquiry, because the language of the Fifth Amendment's due process clause is identical to that of the Fourteenth Amendment's due process clause, the same general principles guide the minimum contacts analysis." *Id*. Federal due process permits the exercise of personal jurisdiction over a non-resident defendant to where the defendant has (1) purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state and (2) the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice. *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336 (5th Cir. 1999).

### A.    Relevant Contacts

The touchstone of the court's inquiry is "whether the defendant's conduct shows that it reasonably anticipates being haled into" the forum. *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009). Specific jurisdiction is a claim-specific inquiry, and it exists when the defendant's

contacts give rise to or are directly related to the cause of action. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984).  "A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Trois*, 882 F.3d at 490 (quoting *Walden v. Fiore*, 134 S. Ct. 1115, 1123 (2014)).  The Fifth Circuit has permitted the exercise of specific personal jurisdiction over an intentional-tort claim where a nonresident defendant places a call to a forum and makes false statements over the phone to a forum resident. *See, e.g., Brown v. Flowers Indus., Inc.*, 688 F.2d 328, 332, 334 (5th Cir. 1982) (holding one defamatory phone call initiated by defendant sufficient to establish personal jurisdiction); *see also Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 314 (5th Cir. 2007) ("When a nonresident defendant commits a tort within the state . . . that tortious conduct amounts to sufficient minimum contacts with the state by the defendant to constitutionally permit courts within that state . . . to exercise personal adjudicative jurisdiction . . . ."); *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999) ("When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes powerful availment."). In *Trois*, the Fifth Circuit held that the minimum contacts test was satisfied where a foreign defendant did not initiate calls to the plaintiff but was a "willing participant" and "the key negotiating party who made representations regarding his business" that gave rise to the fraud claim at issue.  *Trois*, 882 F.3d at 491.

      **B.**     **Analysis**

              1. Who is Bancor?

     The first issue before the court is: to which Defendants should "Bancor's" acts be attributed? Plaintiffs argue the contacts of "Bancor"—which it uses to collectively refer to the

protocol, Bancor DAO, each of the Individual Defendants, LocalCoin, the Foundation, and their agents—should be attributed to each of the Defendants. Plaintiffs argue this generic pleading is acceptable because they adequately allege agency or alter ego relationships that support jurisdiction over Defendants.

LocalCoin is the direct employer of all "Bancor" personnel, including non-parties Richardson and Hindman, who promoted Bancor and v3 at various conferences throughout the United States. FAC ¶ 21. Accordingly, Plaintiffs have sufficiently alleged that the alleged contacts with the forum should be attributed to LocalCoin.

Plaintiffs allege that before the 2022 crash, the Foundation consistently identified itself as "Bancor"—its public email address was contact@bancor.network; its website featured Bancor logos and referred to itself as the "Bancor Foundation"; it published press releases on Bancor's investment products; and it copyrighted Bancor's publications. FAC ¶ 156. It claimed "all rights in" the Bancor "Token Liquidity Network" and purports to "maintain[] the right to select its markets and jurisdictions to operate." FAC ¶ 156. The Foundation controls the Bancor Treasury. FAC ¶ 164. A Bancor "admin" admitted that the Foundation uses its money to "promote adoption of the protocol and pay salaries of full-time [Bancor] contributors." FAC ¶ 168. The Foundation admitted that it "provides on average $10M a year in grants and expenditures to support development on the Bancor protocol, including open-source code, research, audits, bug bounties, analytics, education and legal." FAC ¶ 177. Live interviews at a Palm Beach conference with non-defendants Richardson and Hindman were "made possible by the BProtocol Foundation." FAC ¶ 104, n.2. Additionally, "since the Foundation has retained exclusive control over Bancor's Treasury, it has presumptively funded every 'Bancor' activity alleged [in the Complaint]." FAC n.2. Finally, the Foundation is responsible for engaging and funding

LocalCoin. FAC ¶ 170. Accordingly, the undersigned also finds that Plaintiffs have sufficiently alleged that any alleged contacts with the forum should be attributed to the Foundation.

Next, the court turns to the Individual Defendants. There is no allegation that any Individual Defendant had a direct contact with the United States related to v3. Plaintiffs allege each of the Individual Defendants founded "Bancor" and the Foundation and that some Individual Defendants also founded and control LocalCoin. FAC ¶¶ 23-25. However, Plaintiffs also allege LocalCoin "is owned and operated by Defendants Galia Ben-Artzi, Guy Ben-Artzi, Eyal Hertzog, and several others, including non-party Draper Associates, . . . , and [another] non-party." FAC ¶ 21. Plaintiffs allege Defendants Guy Ben-Artzi and Hertzog have served continuously on the Foundation's corporate board since its formation in 2017. FAC ¶ 20. Plaintiffs also allege the Individual Defendants have identified themselves with Bancor by either using the pronoun "we" to describe Bancor or referring to themselves as the "Bancor team." FAC ¶¶ 173-75. But Plaintiffs' allegation that the Individual Defendants "have effective day-to-day control over Bancor" is conclusory. *See* FAC ¶ 176. Generic and conclusory allegations of control over a company are insufficient as a matter of law to plead specific jurisdiction. *Cambria Cnty. Employees' Ret. Sys. v. Venator Materials PLC*, 532 F. Supp. 3d 440, 451 (S.D. Tex. 2021). Plaintiffs have not sufficiently convinced the court that corporate formalities should be disregarded and the Foundation's and LocalCoin's contacts with the forum should be imputed to the Individual Plaintiffs.

Nor does the Individual Defendants' status as alleged control persons materially change this analysis. An individual's status as a control person of a corporation that has jurisdictional contacts with the United States, standing alone, is insufficient to establish personal jurisdiction. *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 351 (D. Md. 2004). Equating

"the broad understanding of control person liability adopted by the Securities Act" with personal jurisdiction "impermissibly conflates statutory liability with the Constitution's command that the exercise of personal jurisdiction must be fundamentally fair." *Id*. (citing *In re Baan Co. Sec. Litig.,* 245 F. Supp. 2d 117, 129 (D.D.C. 2003); *Tracinda Corp. v. DaimlerChrysler AG,* 197 F. Supp. 2d 86, 99 (D. Del. 2002) (stating "[p]ersonal jurisdiction is an independent threshold consideration to the question of liability")). *But see McNamara v. Bre–X Minerals,* 46 F. Supp. 2d 628, 636 (E.D. Tex. 1999) (establishing control person liability is sufficient to establish personal jurisdiction but finding the individual defendants had sufficient minimum contacts independent of their role as control persons).

Plaintiffs argue neither alter ego nor agency relationships are necessary to impute any contacts to the Individual Defendants because they allege Defendants jointly controlled and directed a scheme that targeted the forum. However, in both cases Plaintiffs rely on for this point—*Commodity Futures Trading Commission v. Cartu*, No. 1:20-CV-908-RP, 2023 WL 5246360 (W.D. Tex. Aug. 15, 2023), and *Federal Trade Commission v. Educare Center Services, Inc.*, 414 F. Supp. 3d 960, 964 (W.D. Tex. 2019)—the deciding courts recited specific alleged acts by the individual defendants directed toward the forum.

In *Cartu*, Cartu partnered in the scheme with forum residents. *Cartu*, 2023 WL 5246360, at *2. Additionally, although Cartu was a Canadian citizen residing in Israel, the scheme "primarily targeted individuals located in the United States or Canada." *Id*. at *1. Cartu used websites, emails, telephone calls, and other communications to entice individuals in the United States to invest in his scheme. *Id*. Cartu approved a request from an employee to send out tablets as incentive rewards for customers in Alabama and California. *Id*. at *2. Cartu directed his employees in an email to "PICK UP THE PHONE AND CALL" a list of high-priority "USA and

Canada customers." *Id*. at *5. Cartu noted that "[w]e operate 24/6 owing to a large amount of our customers being from the United States or Canada," and he offered a discount rate for new U.S. customers—acknowledging that he already had so many U.S. consumers. *Id*. at *5. As alleged in the complaint and described by the court, Cartu had extensive, personal involvement in the running of the scheme and its contacts with the United States. In contrast, Plaintiffs here make no allegation that any Individual Defendant directed Bancor's contacts to the forum and their allegations of control over the Entity Defendants are conclusory.

In *Educare*, the FTC alleged the defendants operated a deceptive telemarketing scheme that would allegedly lower customers' credit card interest rates. *Educare*, 414 F. Supp. 3d at 964. Defendant Souheil was a Canadian citizen and co-owner and president of three entities involved in the scheme. *Id*. The entity defendants partnered with a forum-resident entity defendant to process fees collected from consumers. *Id*. at 966. Souheil allegedly "formulated, directed, controlled, had the authority to control, or participated in" the "deceptive telemarketing to U.S. consumers," "initiating, or causing others to initiate, unsolicited telephone calls," and "unlawful use of RCPOs in connection with telemarketing sales. *Id*. The court found the FTC sufficiently alleged Souheil purposefully availed himself of the forum such that he was subject to suit there. *Id*. 970. Whether or not Souheil initiated any single phone call, he was alleged, at minimum, to have directed many deceptive phone calls be made to U.S. consumers, such that he is "akin to an initiator" of the calls and it is his intentional conduct "that led to this litigation." *Id*. at 971. Moreover, Souheil's alleged contacts were not limited to the communications alone; he allegedly designed and implemented a telemarketing scheme that purposefully targeted the United States. *Id*. He also allegedly operated one of his company's telemarketing activities and received emails and text messages concerning individual consumer inquiries about unauthorized bank charges.

*Id.* Finally, he facilitated the relationship with the scheme's payment processor, which was a forum-defendant. *Id.* Again, the allegations here are in stark contrast to those in *Educare*. Here, Plaintiffs' allegations of control over the entity Defendants are conclusory and not specifically directed to the alleged contacts with the United States.

Accordingly, the undersigned finds Plaintiffs have not sufficiently pleaded specific facts that support attributing Bancor's contacts with the United States to the Individual Defendants. The court will next determine whether Bancor's contacts are sufficient to exercise personal jurisdiction over LocalCoin and the Foundation.

2. Bancor's Contacts with the United States

Plaintiffs' alleged injuries stem from their investments in v3. Accordingly, the court only considers Defendants' contacts with the United States as they relate to v3. v3 was launched on May 11, 2022, after a long marketing campaign. FAC ¶ 77. On December 1, 2021, shortly after v3 was announced, "Bancor" hosted an afterparty at an industry conference in Miami, Florida. FAC ¶ 99. Non-defendant Nate Hindman promoted the event, and non-defendant Mark Richardson presented at the conference.[8] FAC ¶ 99, 101. In February 2022, "Defendants" sponsored a "community pub crawl" in Denver following a week-long industry conference there. FAC ¶ 102. That same month, they also sponsored a DeFi & Fashion event in New York City. FAC ¶ 102. On social media, Bancor promoted that v3 would be unveiled at a May 2022 conference in Palm Beach, during which Bancor expected to onboard new users. FAC ¶ 103. During that conference, non-defendants Richardson and Hindman sat for a 25-minute in-person interview. In June 2022, Plaintiff Gruber spoke to non-defendants Richardson, Hindman, and Joshua Schone at a conference in Austin, after he had already invested in v3. FAC ¶ 105. During

---

[8] They are both LocalCoin employees. FAC ¶ 21.

that conversation, he was encouraged to keep his remaining investments in v3 despite believing he had experienced the losses he thought he was protected against. FAC ¶ 105. This is the only conference any Plaintiff is alleged to have attended, and this is the only contact with any Defendant or Defendant's representative that any Plaintiff is alleged to have had in person. Defendants argue that these contacts are insufficient because "Plaintiffs fail to allege that *their* claims arise out of those contacts." Dkt. 59 at 16.

In contrast to both *Cartu* and *Educare*, no Plaintiff here specifically alleges they were injured by Defendants' contacts with the United States. No Plaintiff alleges they moved their investment from v2.1 to v3 after attending a conference where Bancor spoke or after an event Bancor hosted. There is no allegation any Plaintiff invested in v3 because of Bancor's presence at any U.S. conference.

In *Ford Motor Co. v. Montana Eighth Judicial District Court*, the Supreme Court reiterated that it does not require a "strict causal relationship between the defendant's in-state activity and the litigation." 592 U.S. 351, 362 (2021). The Court's most common formulation of the rule demands that the suit "arise out of *or relate to* the defendant's contacts with the forum." *Id*. In *Ford*, the plaintiffs alleged they were injured in crashes because their Ford vehicles were defective. *Id*. at 356. Although the plaintiffs brought suit in their home states where the crashes occurred, Ford argued the courts lacked specific jurisdiction over it because neither of the vehicles had been designed, manufactured, or originally sold in those states. *Id*. at 356-57. The Court disagreed and held Montana and Minnesota courts had specific jurisdiction over Ford because the plaintiffs' claims *related to* Ford's extensive activities in those states. *Id*. at 361-69.

But unlike Ford, Bancor's presence in the United States is far from systematic. Ford continuously urged forum residents to buy its vehicles—including the two models that had

crashed—through billboards, TV and radio spots, print ads, and direct mail. *Ford*, 592 U.S. at 365. Ford vehicles—again including these two models—were available for sale, new or used, throughout the forum—at 36 dealerships in one forum and 84 in the other. *Id*. Ford worked hard to foster ongoing connections to its cars' owners—forum dealerships maintained and repaired Ford cars and Ford distributed replacement parts to its dealers and independent auto shops in the forums. *Id*. "In other words, Ford had systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States" creating "a strong 'relationship among the defendant, the forum, and the litigation'—the 'essential foundation' of specific jurisdiction." *Id*. (quoting *Helicopteros*, 466 U.S., at 414).

In contrast, Plaintiffs allege Bancor attended four industry conferences in the United States between November 2021 and June 2022 and promoted its presence there on social media. FAC ¶ 97, n.10. Plaintiffs do not allege that they invested in v3 because of statements Bancor made specifically at those conferences. In fact, Plaintiffs only specifically allege Plaintiff Gruber attended the Austin conference where he spoke with non-parties Richardson, Hindman, and Schone after he already had investments in v3. FAC ¶ 105.  There is no allegation that Bancor specifically targeted United States citizens through email, telephone calls, or even mass mailings in the United States. Besides the conferences, all of Bancor's communications described in the First Amended Compliant consist of social media posts, available to nearly the entire world. Attendance at a handful of conferences in a far cry from Ford's systematic contacts with the forums that created a strong relationship among the defendant, the forum, and the litigation. *See Ford*, 592 U.S. at 365.

Alternatively, Plaintiffs argue Bancor's website was sufficiently interactive (one-click acceptance without geoblocking or other safeguards) to establish Defendants' purposeful

availment of the privileges of conducting activities in the United States. But the Fifth Circuit case Plaintiffs cite to support their argument actually rebuts it. "[A] defendant does not have sufficient minimum contacts with a forum state just because its website is accessible there." *Admar Int'l, Inc. v. Eastrock, L.L.C.*, 18 F.4th 783, 787 (5th Cir. 2021). "Website interactivity is important only insofar as it reflects . . . purposeful targeting of residents of the forum state." *Id.* (cleaned up). Here, there is no indication that Bancor's website or other social media accounts were specifically targeted at the United States as opposed to the rest of the world. "The Internet is premised on the lack of territorial limits. Personal jurisdiction works just the opposite." *Id.* at 788.

Accordingly, the court finds Bancor did not purposefully avail itself of the forum such that it could reasonably anticipate being haled into court in the United States. As such, the court lacks personal jurisdiction over all Defendants.

## III. APPLICABILITY OF U.S. SECURITIES LAWS

"It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (internal quotation marks omitted). Therefore, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Id.* In *Morrison*, the Supreme Court invoked the presumption against extraterritoriality to interpret the Exchange Act as applying only to "[1] securities listed on domestic exchanges, and [2] domestic transactions in other securities." *Id.* at 267. The Court reached this conclusion as a matter of statutory interpretation and by considering international comity and the need to avoid "[t]he probability of incompatibility with the applicable laws of other countries." *Id.* at 269. Although *Morrison* involved the Exchange Act, courts have applied

a similar framework to Securities Act claims as well as claims under state Blue Sky laws. *U.S. Sec. & Exch. Comm'n v. Balina*, No. 1:22-CV-00950-DAE, 2024 WL 2332965, at *6 (W.D. Tex. May 22, 2024); *see also Williams v. Binance*, __ F.4th __, 2024 WL 995568 (2nd Cir. Mar. 8, 2024).

Defendants argue investments in v3 are not domestic transactions subject to the Securities Act or the Exchange Act and therefore Plaintiffs' federal claims should be dismissed. In so arguing, Defendants use a standard for domestic transactions adopted by the Second Circuit— where "irrevocable liability is incurred" and whether "title passes within the United States." *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 66–67 (2d Cir. 2012) (citation omitted); *Lykuong Eng v. Akra Agric. Partners, Inc.*, No. 16-cv-00994, 2017 WL 5473481, at *2 (W.D. Tex. Aug. 9, 2017) (Lamberth, J.) (applying the "irrevocable liability" test).

Plaintiffs argue that to the extent the Fifth Circuit has interpreted *Morrison's* "domestic transaction" language, it has done so expansively, without hinging its analysis on where the purchase took place. *See Jiao v. Xu*, 28 F. 4th 591, 597 (5th Cir. 2022). Alternatively, Plaintiffs argue that, even under the Second Circuit standard, the investments are domestic transactions because they are contracts that were entered into in the United States.

*Jiao* is not sufficiently analogous to provide guidance here. In *Jaio*, the Fifth Circuit rejected the defendant's argument that the alleged securities fraud transaction had not occurred in the United States because "the complaint makes clear that the purchase involved a Texas limited liability company's member units, and the exhibits attached to the complaint demonstrate . . . Plaintiffs paid U.S. currency for domestic LLC member units." *Jiao*, 28 F. 4th at 597. With no better guidance from the Fifth Circuit, the court will use the Second Circuit standard, like another court in this district has done. *See Lykuong Eng*, 2017 WL 5473481, at *2.

*Morrison* emphasized that "the focus of the Exchange Act is . . . upon purchases and sales of securities in the United States." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 180 (2d Cir. 2014). *City of Pontiac* examined "whether the mere placement of a buy order in the United States for the purchase of foreign securities on a foreign exchange is sufficient to allege that a purchaser incurred irrevocable liability in the United States, such that the U.S. securities laws govern the purchase of those securities." *Id*. at 181. The Second Circuit held it was not, noting that "a purchaser's citizenship or residency does not affect where a transaction occurs." *Id*. Moreover, the allegation that an American purchaser placed a buy order in the United States that was then executed on a foreign exchange, standing alone, does not establish that that the American purchaser incurred irrevocable liability in the United States. *Id*.

More recently, the Second Circuit decided *Williams v. Binance*, 96 F.4th 129 (2nd Cir. 2024). That case, like this one, involved the purchase of crypto-asset "tokens" by Americans on an international electronic exchange. *Id*. at 133. Applying *Morrison*, the Second Circuit found plaintiffs had plausibly alleged facts that gave rise to an inference of irrevocable liability that occurred in the United States. *Id*. at 137. "First, the transactions at issue were matched, and therefore became irrevocable, on servers located in the United States." *Id*. Specifically, "the complaint plausibly alleges that matching occurred on the infrastructure Binance relies on to operate its exchange" and "much of that infrastructure is located in the United States." *Id*. at 138. "Second, Plaintiffs transacted on Binance from the United States, and pursuant to Binance's Terms of Use, their buy orders became irrevocable when they were sent." *Id*. at 137. The court distinguished *City of Pontiac's* holding that the mere placement of a buy order in the United States for the purchase of foreign securities on a foreign exchange was not, standing alone,

sufficient to allege that a purchaser incurred irrevocable liability in the United States because "Binance's Terms of Use, which remove the trader's ability to unilaterally revoke the trade prior to execution, plus the additional actions Plaintiffs took, including making domestic payments, provide more." *Id.* at 140 (internal quotations omitted). Additionally, the "sovereignty and comity concerns that at least partially motivate the careful policing of the line between foreign and domestic transactions in cases like *City of Pontiac* and *Morrison* are less present in a case like this." *Id.* Notably, "Binance has not registered in any country, purports to have no physical or official location whatsoever, and the authorities in Malta, where [Binance's] nominal headquarters are located, disclaim responsibility for regulating Binance." *Id.* at 139.

Defendants argue that Plaintiffs do not allege any facts showing that irrevocable liability or title passed within the United States. Plaintiffs argue the transactions at issue were executed in the United States, and they seek to differentiate the cases Defendants rely on by arguing those cases addressed trading activity not a "liquidity provision."[9]

Here, Plaintiffs allege they invested in v3 from the United States. FAC ¶ 130. They argue that when they clicked the "accept" button on their computer screens, they entered into investment contracts. Dkt. 56 at 25. But this rationale would turn any online transaction into a domestic transaction. Plaintiffs also allege the transactions relevant to this suit are recorded on the Ethereum blockchain, and the nodes that validate transactions are clustered more densely in the United States that in any other country. Dkt. 54 at 23 (citing FAC ¶ 40). Similar arguments were enough for the *Binance* court to find those transactions were domestic transactions, but the *Binance* court noted it might not always be appropriate to determine whether a transaction was domestic based solely on server location. The *Binance* court also noted the conclusion might be

---

[9] Although this issue is not raised by Defendants, the court struggles to reconcile Plaintiffs' argument here with their arguments that Defendants are liable for the sale or offer for sale of securities.

different if "plaintiffs were seeking to apply United States securities laws based on the happenstance that a transaction was initially processed through servers located in the United States despite all parties to the transaction understanding that they were conducting business on a foreign-registered exchange." *Binance*, 96 F.4th at 139. Such a situation would squarely implicate *Morrison's* comity concerns. *Id.*

Unlike *Binance*, Defendants have not run away from the authority of all jurisdictions. The Individual Defendants are Israeli citizens, LocalCoin is an Israeli corporation, and the Foundation is a Swiss entity. As an alternative to their personal jurisdiction arguments, Defendants asked the court to dismiss this suit under the doctrine of *forum non conveniens* and argued the case should be heard in Israel rather than here. Unlike *Binance*, there is no indication that Israel has disavowed itself of any legal authority over Defendants. Because of that, *Morrison's* comity concerns, which were not an issue in *Binance*, are an issue here. Given the lack of law on this issue, the undersigned is reluctant to create new law when Plaintiffs do in fact have another forum in which they can likely pursue their grievances.

## IV. CONCLUSION

This is not an easy case. Cases of first impression never are. Both the personal jurisdiction and the extraterritoriality issues are close calls,[10] and other courts, on similar facts, could justifiably reach opposite conclusions. These are not easy issues because U.S. law has not yet caught up to online, global crypto asset exchanges. The court agrees with *Risley's* summation of the law surrounding decentralized cryptocurrency exchanges: "the law is currently developing around these exchanges, such that Defendants cannot currently be held liable under a traditional Section 29(b) theory." *Risley v. Universal Navigation Inc.*, 690 F. Supp. 3d 195, 218 (S.D.N.Y. 2023)(dismissing claims brought against creators of online crypto liquidity pool and protocols

---

[10] Because these are close calls, the court submits both analyses to the District Judge.

when harm done to plaintiffs was by others who used the protocols).[11]

While the court has little patience for foreign entities that cause American investors to lose money, that does not give the court authority to extend American law to cover foreign defendants who operate an unregulated, global, decentralized, online crypto asset exchange. That role belongs to the legislature. If American investors want the certain protections of the United States' laws and courts, they should limit their investments to those that are clearly within the scope of those laws.

## V.    RECOMMENDATION

For the reasons given above, the court **RECOMMENDS** that Defendants BProtocol Foundation, LocalCoin, Ltd., Galia Benartzi, Guy Ben-Artzi, Eyal Hertzog, and Yehuda Levi's Motion to Dismiss Plaintiffs' First Amended Class Action Complaint (Dkt. 54) be **GRANTED and the case be dismissed without prejudice.**

## VI.    OBJECTIONS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections. *See Battles v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted

---

[11] The *Risley* defendants were American individuals and entities. Thus, *Risley* did not struggle with the personal jurisdiction and extraterritoriality issues here. However, *Risley* does have some applicability to claims asserted by Plaintiffs and expresses how ill-prepared current U.S. law is to these computer-based, decentralized exchanges.

by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).


SIGNED July 31, 2024,

_____
MARK LANE
UNITED STATES MAGISTRATE JUDGE